# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| PIPELINE PRODUCTIONS, INC., *et al.*, | ) |
| Plaintiffs and Counterclaim Defendants, | ) ) ) |
| v. | ) Case No. 15-4890-KHV |
| THE MADISON COMPANIES, LLC, *et al.*, | ) ) |
| Defendants and Counterclaimants. | ) ) |

## **MEMORANDUM AND ORDER**

This matter comes before the court on Plaintiffs' Application for Attorneys' Fees in Connection with Their Motion for Sanctions (ECF No. 489). Plaintiffs Pipeline Productions, Inc., Backwood Enterprises, LLC, OK Productions, Inc., and Brett Mosiman (collectively "Pipeline") seek $14,595 in attorneys' fees resulting from the briefing on their motion for sanctions (ECF No. 462). Defendants The Madison Companies, LLC and Horsepower Entertainment, LLC (collectively "Madison") argue that counsel's proposed hourly rates are excessive and that the time spent briefing the motion for sanctions is excessive. Madison proposes an award of $2,420 to $2,640. For the reasons stated below, Pipeline's motion is granted. The court orders Madison to pay Pipeline $14,595 within ten business days.

## I.   **RELEVANT BACKGROUND**

The case arises out of the parties' business dealings relating to the Thunder on the Mountain country music festival ("Thunder") in 2015. According to the Complaint, Pipeline is a well-known producer of live music festivals, including Thunder. Madison is a venture capital firm that was looking to invest in Pipeline's music festival business. The parties engaged in business dealings

leading up to the then-planned Thunder festival in 2015. Shortly before the festival was scheduled to occur, those business dealings fell through. This lawsuit centers around whether, when, and the extent to which the parties incurred legally binding obligations to one another before the deal fell through. Pipeline asserts claims for breach of contract, breach of fiduciary duty, fraud, and tortious interference. As relevant to Pipeline's motion for sanctions, Pipeline alleges that, after the Thunder deal fell apart, Madison hired away key Pipeline partners, employees, and agents to drive Pipeline out of business. One of these key individuals was Nathan Prenger.

On May 7, 2019, the court granted in part and denied in part Pipeline's motion for sanctions. *See Pipeline Prods. v. Madison Cos.*, No. 15-4890-KHV, 2019 WL 2011377, at *1 (D. Kan. May 7, 2019). Madison failed to timely produce a draft consulting agreement between Mr. Prenger and Horsepower for work on the Kaaboo Del Mar music festival ("the draft agreement"). The draft agreement was responsive to Pipeline's Requests for Production ("RFP") Nos. 9 and 24. The court found that Madison failed to comply with a court order compelling it to respond in full to RFP No. 9, thus triggering sanctions under FED. R. CIV. P. 37(b)(2). The court also found that Madison's response to RFP No. 24 incorrectly stated that no responsive documents existed and/or that Madison failed to timely supplement this response once it learned this response was incorrect, thus triggering sanctions under FED. R. CIV. P. 26(g)(3), FED. R. CIV. P. 37(c)(1), or both. The court declined to adopt the most severe sanctions Pipeline proposed. However, the court stated that it would allow Pipeline the opportunity to conduct additional limited discovery to put Pipeline in the same position it would have been in if Madison had complied with its discovery obligations. *Id.* at *5. In addition, the court stated that it would award Pipeline its reasonable attorneys' fees and costs incurred in filing the motion. *Id.*

The motion now before the court is Pipeline's request for attorneys' fees. Pipeline asks the court to award attorneys' fees in the amount of $14,595 for the time three attorneys spent briefing the motion for sanctions. The proposed fees and time expended are as follows: 14 hours of time for attorney Jack McInnes at $550 per hour, 17.5 hours of time for attorney Anthony Bonuchi at $500 per hour, and 3.7 hours of time for attorney Jennie Carter at $450 per hour.

In response, Madison argues Pipeline's requested hourly rates and hours spent are excessive. Madison urges the court to compute the number of hours reasonably expended by multiplying 1.1 hours per page times the number of pages of Pipeline's briefs on the motion for sanctions. Pipeline's opening brief was five pages (ECF No. 462) and its reply brief was three pages (ECF No. 474), for a total of eight pages. Madison argues a reasonable rate is $275 to $300 per hour. Madison therefore proposes an award of $2,420 ($275 x 8 hours x 1.1 hours per page) to $2,640 ($300 x 8 hours x 1.1 hours per page).

## II. <u>LEGAL STANDARD</u>

When imposing attorneys' fees as a sanction under Rule 11, the court considers four factors: "(1) the reasonableness of the proposed fees, (2) the minimum amount required to deter misconduct, (3) the offender's ability to pay, and (4) 'other factors' as the court sees fit, such as the offending party's history, experience, and ability; the severity of the violation; and the risk of chilling zealous advocacy." *King v. Fleming*, 899 F.3d 1140, 1155 (10th Cir. 2018) (citing *White v. Gen. Motors Corp.*, 908 F.2d 675, 684-85 (10th Cir. 1990)). Discovery sanctions under Rules 26(g), 37(b)(2), and 37(c)(1) are all analogous to Rule 11 sanctions insofar as these rules all use the term "sanctions" and serve predominantly punitive purposes. *Ocelott v. Del. Flood Co.*, 76 F.3d 1538, 1554 (10th Cir. 1996) (noting similarities in sanctions under Rule 11 and Rule 37(b) and concluding both are punitive in nature); *see also Farmer v. Banco Popular of N. Am.*, 791 F.3d

1246, 1259 (10th Cir. 2015) (applying the *White* factors when evaluating an award of attorneys' fees as a punitive sanction pursuant to the court's inherent authority). This court is therefore guided by the factors set forth above and other case law involving Rule 11 sanctions in deciding what sanctions are appropriate. *In re Byrd, Inc.*, 927 F.2d 1135, 1137 (10th Cir. 1991) (noting that courts often consider case law interpreting Rule 11 sanctions when considering Rule 26(g) sanctions); *United States v. Perea*, No. 08-20160-08-KHV, 2010 WL 11583172, at *5 n.13 (D. Kan. Jan. 7, 2010) ("While *White* involved sanctions under Rule 11, its principles apply equally to sanctions under other rules . . . .").

In determining what sanctions to impose, the court must consider the purposes to be served by sanctions. *White*, 908 F.2d at 683. Rule 37 sanctions are imposed not merely to reimburse the wronged party or to penalize the offending party, but to deter others from engaging in similar conduct. *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976). In this case, the sanctions were expressly meant to deter abusive conduct. *Pipeline,* 2019 WL 2011377 at *3. "The appropriate sanction should be the least severe sanction adequate to deter and punish the [wrongdoer]." *White*, 908 F.2d at 685.[1]

The court therefore analyzes the four factors set forth above, mindful of the purposes for imposing the sanctions at issue.

---

[1] Madison argues the court should also consider the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). The Tenth Circuit has relied on those factors for guidance, but found no error where the district court declined to expressly consider them and instead relied solely on the lodestar method. *Anchondo v. Anderson, Crenshaw & Assocs., L.L.C.*, 616 F.3d 1098, 1103-04 (10th Cir. 2010) ("[I]t has only become clearer that the lodestar determination is primary and that the propriety of such a determination is not automatically called into doubt merely because the trial court did not expressly discuss the *Johnson* factors."). Moreover, courts more often consider the *Johnson* factors when awarding compensatory attorneys' fees under a fee-shifting statute rather than when assessing attorneys' fees as a punitive sanction. Neither side specifically addressed each of the *Johnson* factors, so the court also declines to conduct a separate analysis that expressly considers these factors.

## III. THE APPROPRIATE AMOUNT OF SANCTIONS

### A. Reasonableness of the Proposed Award

The court must independently analyze the reasonableness of the requested attorneys' fees. *King*, 899 F.3d at 1155. "The proper procedure for determining a reasonable attorneys' fee is to arrive at a lodestar figure by multiplying the hours [] counsel reasonably spent . . . by a reasonable hourly rate." *Praseuth v. Rubbermaid, Inc.*, 406 F.3d 1245, 1257 (10th Cir. 2005); *see, e.g.*, *King*, 899 F.3d at 1155; *accord Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1249 (10th Cir. 1998); *see also, e.g.*, *Kayhill v. Unified Gov't of Wyandotte Cty.*, 197 F.R.D. 454, 459 (D. Kan. 2000) (using the lodestar method to calculate an award of attorneys' fees as a Rule 37 sanction).

#### 1. Hours Counsel Reasonably Expended

To demonstrate reasonable time expended, the party seeking fees must submit "meticulous, contemporaneous time records that reveal all hours for which compensation is requested and how those hours were allotted to specific tasks." *Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1215 (10th Cir. 2000). The fee applicant should exercise billing judgment with respect to the number of hours worked and billed. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). Billing judgment consists of winnowing hours actually expended down to hours reasonably expended. *Praseuth*, 406 F.3d at 1257.

Pipeline states that three attorneys spent more than 30 hours on the underlying motion for sanctions. Pipeline's counsel exercised billing judgment to reduce and exclude certain time, and Pipeline now seeks fees for 28.8 hours of work. The court has reviewed the time records submitted and finds the time entries to be reasonable for briefing on Pipeline's motion for sanctions.

Madison does not argue that any specific time entries are unreasonable. Instead, Madison argues the overall amount of time is unreasonable because, according to Madison, Pipeline should

be capped at 1.1 hours per page. Pipeline's opening and reply briefs collectively totaled only approximately eight pages, and Madison therefore reasons that 8.8 hours is reasonable. But capping Pipeline's fees based solely on an hours-per-page limitation is unsupported by Tenth Circuit precedent. Even in the district court cases Madison cites, those judges did not reduce the number of hours based only on an hours-per-page analysis. *See, e.g.*, *Farmer v. Astrue*, No. CIV.A. 09-2505-JWL, 2010 WL 4904801, at *3 (D. Kan. Nov. 24, 2010) (agreeing "in principal that 1.1 hours per page in general would not be an unreasonable time writing a Social Security brief" but ultimately reducing hours billed because plaintiffs' brief was unreasonably long); *Seamands v. Sears Holding Corp.*, No. 09-2054-JWL, 2011 WL 884391, at *12 (D. Kan. Mar. 11, 2011) (finding 40 hours on an 11-page response brief was excessive but also considering the substance of the brief); *Howard v. Segway, Inc.*, No. 11-CV-688-GKF-PJC, 2013 WL 869955, at *8 (N.D. Okla. Mar. 7, 2013) (finding 27 hours spent drafting a motion to compel and a reply brief was excessive but noting that "the primary billing attorney is still relatively new to the practice of law and that this often results in more time expended").

These cases demonstrate that courts determine the amount of time reasonably expended on a case-by-case basis, considering the substance of the briefs, the experience of the attorneys working on the briefs, and the length of the briefs, among other pertinent considerations in a given case. The undersigned therefore rejects Madison's suggestion that the court should apply a strict hours-per-page formula when determining the reasonableness of time expended. Length of a brief is not always an accurate indicator of time reasonably expended. For example, here, the court imposed strict page limits for briefing on Pipeline's motion for sanctions. This required the parties to devote effort to presenting their issues concisely, which often requires billable time that is not necessarily reflected in a brief's length.

The court therefore finds that Pipeline reasonably expended 28.8 hours briefing the sanctions motion. Pipeline's attorneys submitted precise, detailed time records that show how hours were allotted to specific tasks, and they exercised billing discretion in reducing the number of hours for which they seek compensation. The court has also considered the length of the briefs, their substance, page limits, and the court's expedited briefing schedule. The court also credits the representation of Pipeline's counsel—who apparently represents Pipeline on a contingency-fee basis—that they had no incentive to over-lawyer the sanctions issue.

### 2. Reasonable Hourly Rates

"To determine what constitutes a reasonable rate, the district court considers the prevailing market rate of the relevant community." *Lippoldt v. Cole*, 468 F.3d 1204, 1224 (10th Cir. 2006) (internal quotations omitted); *see also Perdue v. Kenney*, 559 U.S. 542 (2010) (same). Here, the parties dispute what constitutes the relevant community and the prevailing rate for that community.

#### i. Relevant Community

Turning first to the "relevant community," Madison argues the court must apply Topeka rates because Pipeline designated the Topeka courthouse as the place of trial. Pipeline, on the other hand, seeks rates more commensurate with those in the Kansas City market, which is where Pipeline's counsel is located. As explained below, the court finds that the relevant community in this case is broad enough to encompass Kansas City.

The relevant community consists of "the area in which the litigation occurs" or "the area in which the court sits." *Ramos v. Lamm*, 713 F.2d 546, 555 (10th Cir. 1983); *accord Case*, 157 F.3d at 1256 (quoting *Ramos*, 713 F.2d at 555). Most district courts in the Tenth Circuit have followed the "area in which the litigation occurs" approach rather than narrowly limiting the relevant market to the city of trial. *See, e.g., Busby v. City of Tulsa*, No. 11-CV-447-JED-JFJ,

2018 WL 7286180, at *3 (N.D. Okla. Oct. 23, 2018) (stating the court must determine what comparable attorneys "practicing in the area in which the litigation occurs" would charge), *report and recommendation adopted*, No. 11-CV-447-JED-JFJ, 2019 WL 169686 (N.D. Okla. Jan. 11, 2019); *Fallen v. GREP Sw., LLC*, 247 F. Supp. 3d 1165, 1197–98 (D.N.M. 2017) (defining the relevant market as "the area in which the litigation occurs"); *Clayton v. Steinagel*, No. 2:11CV379 DS, 2012 WL 6624203, at *1 (D. Utah Dec. 19, 2012) (same).

Contrary to Madison's argument, the Tenth Circuit has not held that the relevant community is limited to a specific metropolitan area where the case is designated for trial. The Tenth Circuit has discussed rates from particular metropolitan areas, but those cases generally involved determinations about the prevailing market rate in the undisputedly relevant metropolitan area, *see, e.g.*, *Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186, 1203-04 (10th Cir. 1998) (district court erred by not considering evidence of prevailing market rates in the Kansas City area), or a dispute over whether to apply an out-of-district versus a local rate, *see, e.g.*, *Lippoldt*, 468 F.3d at 1225 (upholding Wichita rates in a case where the trial was held there). The Tenth Circuit has endorsed out-of-state rates if a case is "unusual or requires such special skills that only an out-of-state attorney possesses." *See Lippoldt*, 468 F.3d at 1225. And this approach is in line with other courts of appeal. As the Second Circuit observed, "[t]he legal communities of today are increasingly interconnected" and defining "markets simply by geography is too simplistic." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of Elections*, 522 F.3d 182, 192 (2d Cir. 2008). Similarly, the Seventh Circuit has found that "community" "could mean a community of practitioners; particularly when . . . the subject matter of the litigation is one where the attorneys practicing it are highly specialized and the market for legal services in that area is a national market." *Jeffboat, LLC v. Dir., Office of Workers' Comp. Programs*, 553

8

F.3d 487, 490 (7th Cir. 2009) (noting there was no local market for lawyers litigating workers' compensation claims brought under the Longshoreman and Harbor Workers' Compensation Act). The Eighth Circuit has also concluded that the relevant community may extend beyond the local geographic community and that "[a] national market or a market for a particular legal specialization may provide the appropriate market." *Casey v. City of Cabool, Mo.*, 12 F.3d 799, 805 (8th Cir. 1993).

In contrast, this case involves a dispute over whether the court should apply prevailing market rates in Topeka or Kansas City, both of which are within the District of Kansas. Although the Tenth Circuit has not held that "the area in which litigation occurs" necessarily includes the entire district, other courts of appeal often define the relevant market by referring to the district where the case was filed or the "forum," which would be the district. *See e.g., Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343, 1348 (Fed. Cir. 2008) (collecting cases and recognizing that "courts of appeals have uniformly concluded that . . . forum rates should be used"); *see also Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008) (describing the relevant community as "the forum in which the district sits"); *Larsen v. JBC Legal Grp., P.C.*, 588 F. Supp. 2d 360, 363 (E.D.N.Y. 2008) (stating that the relevant community is the district where the case was filed but that judges routinely consider market rates in both the Eastern District of New York and the Southern District of New York). It is particularly appropriate here to reject Madison's attempt here to distinguish the "relevant community" between Topeka and Kansas City given the fact that, even within the district, Topeka is only about 60 minutes from Kansas City.

Madison points out that some judges in this district have stated that the relevant market is the city of trial. For example, Madison relies on *Erickson v. City of Topeka*, which involved a lawsuit brought by a City of Topeka employee against the City of Topeka, which was represented

9

by Topeka counsel. 209 F. Supp. 2d 1131, 1134 (D. Kan. 2002) (setting forth the facts of the case on summary judgment). The court rejected higher Kansas City rates in favor of lower Topeka rates. *Erickson v. City of Topeka*, 239 F. Supp. 2d 1202, 1209 (D. Kan. 2002). But that was a civil rights case, and the Tenth Circuit has noted that "[i]n every major metropolitan area there are a substantial number of lawyers who possess the skill to handle all but the most unusual civil rights cases." *Ramos*, 713 F.2d at 555; *see also Paradigm All., Inc. v. Celeritas Techs., LLC* No. 07-1121-EFM, 2011 WL 251452, at *5 (D. Kan. Jan. 25, 2011) (determining Wichita was the relevant community and noting the plaintiff objected to the court's proposal to try the case in Kansas City).

Madison's reliance on *Erickson* is not persuasive here for at least two reasons. First, whereas the *Erickson* case had a strong nexus to Topeka, this case has none. This case involves negotiations over a country music festival in Arkansas. The corporate plaintiffs all have their principal place of business in Lawrence, and Mr. Mosiman also resides in Lawrence. (Am. Compl., ECF No. 56 ¶¶ 7-10.) Defendants Madison and Horsepower are out-of-state limited liability companies whose members are located in Colorado and California. (Pretrial Order, ECF No. 477, at 2.) Pipeline's original attorney was William J. Skepnek, who is located in Lawrence. And even though Madison retained local counsel in Topeka, Madison's lead counsel from Los Angeles are the attorneys who are actively litigating the case.

This case's only real connection to Topeka is that Pipeline designated it as the place of trial. However, a plaintiff's designated place of trial is subject to change. *See* D. KAN. RULE 40.2(e) ("The court is not bound by the requests for place of trial. It may determine the place of trial upon motion or in its discretion."). For example, in *Radiologix, Inc. v. Radiology & Nuclear Medical, LLC*, the court determined that a case originally designated for trial in Topeka should be tried in Kansas City. No. 15-4927-DDC-KGS, 2019 WL 121118, at *2 n.1 (D. Kan. Jan. 7, 2019).

The court considered (among other things) that Kansas City was likely a more convenient forum for many potential out-of-town witnesses who would be flying into the Kansas City airport and thus would incur additional travel time and expenses if they had to travel to the Topeka courthouse rather than the Kansas City courthouse. *Id.* at *2-*3. These same considerations could apply here because many witnesses are located in Colorado or elsewhere.

Second, unlike the nature of *Erickson* as a civil rights case, this case presents a much different scenario. As explained above, Pipeline was originally represented by Mr. Skepnek in Lawrence. Mr. Skepnek withdrew as counsel of record nearly two years into the case, and Jack McInnes entered his appearance. (ECF Nos. 35, 39 & 45.) Mr. McInnes is located in the Kansas City area. Pipeline explains that Mr. McInnes entered his appearance only after Pipeline could no longer afford to pay its hourly attorney, whereas Pipeline's current attorneys have taken this case on a contingency-fee basis. Pipeline argues very few lawyers in Topeka would have the ability to take a case of this magnitude on a contingency-fee basis—investing more than a million dollars in time and advancing more than a hundred thousand dollars of case expenses. (ECF No. 498, at 2.) Importantly, Madison has offered no evidence to rebut this. Topeka may have ample attorneys who would be capable of handling complex business litigation such as this case. But Madison has offered no evidence to identify a relevant market of competent Topeka attorneys who would have been willing and able to invest the necessary time and financial resources to take on high-risk, contingency-fee-based business litigation against Los Angeles counsel who have adopted an aggressive litigation strategy that has resulted in protracted proceedings. The record demonstrates the opposite. When Pipeline was confronted with needing to replace its hourly litigation counsel, it had to look to the larger Kansas City-area market to find attorneys who were willing to shoulder the financial burden of advancing significant up-front resources and costs.

Therefore, the only evidence of record regarding the "relevant community" for counsel who were willing and able to take on this case supports the reasonableness of Pipeline's decision to hire its current counsel in Kansas City. So even if the court were to consider disparities in rates within the District of Kansas (which the court is not persuaded it is necessarily required to do), the court finds that the "relevant community" is broad enough to include the Kansas City area. In this respect, this case is akin to *Reazin v. Blue Cross and Blue Shield of Kansas, Inc.*, where the Tenth Circuit credited the district court's explanation that "there is neither a lawyer nor a firm in this town [Wichita] which could have devoted to this case the timely expertise, experience, and manpower put forth by Jones Day." 899 F.2d 951, 982-83 (10th Cir. 1990) (quoting the district court's decision); *see also, e.g.*, *Large v. Fremont County*, No. 05-CV-0270, 2013 WL 12342417, at *1-*3 (D. Wyo. Sept. 20, 2013) (awarding out-of-district rates in a minority vote dilution case where the defendants did not show that local lawyers were competent to handle the litigation "or their willingness and ability to invest the necessary time and financial resources to handle this unique and complex case").

### ii. Market Rate

Having found the relevant community encompasses Kansas City, the court must determine whether Pipeline has established the reasonableness of its requested rates. The party seeking fees "must provide evidence of the prevailing market rate for similar services by lawyers of reasonably comparable skill, experience, and reputation in the relevant community." *Lippoldt*, 468 F.3d at 1224 (internal quotations omitted) (quoting *Blum,* 465 U.S. at 895 n. 11); *Perdue*, 559 U.S. at 555 (same). If the parties fail to present adequate evidence of prevailing market rates, the court may rely on other relevant factors, including its own knowledge, to establish the rate. *Lippoldt*, 468 F.3d at 1225.

Attorneys' fee awards often arise in cases involving federal fee-shifting statutes, not those involving sanctions for discovery violations. The distinction can be important because the primary purpose of sanctions is to punish and deter, whereas the primary purpose of fee-shifting statutes is to compensate. *See Robinson v. City of Edmond*, 160 F.3d 1275, 1281 (10th Cir. 1998) (noting the purpose behind the § 1988(b) fee-shifting provision "was not to give private lawyers an unwarranted windfall, but rather to ensure compensation adequate to attract competent counsel" (internal quotations omitted)). Courts more closely scrutinize awards under federal fee-shifting statutes because,

> [i]n contrast to a private fee agreement between a party and his attorney in which a party may agree to an aggressive litigation strategy and the inevitably resultant higher fees, a fee-shifting statute is not a voluntary matter. Fee-shifting imposes one party's fee obligations upon the very party who was the subject of that litigation strategy. Thus, awards made under the authority of fee-shifting statutes are not intended to replicate fees which an attorney could earn through a private fee arrangement with a client.

*Praseuth*, 406 F.3d at 1257; *see also Robinson*, 160 F.3d at 1287-88 (stating that market-rate awards would invite attorneys who normally command fees far in excess of the standard market rate for civil rights representation to bill at an inordinately high rate). But these considerations are different when awarding attorneys' fees for discovery violations, where a party's own overly aggressive or neglectful litigation strategy caused the opposing party and the court to expend additional time and resources. In most instances, such an award *should* approximate fees an attorney would earn through a private fee arrangement in order to deter abusive discovery practice. Therefore, the court will generally look to what the lawyers would have received if they were selling their services in the open market. *See Case*, 157 F.3d at 1256.

Pipeline proposes rates of $550 per hour for Mr. McInnes, who has acted as lead counsel on this case; $500 per hour for Mr. Bonuchi; and $450 per hour for Ms. Carter. Madison argues a

13

reasonable rate for counsel would be $275 or $300 per hour, based largely on its position that the court should consider only the prevailing market rates for Topeka attorneys. (ECF No. 494, at 4.) The court has considered Madison's local counsel's affidavit attesting that the prevailing rate in the Topeka market for attorneys with similar experience would be $300 to $350 per hour, but the affidavit fails to expressly consider the practice area involved—high-risk, contingency-fee-based complex litigation. (ECF No. 494-1 ¶ 4.) To that end, it is less persuasive than Mr. McInnes' declaration, which states that he regularly monitors fee awards in complex litigation in this geographic area and that his proposed fee is reasonable based on his knowledge of these awards. (ECF No. 489-1, ¶ 15.)

Madison also relies on *A Flash Report on the 2017 Economics of Law Practice Survey in Kansas*, published by the Kansas Bar Association in September 2017. Madison notes that the report provides a mean rate of $236 per hour for Topeka/Shawnee County attorneys, with a rate of $250 per hour representing the 75th percentile. Madison notes that for lawyers with 10 to 14 years of experience, the rates were $240 per hour and $275 per hour, respectively. The court has considered those figures, but they are less persuasive because they are aggregate figures that are not narrowly tailored to the particular type of litigation and attorneys[2] necessitated by this case.

---

[2] The three attorneys who worked on the sanctions briefs have extensive experience litigating complex cases. Mr. McInnes' declaration states that he is a 2004 University of Kansas graduate and a member of Order of the Coif. He previously worked for two large, well-respected Kansas City firms before starting his own law practice in 2013. His current practice is limited to complex, contingency-fee litigation in state and federal courts nationwide. Ms. Carter also graduated from law school in 2004, previously worked for the same two law firms, served as a law clerk to a federal district court judge, and also has significant experience litigating complex cases. Mr. Bonuchi's declaration states that he has extensive experience serving as lead and co-counsel in complex business litigation in state and federal courts in Kansas and Missouri. He states that his hourly rate of $500 in contingency-fee cases is reasonable based on his experience and background. Before founding his own law firm in 2015, Mr. Bonuchi was a shareholder in the appellate and business litigation practice groups of a large law firm.

Moreover, the court is not required to award fees at a mean rate as of 2017 or even at a rate in the 75th percentile but instead to award fees at a rate the market would presently command for similar services by lawyers of reasonably comparable skill, experience, and reputation.

In support of Pipeline's request for attorneys' fees, it cites a 2017 case in which the court awarded Mr. McInnes fees working out to a rate of $405 per hour. *See Hoffman v. Poulsen Pizza, LLC*, No. 15-2640-DDC-KGG, 2017 WL 25386, at *6 (D. Kan. Jan. 3, 2017). *Hoffman* was a Fair Labor Standards Act case in which the court noted that Mr. McInnes' and co-counsel's hourly rates were "on the high end of the approvable range, [but] . . . reasonable in light of all the risks and other factors present in this case." *Id.* at *7 (noting that other judges in this district had approved rates ranging from $180-$590 per hour in FLSA cases). Pipeline also notes that the Western District of Missouri awarded attorney fees for Mr. McInnes at a rate of $450 per hour in 2014, and that a Jackson County, Missouri Circuit Court awarded attorney fees for him at a rate of $450 per hour in 2013. (ECF No. 489, at 3).

Madison points out that these rates are lower than what Mr. McInnes requests here. However, Madison does not account for the passage of time. These cases are between two to six years old. Rates in this area have increased in the past few years, and so has Mr. McInnes's experience and seniority. Prior fee awards do not themselves set the market. *See B & G Mining, Inc. v. Dir., OWCP,* 522 F.3d 657, 664 (6th Cir. 2008); *see also Student Pub. Interest Research Group of N.J. v. AT & T Bell Laboratories,* 842 F.2d 1436, 1446 (3d Cir.1988) (cautioning that relying on prior fee awards perpetuates "a court-established rate as a 'market' when the rate in fact bears no necessary relationship to the underlying purpose of relying on the marketplace: to calculate a reasonable fee sufficient to attract competent counsel").

Madison also argues the court should award fees for Mr. Bonuchi and Ms. Carter's time at the mean rates reported by the KBA in 2017 because Pipeline has not cited any cases setting their reasonable rate. The Tenth Circuit has rejected this approach. When the court is presented with evidence that the market commands rates at a certain level, the court may not disregard the evidence and instead impose rates at a customary level. *See Case*, 157 F.3d at 1256 (finding the court abused its discretion in setting rates that ignored market evidence before it). Mr. Bonuchi's and Ms. Carter's experience and qualifications are similar to that of Mr. McInnes, so the court may properly consider his awards when evaluating Mr. Bonuchi's and Ms. Carter's proposed rates.

Finally, Pipeline points out that Madison's Los Angeles counsel's hourly rate is far higher than what Pipeline requests here. The court may consider the rate charged by opposing counsel in determining a reasonable rate. *See Sussman v. Patterson*, 108 F.3d 1206, 1212 (10th Cir. 1997). Here, Pipeline points out that in April of 2016, Madison's Los Angeles counsel sought a discounted rate of $647-$810 per hour for partners and $540 per hour for associates. Madison does not dispute this assertion. Madison's counsel's billing rates certainly shed light on the reasonableness of the hourly rates requested by Pipeline.

In sum, the court has considered the attorneys' qualifications, practice area, the risk and contentious nature of this litigation, affidavits and declarations of all attorneys, the KBA report, awards to Mr. McInnes in other cases, and Madison's counsel's hourly rate. Pipeline has established its counsel's requested rates are in line with the prevailing market rate for similar services by lawyers of reasonably comparable skill, experience, and reputation in the relevant community. For these reasons, the court finds that Pipeline's proposed award of $14,595 represents reasonable hours expended and billed at a reasonable rate.

## IV. <u>MINIMUM REQUIRED TO DETER & OTHER FACTORS</u>

Otherwise "reasonable" fees become excessive if they are greater than "that amount reasonably necessary to deter the wrongdoer." *White*, 908 F.2d at 685. "In addition, the court may consider factors such as the offending party's history, experience, and ability, the severity of the violation, the degree to which malice or bad faith contributed to the violation, the risk of chilling the type of litigation involved, and other factors as deemed appropriate in individual circumstances." *Id*.

The undersigned has considered the possibility of reducing the full amount of the fees requested because, although Pipeline proved the discovery violations, the court declined to adopt any of the substantive sanctions Pipeline requested. However, the possibility of reducing fees on that basis is counterbalanced by the Madison's failure to acknowledge and accept responsibility for the discovery violations. Instead, Madison suggested in a subsequent pleading that Pipeline was to blame because the email with the draft agreement was sent to Mr. Prenger's Pipeline email address and therefore, according to Madison, Pipeline had it all along. (ECF No. 538.) However, Pipeline clarified at a subsequent discovery conference on July 12, 2019 (ECF No. 543) that it checked Mr. Prenger's Pipeline email account—once at the outset of the litigation and then again after Madison tried to blame Pipeline for not finding the email sooner—and, both times, the email with the draft consulting agreement was not there. The court is therefore left to surmise that Mr. Prenger may have deleted it at some point, which suggests the email's potential importance. So, aside from Madison trying to avoid responsibility by misplacing blame on Pipeline for not discovering the document sooner, Madison has never offed a full explanation as to how or why it

17

committed the subject discovery violations.³ Without a more robust explanation, the court cannot rule out the possibility that the violations were willful, malicious, or in bad faith. Although the court is reluctant to make any such findings, it certainly appears that the violations were, at a minimum, reckless. And because Madison failed to timely produce the draft consulting agreement within the discovery period, Pipeline was put to the expense of follow-up discovery. This level of culpability and the extent to which Pipeline was damaged by the untimely production leads the court to believe that plaintiffs are entitled to the full amount requested because it is the minimum amount necessary to deter similar future misconduct by the defendants.

The court has also considered the possibility that the amount of the award may risk chilling zealous advocacy. That risk seems low here. Defendants have litigated this case aggressively. Pipeline's proposed award of $14,595 might seem substantial in some cases, but it is not substantial in the grand scheme of this case. To the contrary, the court can only hope the amount awarded will be substantial enough to at least serve as a speed bump to curb overzealous advocacy.

## V. **ABILITY TO PAY**

Because the purpose of punitive sanctions is to deter misconduct, the court must consider the offending party's ability to pay. *White*, 908 F.2d 685. "The sanctioned party bears the burden to prove its inability to pay an otherwise-appropriate sanction." *King*, 899 F.3d at 1156. The court need not weigh this factor if the sanctioned party fails to provide any information about its ability

---

³ Months after this motion was fully briefed, Madison suggested—buried in a footnote in a separate filing—that Madison produced the Prenger consulting agreement immediately after finding it, which Madison contends "shows at most that their previous searches for such documents was [sic] imperfect." (ECF No. 538, at 3 n.2.) Yet Madison still did not offer any explanation as to why its previous searches did not find the draft agreement, or why it did not timely supplement its RFP response to clarify that responsive documents existed and were being produced. Notably, a Madison consultant sent the draft agreement from a Madison email address with a copy to Madison's CEO. (ECF No. 472-4, at 2.)

to pay. *See id.* Here, the court declines to consider this factor because Madison has not presented any information regarding its ability to pay.

## VI. <u>CONCLUSION</u>

Pipeline presented sufficient information to establish the reasonableness of its requested $14,595 award, both in terms of the amount of time spent on briefing the sanctions motion and the proposed rates. This amount represents the minimum amount required to deter similar discovery violations, and Madison's failure to acknowledge or accept any responsibility for the discovery violations further bolsters the court's conclusion that the amount requested represents an appropriate sanction. For these reasons, Pipeline's motion is granted.

**IT IS THEREFORE ORDERED** that Plaintiffs' Application for Attorneys' Fees in Connection with their Motion for Sanctions (ECF No. 489) is granted. The court orders Maison to tender payment in the amount of $14,595 to Pipeline within ten business days. Upon tendering payment, Madison shall file a notice stating that it has complied with this order.

**IT IS SO ORDERED.**

Dated July 19, 2019, at Topeka, Kansas.

s/ Angel D. Mitchell
Angel D. Mitchell
U.S. Magistrate Judge
