**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

| | | |
|---|---|---|
| PIPELINE PRODUCTIONS, INC., | ) | |
| BACKWOOD ENTERPRISES, LLC, | ) | |
| OK PRODUCTIONS, INC., | ) | |
|     and | ) | |
| BRETT MOSIMAN, | ) | |
| | ) | Case No. 5:15-cv-04890-KHV-ADM |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE MADISON COMPANIES, LLC, | ) | |
| HORSEPOWER ENTERTAINMENT, LLC, | ) | |
| KAABOO, LLC, | ) | |
| KAABOOWORKS SERVICES, LLC, | ) | |
| KAABOOWORKS, LLC, | ) | |
| KAABOO DEL MAR, LLC, | ) | |
|     and | ) | |
| WARDAWGZ, LLC, | ) | |
| | ) | |
|     Defendants. | ) | |

## SECOND AMENDED COMPLAINT

Plaintiffs, for their Second Amended Complaint against Defendants, state as follows:

1.     Brett Mosiman, the principal of OK Productions, Inc. ("OK"), Backwood Enterprises, LLC ("Backwood") and Pipeline Productions, Inc. ("Pipeline"), was a successful and sought-after producer of music festivals.

2.     Bryan Gordon, the principal of The Madison Companies, LLC ("Madison") and Horsepower Entertainment, LLC ("Horsepower"), agreed to purchase 51% of Plaintiffs' Thunder on the Mountain music festival ("Thunder") in exchange for $750,000.00, advancing $500,000.00 of operating capital, and paying certain operating expenses.

3.      Plaintiffs diligently prepared for Thunder, booking artists such as Carrie Underwood and the Zac Brown Band, selling tickets, and engaging vendors, but Madison/Horsepower got nervous about ticket sales and tried to extort Plaintiffs two months before the festival to get a better deal.

4.      When Plaintiffs refused, Madison/Horsepower reneged on their agreement, artists refused to appear without payment, and the festival had to be cancelled. The consequences were a predictable, and intentional, result of Madison/Horsepower's misconduct. Angry vendors came calling, ticketholders filed class action lawsuits, and Plaintiffs were left holding the bag.

5.      To add insult to injury, Madison/Horsepower, working with or on behalf of, Kaaboo, LLC ("Kaaboo"), KabooWorks Services, LLC ("KWS"), KaabooWorks, LLC ("KaabooWorks"), and Kaaboo Del Mar, LLC ("Kaaboo Del Mar")[1] pilfered several of Plaintiffs' key partners, employees and agents to drive Plaintiffs out of business and prevent them from defending themselves in court.

6.      Madison/Horsepower also filed frivolous lawsuits against Plaintiffs in other courts lacking jurisdiction to drain their resources and spread their attorneys thin.

7.       Defendants' willful, wanton, fraudulent and malicious (collectively, "willful") conduct has devastated Plaintiffs' finances, significantly damaged their reputation, and substantially hindered their ability to put on music festivals going forward.

## I. PARTIES

8.      Pipeline, a well-known producer of live music, is a Kansas corporation with its principal place of business in Lawrence, Kansas.

---

[1] These entities will be referred to collectively as the "Kaaboo entities" in this pleading.

9.      Backwood, d/b/a Thunder, is an Arkansas limited liability corporation with its principal place of business in Lawrence, Kansas. Its members are residents of Kansas.

10.     OK, the parent corporation of Backwood and other related music festival entities, is an Arkansas corporation with its principal place of business in Lawrence, Kansas.

11.     Mosiman, the principal of OK, Backwood, Pipeline and other related music festival entities, resides in Lawrence, Kansas.

12.     Madison is a Delaware limited liability company with its principal place of business at 5299 DTC Boulevard, Suite 1100, Greenwood Village, Colorado.  It is owned by WarDawgz, LLC.

13.     Horsepower is/was a Delaware limited liability company with its principal place of business in the same office in Greenwood Village, Colorado. Its sole member is/was Madison.

14.     Kaaboo is a Delaware limited liability company with its principal place of business in the same office in Greenwood Village, Colorado. It is owned by WarDawgz; Gordon, Wolkov and Walker; and outside investor entities, none of which are Kansas residents.

15.     WarDawgz is a Delaware limited liability company with its principal place of business in the same office in Greenwood Village, Colorado. It has four members, each of which is a limited liability company. Each of those limited liability companies has one individual member, and they are residents of Colorado and California.

16.     KWS is a Delaware limited liability company with its principal place of business in the same office in Greenwood Village, Colorado. It is a wholly-owned subsidiary of Kaaboo.

17.     KaabooWorks is a Delaware limited liability company with its principal place of business in the same office in Greenwood Village, Colorado. It is owned by Kaaboo.

18.     Kaaboo Del Mar is a Delaware limited liability company with its principal place of business in the same office in Greenwood Village, Colorado. It is owned by Kaaboo.

## II. JURISDICTION AND VENUE

19.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332 since the matter in controversy exceeds $75,000.00 and is between citizens of different states. This is not disputed.

20.     Venue is proper in this Court under 28 §1391 since a substantial part of the events occurred in this District. This is not disputed.

21.     The Court's personal jurisdiction over Plaintiffs and Defendants Madison and Horsepower is not disputed.

22.     The Kaaboo entities are likewise subject to personal jurisdiction in this District. These entities are the successors to Madison/Horsepower's music festival business under any one of three theories: (1) there was a de facto merger; (2) they are simply a continuation of Madison/Horsepower's music festival business; or (3) the transfers and reorganization were done in a fraudulent effort to escape liability for Madison/Horsepower's debts, including this lawsuit. In Kansas, the contacts and conduct of Madison/Horsepower are imputed to successors like the Kaaboo entities for purposes of personal liability. *See* Kan. Stat. Ann. § 60-308.

23.     Alternatively, the Kaaboo entities, through the acts of their agents and officers, including but not limited to, Bryan Gordon, Seth Wolkov and Rob Walker, negotiated and contracted with several Kansas residents, including Nathan Prenger, Brian Pilsl, Brian Wingerd and Taylor Gustafson, to tortiously interference and intentionally damage Plaintiffs, who are also Kansas residents. *See* Kan. Stat. Ann. § 60-308.

## III. FACTUAL ALLEGATIONS

### A. Background

24.     Mosiman has been in the live music business for more than 30 years. Before Thunder was cancelled, he had an outstanding reputation in the industry with more than 25 successful music festivals under his belt, including several with multi-year runs.

26.     Because of Mosiman's track record and reputation, Plaintiffs could book top artists at preferential pricing and terms.

27.     Madison is a venture capital firm. Horsepower is its wholly owned subsidiary. Gordon is Madison/Horsepower's founder, Chairman and CEO. At all relevant times, he had authority – apparent and actual – to bind the companies.

28.     During January 2014, Mosiman met Gordon, who represented that he was the primary principal of Madison. Gordon told Mosiman that Madison wanted to partner with Mosiman and his companies to produce music festivals by taking advantage of Mosiman's reputation and expertise and Madison significant financial resources. In fact, Gordon boasted that Madison was a billion-dollar company.

### B. Earlier Negotiations

29.     Gordon proposed to Mosiman that Madison/Horsepower and Mosiman's companies produce festivals on an ongoing basis. This included all of Plaintiffs' existing or planned music festivals, including Wakarusa, Harvest and Thunder.

30.     Gordon and Mosiman explored this possibility at length. Several Madison/Horsepower executives and employees also toured Plaintiffs' operations and attended the 2014 Wakarusa festival.

31.     After months of negotiating and completing substantial due diligence, including review of Plaintiffs' books and records, Gordon, on behalf of Madison/Horsepower, and Mosiman, on behalf of Backwood/Pipeline, entered into a non-binding letter of intent ("LOI") dated July 28, 2014 for Madison/Horsepower to purchase 51% of Plaintiffs' music festival business.

32.     Madison/Horsepower and their owners considered Plaintiffs' festival business to be worth at least $13,000,000.00. In fact, they offered to pay $6,560,000.00 in payments and investments for 51% of the business.

33.     This case does not involve or relate to the LOI. As explained in detail below, the parties were unable to reach agreement regarding the purchase of a controlling interest of Plaintiffs' music festival business, and the LOI expired, by its own terms, if a deal was not completed on or before November 1, 2014.

34.     It should be noted, however, that on or about August 28, 2014, Mosiman emailed Gordon to inform him of a "major concern" regarding the LOI and Thunder, which was scheduled to take place on June 26-28, 2015. In the email, Mosiman warned that he would be in a "**very precarious and damaging position**" of not being able to follow thru on artist offers if the LOI was not consummated. Accordingly, he asked whether Madison/Horsepower would proceed w partnering/funding on Thunder regardless of how the LOI deal worked out.

35.     Gordon gave Mosiman his assurance that Madison/Horsepower would cover/fund Thunder's financial obligations if the LOI fell apart.

36.     Days later, Gordon referred to Madison/Horsepower's "commitment" to fund Thunder in a text message.

37.     On or about September 17, 2014, Gordon also told Mosiman to "keep stoking the flame" after a positive social media response regarding Thunder.

38.     After receiving Madison/Horsepower's commitment to cover/fund Thunder's financial obligations if the LOI fell apart, Plaintiffs started booking artists to appear at the festival.

39.     Concurrently, Pipeline entered into a consulting agreement with Madison/Horsepower to produce their Kaaboo Del Mar festival for three years for a total of $650,000.00. Although there was never a signed agreement in place, both sides performed pursuant to the terms of their agreement for the better part of a year. In fact, Madison/Horsepower paid Pipeline approximately $10,000.00 per month until they stopped paying after they backed out of Thunder.

40.     Additionally, Pipeline Ticketing entered into an agreement with Madison/Horsepower to act as the exclusive ticket agent for their Kaaboo Del Mar festival. Although there was never a signed agreement in place, Madison/Horsepower agreed to pay them once tickets began selling, and Pipeline Ticketing sold tickets for approximately seven months until Madison/Horsepower replaced them after they backed out of Thunder.

41.     This case does not involve or relate to Pipeline's production or ticketing agreements for the Kaaboo Del Mar festival, but both breaches demonstrate Defendants' pattern of fraud.

42.     On or about October 9, 2014, while Plaintiffs continued to work to finalize the LOI regarding purchase of a controlling interest in Plaintiffs' entire music festival business, Madison/Horsepower was internally emailing that they were only interested in Thunder.

43.     On or about October 23, 2014, approximately one week before the LOI was due to expire, Madison/Horsepower proposed a substantially different agreement for significantly less money. This is another example of Defendants' deceitful practices.

44.     Plaintiffs did not accept the proposal, which operated as a revocation of the LOI.

### C. The Thunder Agreement

45.     On or about November 4, 2014, Mosiman emailed Gordon to propose a new agreement between Backwood/Pipeline and Madison/Horsepower for the limited purpose of owning and producing just the Thunder festival. Mosiman's proposal gave Gordon two options, including Option B, which involved Madison/Horsepower purchasing a 51% interest of Thunder through payment to Backwood/Pipeline of $700,000.00, advancing $500,000.00 of operating capital for the festival, and paying certain operating expenses of Thunder.

46.     In a series of telephone calls between November 3-6, 2014, Gordon agreed to a slightly modified version of Option B on behalf of Madison/Horsepower under which Madison/Horsepower would pay Backwood/Pipeline $750,000.00 for a 51% interest in Thunder, fund $500,000.00 of operating capital for the festival, and pay Backwood/Pipeline $80,000.00 to produce and operate Thunder ("Agreement").

47.     Shortly after this Agreement, on or about November 6, 2014, Mosiman sent an email to Gordon seeking confirmation of Madison/Horsepower's acceptance of the Agreement, he was given that assurance, and he asked Gordon, in his role as controlling owner, about booking Carrie Underwood. Gordon's response to Mosiman was: "**Do it , Please!**"

48.     On or about November 19, 2014, Madison/Horsepower created four entities to put on Thunder – Thunder on the Mountain, LLC; Thunder on the Mountain Management, LLC; Thunder on the Mountain Investment, LLC; and Thunder on the Mountain Advisors, LLC.

49.     In reliance upon the confirmed Agreement, Plaintiffs made industry commitments to artists, which relied solely on the commitment made by Madison/Horsepower.

50.     In reliance upon the confirmed Agreement, Plaintiffs also sold tickets and engaged vendors.

51.     By reason of their Agreement, Plaintiffs and Madison/Horsepower became joint venturers together, and they owed reciprocal fiduciary duties to each other.

52.     Pursuant to their Agreement, Plaintiffs spent more than 4,000 hours producing Thunder, which included, among other things: creation of infrastructure; contracting with vendors; setting up ticketing; organizing and announcing the sale of tickets; marketing; producing and placing billboards and other advertising; producing video clips for media and the internet; giving interviews; and contacting radio stations to promote Thunder.

53.     During this time, Mosiman used his industry contacts and relationships to obtain commitments from approximately 50 artists to perform at Thunder. In addition to Carrie Underwood and Zac Brown, the lineup included Big & Rich, the Eli Young Band and Sarah Evans.

54.     Pursuant to their Agreement, Madison/Horsepower funded $272,000.00 of its $500,000.00 agreement by making deposit payments directly to artists pursuant to the terms of the parties' performance contracts with the artists. This funding happened before artists were announced.

55.     None of the $272,000.00 went to Plaintiffs or their related entities.

56.      Pursuant to their Agreement, Plaintiffs kept Madison/Horsepower and their owners informed and involved in the progress of Thunder, including sending daily advance ticket sales, and calling and emailing more than a dozen employees and agents of Madison/Horsepower relating to the festival.

57.     The most closely held number of any live music promoter is his or her ticket sales. Plaintiffs would not have given this information to anyone but a business partner.

58.     Pursuant to the Agreement, Madison/Horsepower immediately exercised significant control over Thunder's operations. Gordon decided what bands to book and how much to pay them. He was also heavily involved in marketing and scheduling.

59.     In reliance upon Madison/Horsepower's Agreement and conduct thereafter, including funding $272,000.000 of operating capital and assuming control of the festival pursuant to the prescribed deal points, Plaintiffs performed the work required to produce Thunder.

60.     On or about December 12, 2014, Madison/Horsepower sent various draft documents to formalize the parties' Agreement that reflected the key terms they had negotiated.

61.     The documents included an additional $150,000.00 in payments to Plaintiffs but also added several new and onerous terms.

**D. Madison/Horsepower Back Out**

62.     In the music industry, it is well known that festivals typically require several years of brand development to achieve profitability.

63.     Defendants are aware that music festival profitability takes time. In fact, they have admitted this to their Kaaboo investors, and their new Kaaboo festivals have lost money.

64.     Thunder was produced in 2013, was not produced in 2014, and was scheduled for production in 2015. While the parties were optimistic about ticket sales, they anticipated that Thunder might not be profitable in 2015.

65.     From the date of first sale, Plaintiffs provided Madison/Horsepower and their owners with daily emails reflecting advance ticket sales from which they were able to forecast that Thunder would operate at a loss in 2015.

66.     Getting nervous as time went on, however, **Madison/Horsepower tried to completely change the terms of the parties' Agreement** on or about March 29, 2015, just months from the start of the festival.

67.     On or about April 7, 2015, counsel for Plaintiffs emailed a letter to counsel for Madison/Horsepower to reiterate the terms of the Agreement and demand performance by Madison/Horsepower.

68.     Counsel for Plaintiffs reminded counsel for Madison/Horsepower that, at minimum, the parties were joint venturers in the 2015 Thunder festival.

69.     In the letter, counsel for Plaintiffs expressly warned of significant damage to Plaintiffs and their related entities both financially and to their reputations if Madison/Horsepower did not abide by their Agreement. He expressly stated that the potential damage "would extend well beyond the festival to the other business interests of Backwood and its owners and related affiliates."

70.     Thereafter, on or about April 14, 2015, while Plaintiffs continued to try to complete production of Thunder, Madison/Horsepower filed a lawsuit in Delaware in which it denied and repudiated the Agreement, the promises made by Gordon on November 3-6, 2014, and five months of performance that had already occurred.

71.     On April 15, 2015, Suzanne Land, who had recently been put in charge of the Thunder project, called Plaintiffs to advise them of the lawsuit and inform them that Madison/Horsepower would no longer be participating in Thunder. During the call, Land gave Plaintiffs two options: (1) execute a fully-secured promissory note for an alleged loan that never existed; or (2) face scorched-earth litigation from Gordon and Madison/Horsepower, who were "in it to win in it," regardless of the time it took or the money it cost.

72.     Madison/Horsepower refused to provide the additional $268,000.00 to produce Thunder, pay $750,000.00 to purchase their 51% interest, or pay the operating costs in breach of the parties' Agreement.

73.     Madison/Horsepower also reneged on their responsibility for Thunder's losses.

74.     Madison/Horsepower simply walked away.  They did not attempt to mitigate Thunder's losses, nor did they reimburse Thunder's ticket holders, vendors or sponsors.

75.     On information and belief, Defendants paid the artists scheduled to appear at their Kaaboo Del Mar music festival before the deposits were even due to save their own skin.

76.     Defendants also sent defamatory letters to artist agencies about their relationship with Plaintiffs knowing they would substantially harm Plaintiffs' reputation.

77.     The second round of artist payments was due in late April 2015. Because of Madison/Horsepower's abrupt breach, Plaintiffs were put in the untenable position of having to borrow money from other festivals to keep Thunder afloat.

78.     Plaintiffs searched for an alternative financial partner to put on Thunder 2015 but could not find one in the small amount of time before the festival.

79.     Because of Defendants' conduct, Plaintiffs were not able to perform the terms of the contracts with Thunder's artists. As a result, the artists refused to appear. Despite Plaintiffs' best efforts to keep the festival going, Thunder had to be cancelled.

80.     Because of their conduct, Madison/Horsepower have forfeited their contribution to Thunder's operating capital, as well as any equity in the festival going forward.

81.     After backing out of Thunder, Madison/Horsepower also unilaterally stopped paying Pipeline for producing the Kaaboo Del Mar festival and unilaterally cancelled their ticketing agreement with Pipeline Ticketing, leaving them with thousands of dollars in unpaid bills.

**E. Defendants Raided Plaintiffs' Employees**

82.     To make matters worse, beginning in at least March 2015 (if not earlier), Madison/Horsepower and the Kaaboo entities attempted to further destroy Plaintiffs' businesses by hiring away their key partners, employees and agents, including Prenger, their Sprocket Marketing partners, Pilsl and Wingerd, and their primary ticketing employee, Gustafson.

83.     In or around March 2015, before Madison/Horsepower allege that Plaintiffs ended "the negotiations" by sending the April 7, 2015 letter, Gordon, on behalf of Madison/Horsepower was having discussions with Prenger about leaving Plaintiffs and coming to work for Madison/Horsepower to produce their Kaaboo music festivals.

84.     Defendants' officers, executives, employees, and representatives communicated with Plaintiffs' partners, employees, and agents using Madison/Horsepower email addresses and letterhead about positions and consulting deals with Defendants.

85.     Defendants also instructed these partners, employees and agents of Plaintiffs that they could no longer work with Plaintiffs.

86.     This was done by Defendants to drive Plaintiffs out of business and keep them from engaging in the litigation.

**F. Defendants Filed Frivolous Lawsuits in Foreign Jurisdictions**

87.     Madison/Horsepower filed several frivolous claims against Plaintiffs in venues outside Kansas to deplete their resources and prevent them from working on this case.

88.     As stated above, Madison/Horsepower preemptively filed a lawsuit against Plaintiffs in Delaware over a non-existent loan.

89.     Madison/Horsepower also filed counterclaims against Plaintiffs in this case over the same non-existent loan.

90.     Despite sending defamatory emails about Plaintiffs to artist agencies themselves, Madison/Horsepower additionally filed a separate lawsuit against Plaintiffs in Colorado alleging that Plaintiffs defamed them after Thunder was cancelled.

91.     Both the Delaware and Colorado lawsuits were dismissed by the courts for lack of personal jurisdiction after substantial work by Plaintiffs.

92.     Madison/Horsepower filed a notice of appeal in Delaware but dropped it.

93.     Madison/Horsepower did not file a notice of appeal in Colorado.

**G.  Madison/Horsepower and Their Owners Disposed of Their Assets and Reorganized their Music Festival Business During the Course of This Litigation**

94.     After litigation between the parties began, Madison/Horsepower, by and through their principals, Gordon, Wolkov and Walker, transferred the companies' assets and employees to the Kaaboo entities in a series of steps to avoid paying judgment in this case.

95.     Gordon, Wolkov and Walker formed Horsepower in October 2013 to be Madison's music festival business. As of April 2015, Horsepower was a wholly owned subsidiary of Madison.

96.     On July 18, 2014, Horsepower filed six trademark applications listing itself as owner of the Kaaboo mark.

97.     On or around November 12, 2014, Madison and Horsepower formed Kaaboo. Two weeks later, they formed Kaaboo Del Mar.

98.     Neither Kaboo nor Kaaboo Del Mar ever employed workers.

99.     Further, Defendants' organizational charts from late 2014 show Horsepower as a wholly owned subsidiary of Madison and Kaaboo Del Mar (and other Del Mar entities) under Horsepower.

100.    Documents provided by Defendants to potential investors from October 2014 through April 2015 state that the Kaaboo Del Mar festival was a c t u a l l y "presented by Horsepower Entertainment, A Madison Company." Those same documents referred to the Kaaboo Del Mar festival as "Horsepower's new event" and represent that Kaaboo Del Mar Management, LLC and Kaaboo Del Mar Advisors, LLC were "wholly owned subsidiaries of Horsepower."

101.    As explained above, Madison/Horsepower filed suit against Plaintiffs in Delaware on April 14, 2015.

102.    An organizational chart dated May 4, 2015 depicts the then-existing Kaaboo entities directly under Madison, instead of Horsepower.

103.    On June 16, 2015, Defendants formed KaabooWorks. Two days later, KWS was formed.

104.    KWS is the only Kaaboo entity that has employed workers.

105.    On July 15, 2015, Defendants switched the primary email addresses for all their music festival employees from @horsepowerent.com to @kaabooworksllc.com.

106.    On July 24, 2015, Robert Walker, Madion/Horsepower's CFO and Treasurer, executed an assignment in which it transferred to KaabooWorks all "rights, title, and interest in and to the mark Kaaboo including . . . the goodwill of the business connected with the use of, and symbolized by" the Kaaboo mark.

107.    As of this time, Madison was the sole member/owner of KaabooWorks.

108.    On or around January 1, 2016 all Madison's music festival employees (technically employed by M Capital Services, the employing entity for Madison) were terminated as Madison/Horsepower employees and instantaneously rehired by KWS, the employing entity for the Kaaboo entities.

109.     On January 2, 2017, Madison transferred its membership interest in KaabooWorks to WarDawgz, which Gordon, Walker, Wolkov and Barbara O'Hare formed in December 2016 to be the vehicle by which they would own Kaaboo.

110.     Then on February 14, 2017, WarDawgz withdrew as the sole member of KaabooWorks and was replaced by Kaaboo.

111.     The owners of Madison/Horsepower transferred their music festival business, including its assets, employees, the Kaaboo marks and goodwill, to KaabooWorks. At or around the same time, those same owners and principles transferred ownership of KaabooWorks from Horsepower to Madison to WarDawgz and finally to Kaaboo.

112.     All the principals and officers of all of these entities have at all relevant times been the same: Gordon is CEO; Walker is CFO; and Wolkov is President.

113.     The offices for the music festival business have never changed and remain the same today. Madison/Horsepower's offices are the same as the Kaaboo entities' offices.

114.     None of these transfers or assignments detailed here included any monetary value passing from the transferee to the transferor.

115.     The day-to-day operations of the music festival business did not change as a result of these transactions.

116.     Contracts and agreements to which Madison/Horsepower were obligated are now the obligations of Kaaboo.

117.     Madison/Horsepower are no longer involved in any music festival business.

118.     The decision-makers for all these entities are the same.

119.     Employees and officers of Kaaboo use the same computers, servers and cloud-based platforms that they used under Madison/Horsepower.

120.    Madison's only remaining asset is the office lease.

121.    Madison no longer has any employees.

122.    Madison no longer puts on any music festivals.

123.    Horsepower no longer has any assets.

124.    Horsepower no longer has any employees.

125.    Horsepower no longer puts on any music festivals.

126.    Kaaboo is the only Madison family company that puts on music festivals.

127.    The same executives that served Madison/Horsepower now serve Kaaboo.

128.    Kaaboo shares lawyers with Madison/Horsepower.

**H. Defendants Concealed the Nature of their Business Structure, the Transfer of Assets and Employees, and the Reorganization from Plaintiffs and the Court to Escape Liability for Plaintiffs' Claims**

129.    Although nearly all of the actions took place after this lawsuit was filed, Madison/Horsepower did not inform the Court or Plaintiffs that the business had been transferred or reorganized until Plaintiffs discovered it.

130.    In fact, throughout this case Defendants objected to any and all discovery requests, deposition topics, and subpoenas that sought information into their corporate structure and organization and the transfer of assets and ownership.

131.    Defendants' objections and arguments to the Court were based on misleading statements and omissions of material facts that distorted the Court's (and Plaintiffs') understanding of the relationship between Madison/Horsepower and the Kaaboo entities.

132.    For example, in their motion for protective order (Doc. 265), Defendants stated that "Horsepower's business . . . was to seek out and invest in existing music festival businesses or festivals like Pipeline" while Kaaboo "was created to build from the ground up." But informational

packets Defendants sent to investors in October 2014 through April 2015 showed that Horsepower was "a creator, promoter and operator of festivals, as well as a growth capital investor in existing festivals…"

133.    Similarly, in an effort to paint the Kaaboo entities and Madison/Horsepower as wholly separate, Defendants maintained that "Madison has no ownership stake in Kaaboo" and "Horsepower has no ownership stake in Kaaboo." Doc. 265 at 4-5.

134.    Defendants left out material facts that Madison/Horsepower owned Kaaboo and Kaaboo Del Mar, as well as the Kaaboo mark and goodwill, until this lawsuit was filed.

135.    In addition, Defendants withheld until after the close of discovery hundreds of pages of documents in violation of the Court's order compelling their production and were sanctioned as a result. The documents withheld included several drafts of Prenger's consulting agreement, the first of which was with Horsepower for work on the Kaaboo Del Mar festival that was created and circulated on or around April 15, 2015. Defendants also withheld correspondence showing that Gordon and Prenger had been discussing those terms of this agreement for "weeks" before that, which is important because Defendants have maintained that they did not discuss any consulting agreement with Prenger before the Thunder deal fell apart, which Defendants claim was April 7, 2015. Moreover, Defendants failed to provide the draft consulting agreement that showed on June 23, 2015 they removed the Horsepower as the contracting party with Prenger and replaced it with KWS.

136.    This evidence would have contradicted Defendants' constant refrain in this case that "Kaaboo has nothing to do with this lawsuit." *See, e.g., id.* at 4.

137.    In September 2018, the Magistrate sustained Defendants' objections and blocked all Kaaboo-related discovery. That situation did not change until May 2019, when the Article III judge reversed that order and discovery was reopened. Only then did Plaintiffs learn the facts detailed above. )

138.    Because of Defendants' concealment, Plaintiffs had no ability to learn the vast majority of facts set forth above until Defendants were forced to produce this information.

139.    Madison/Horsepower dissolved themselves of their assets and reorganized their music festival business under the Kaaboo entities to avoid liability.

140.    Defendants have a pattern and practice of transferring assets and creating shell companies to hide money from their creditors, partners, investors and regulators.

141.    Kaaboo did not pay any value for Madison/Horsepower's assets and/or employees.

142.    Madison/Horsepower's transfer of assets and employees to Kaaboo did not occur at arm's length.

**I. Damages**

143.    Defendants' willful conduct had known, intended and predictable consequences, which caused Plaintiffs to incur substantial damages.

144.    Not only did Madison/Horsepower fail to make their required payments pursuant to the parties' Agreement, they denied responsibility for Thunder losses and caused ticketholder class action lawsuits.

145.    Further, as Mosiman and Plaintiffs' counsel warned, Defendants' conduct caused substantial additional harm to Plaintiffs and their related entities including, but not limited to, the loss of their real property where they held their festival site, the loss of their ticketing company, and the loss of their festivals and a number of related music festival entities.

146.    Artists and investors want to work with producers that do not cancel festivals.

147.     Because of Defendants' conduct, Plaintiffs' reputation has been substantially harmed. Neither Mosiman nor his companies can obtain commitments from artists without substantially prepaying their appearance fees. The damage to Plaintiffs' reputation has significantly impaired their ability to produce and operate music festivals going forward. Before meeting Defendants, Mosiman and Plaintiffs had produced at least 25 festivals and never had an entity fail. Since meeting Defendants, they have not produced any festivals and a number of their business became insolvent directly from the consequences of Madison/Horsepower's breach.

148.     Defendants have engaged in a pattern and practice of fraudulent business dealings. They have repeatedly and intentionally misled other businesses by boasting about assets that they do not own, including on their website and in interviews. Defendants induce businesses they target to enter into agreements, share trade secrets and other financial information with them, and then pull the rug out from under them when the businesses are most vulnerable. They strong-arm businesses with threats and abusive litigation, and they fraudulently transfer and otherwise misappropriate assets to avoid liability. Plaintiffs seek to prevent Defendants from engaging in this type of ruthless behavior ever again.

## IV. CLAIMS FOR RELIEF

### Count I – Breach of Contract
### (*Against Madison/Horsepower*)

149.     Plaintiffs incorporate and re-allege paragraphs 1-148 as if fully set forth herein.

150.     The Thunder Agreement was a contract between Backwood/Pipeline and Madison/Horsepower.

151.    There was sufficient consideration to support the contract. In exchange for a 51% interest in Thunder, Madison/Horsepower agreed to pay Backwood/Pipeline $750,000.00, fund $500,000.00 of operating capital for the festival, and pay $80,000.00 for production and operation.

152.    Madison/Horsepower breached the contract by, among other things, failing to pay Backwood/Pipeline $750,000.00, only funding a portion of the operating capital, failing to pay production and operation expenses, and failing to pay their share of the festival's losses.

153.    Plaintiffs suffered substantial damages as a direct result of the breach of contract by Madison/Horsepower, including, but not limited to, the damages specified by the terms of the contract, consequential damages arising from the breach or that may reasonably be assumed to have been within the contemplation of both parties as the probable result of the breach, and damages to Plaintiffs' reputation, including to their brand and built-up equity.

WHEREFORE, Plaintiffs pray that this Court: (a) award them damages for Madison/Horsepower's breach in such amount as the evidence may show; and (b) grant such further relief as may be necessary or appropriate.

### Count II – Breach of Fiduciary Duty
**(*Against Madison/Horsepower*)**

154.    Plaintiffs incorporate and re-allege paragraphs 1-153 as if fully set forth herein.

155.    Plaintiffs and Madison/Horsepower were joint venturers in a business enterprise. Specifically, Plaintiffs and Madison/Horsepower entered into a joint venture to produce Thunder.

156.    As joint venturers in a business enterprise, a fiduciary relationship existed between Plaintiffs and Madison/Horsepower.

157.    Plaintiffs placed special trust and confidence in Madison/Horsepower. Specifically, Plaintiffs relied upon Madison/Horsepower's agreements and assurances that they would fund Thunder.

158.    Because of the fiduciary relationship, Madison/Horsepower were bound to act in good faith and with due regard to the interests of Plaintiffs.

159.    Madison/Horsepower breached their fiduciary duty by, among other things, attempting to force Plaintiffs to enter into a new deal regarding Thunder, suing Plaintiffs if they did not agree to sign a fully executed promissory note for a non-existent loan, sending defamatory letters to artist agencies, pilfering Plaintiffs' employees, partners and agents, and suing Plaintiffs in courts without jurisdiction.

160.    Madison/Horsepower were not acting in the best interests of the joint venture. They were acting unilaterally for their own personal interests at Plaintiffs' expense.

161.    Plaintiffs suffered substantial damages as a direct result of the breach of fiduciary duty by Madison/Horsepower.

WHEREFORE, Plaintiffs pray that this Court: (a) award them damages for Madison/Horsepower's breach in such amount as the evidence may show; (b) award them punitive damages to punish Madison/Horsepower; and (c) grant such further relief, including attorneys' fees and costs, as may be necessary or appropriate.

### Count III – Fraud – Promise of Future Events
#### (*Against Madison/Horsepower*)

162.    Plaintiffs incorporate and re-allege paragraphs 1-162 as if fully set forth herein.

163.    Madison/Horsepower had no intention of performing their promises to fund Thunder at the time they made them.

164.     Madison/Horsepower did not perform their promise to fund Thunder as they said they would.

165.     Madison/Horsepower made the promise to fund Thunder with the intent to deceive and for the purpose of inducing Plaintiffs to proceed and force them to accept a terrible deal.

166.     Plaintiffs reasonably relied on and acted upon Madison/Horsepower's promise by booking bands and promoting and preparing for the festival.

167.     Plaintiffs sustained damages relying upon the promises of Madison/Horsepower.

WHEREFORE, Plaintiffs pray that this Court: (a) award them actual damages for Madison/Horsepower's fraud in such amount as the evidence may show; (b) award them punitive damages to punish Madison/Horsepower; and (c) grant such further relief, including attorneys' fees and costs, as may be necessary or appropriate.

### Count IV – Tortious Interference
### *(Against Madison/Horsepower and the Kaaboo Entities)*

168.     Plaintiffs incorporate and re-allege paragraphs 1-167 as if fully set forth herein.

169.     Madison/Horsepower and the Kaaboo entities knew of the existence of Plaintiffs' business relationships with Prenger and other key partners, employees and agents, and of the probable economic benefit of those relationships to Plaintiffs.

170.     But for the conduct of Madison/Horsepower and the Kaaboo entities, it was reasonably certain that Plaintiffs would have continued the relationships with Prenger and these partners, employees and agents.

171.     Madison/Horsepower and the Kaaboo entities interfered with Plaintiffs' relationships with partners, employees and agents for the purpose of damaging Plaintiffs' business.

172.    Madison/Horsepower and the Kaaboo entities worked together, on behalf of one another, or in concert in negotiating with, contracting with, communicating with, or hiring Plaintiffs' partners, employees, and agents.

173.    This conduct of Madison/Horsepower and the Kaaboo entities has damaged Plaintiffs.

WHEREFORE, Plaintiffs pray that this Court: (a) award them actual damages for Madison/Horsepower and the Kaaboo entities' tortious interference in such amount as the evidence may show; (b) award them punitive damages to punish Madison/Horsepower, and the Kaaboo entities; and (c) grant such further relief, including attorneys' fees and costs, as may be necessary or appropriate.

**Count V – Successor Liability.**
*(Kaaboo)*

174.    Plaintiffs incorporate and re-allege paragraphs 1-173 as if fully set forth herein.

175.    Plaintiffs became a creditor of Madison/Horsepower when they filed their original Complaint against them in this Court on May 15, 2015.

176.    This litigation began in earnest when Madison/Horsepower filed suit against Plaintiffs in Delaware on April 15, 2015.

177.    After this litigation arose, Madison/Horsepower, by and through their owners and executives, Gordon, Wolkov and Walker, intentionally transferred their assets and employees to the Kaaboo entities.

178.    Madison/Horsepower, by and through their owners, acted with the intent to prevent Plaintiffs from collecting on their claims in this case and potential damages and judgment.

179.    Madison/Horsepower and their owners and executives intended to hinder or defraud Plaintiffs.

180.    The transfer of Madison/Horsepower's assets were made to the Kaaboo entities by Gordon, Wolkov and Walker, the owners and executives of both Madison/Horsepower and the Kaaboo entities.

181.    Madison/Horsepower and their owners and executives took steps to conceal the existence of these transfers and sales.

182.    As a result of their fraudulent transfers, Madison/Horsepower have become essentially insolvent and/or lack the ability to satisfy a judgment against them in this litigation.

183.    Madison/Horsepower, by and through their owners and executives, transferred their assets to the Kaaboo entities for the purpose of hiding and concealing them from Plaintiffs and avoiding satisfaction of a potential judgment in this case.

184.    Madison/Horsepower are essentially shells at this point, serving no purpose other than to litigate this action.

185.    Even if the transfers were not outright fraudulent, which Plaintiffs do not suggest, Kaaboo is still liable for debts arising out of this action because they are simply a continuation of Madison/Horsepower's music festival business.

186.    Alternatively, the reorganization Madison/Horsepower undertook by and through their owners and executives, Gordon, Walker and Wolkov, effectively merged or consolidated the music festival business under Kaaboo.

187.    All the transfers outlined above occurred after the dispute arose in this case.

188.    No money was paid to any transferor entity, member or owner in connection with the transactions outlined in this complaint.

189.    The executives and officers of Madison/Horsepower are the same individuals in the same roles as the Kaaboo entities.

190.    Madison/Horsepower's music festival employees were transferred to employment under KWS en mass after this litigation began.

191.    The employees, agents, officers, and executives of the Kaaboo entities use the same offices, computers, servers, and cloud-based platforms as Madison/Horsepower did. From an operational standpoint, the only thing that has changed is the name of the business.

192.    There are sufficient grounds to disregard the legal fiction of corporate separateness between Madison/Horsepower, the Kaaboo entities, and WarDawgz.

193.    166. Madison/Horsepower's bad faith in transferring their assets and employees to Kaaboo make it unfair for Madison/Horsepower to hide behind their corporate veil and, now that they have transferred all their assets to their related Kaaboo entities and/or Wardawgz, to claim that they are unable to satisfy any judgment against them in this case.        .

WHEREFORE, Plaintiffs pray that this Court: (a) disregard the separate corporate entities of Kaaboo, KWS, KaabooWorks, Kaaboo Del Mar and WarDawgz, and should enter any judgment herein against all named Defendants in joint and several liability; (b) any award for punitive damages should be calculated based on all of the assets and income of all Defendants; and (c) grant such further relief, including attorneys' fees and costs, as may be necessary or appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury in Topeka, Kansas of all issues so triable pursuant to the Federal Rules of Civil Procedure.


Dated:            August 30, 2019                    Respectfully submitted,

**MCINNES LAW LLC**

By: _/s/Jack McInnes_
Jack McInnes (KS #21898)
1900 West 75th Street, Suite 120
Prairie Village, Kansas  66208
Telephone: (913) 220-2488
Facsimile: (913) 273-1671
jack@mcinnes-law.com
_____

**BONUCHI LAW**
Anthony Bonuchi
601 Walnut, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 944-3232
Facsimile: (816) 944-3233
anthony@bonuchilaw.com

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on 30th day of August 2019, a true and correct copy of the foregoing document was filed with the Clerk of Court via CM/ECF and served on counsel for Defendants through the Notice of Electronic Filing.

By: _/s/ Jack McInnes_____