## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| PIPELINE PRODUCTIONS, INC., et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) CIVIL ACTION |
| THE MADISON COMPANIES, LLC, et al., | ) CASE NO. 5:15-cv-04890-KHV-ADM |
| | ) |
| | ) |
| Defendants. | |

## <u>AMENDED PRETRIAL ORDER</u>

U.S. Magistrate Judge Angel D. Mitchell reconvened the pretrial conference in this case on November 13, 2019. Plaintiffs Pipeline Productions, Inc., Backwood Enterprises, LLC, OK Productions, Inc., and Brett Mosiman (collectively, "Plaintiffs" or "Pipeline") appeared through counsel Jack McInnes and Tony Bonuchi. Defendants The Madison Companies, LLC ("Madison"), Horsepower Entertainment, LLC ("Horsepower"), KAABOO, LLC, KAABOO Del Mar, LLC, KAABOOWorks, LLC, KAABOOWorks Services, LLC, and WarDawgz, LLC (collectively, "Defendants") appeared through counsel, Benjamin Scheibe, Ira Bibbero, and Timothy A. Shultz.

This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the Court's approval, or by order of the Court to prevent manifest injustice. Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(c).

1.    **PRELIMINARY MATTERS.**

a.    **Subject Matter Jurisdiction.**    Subject matter jurisdiction is invoked under 28 U.S.C. § 1332 and is not disputed. *See also* Joint Response to the Court's Order to Show Cause and Order (ECF Nos. 632 & 638) regarding party limited liability companies.

1369618.1

b.   **Personal Jurisdiction.** The court's personal jurisdiction over Defendants Madison and Horsepower is not disputed. The parties dispute whether this court also has personal jurisdiction over the remaining, newly joined defendants KAABOO, LLC, KAABOOWorks Services, LLC, KAABOOWorks, LLC, KAABOO Del Mar, LLC, and WarDawgz, LLC. *See* Motion to Dismiss and related briefing (ECF Nos. 614, 615 & 645).

c.   **Venue.** Venue in this Court is not disputed, except to the extent that the newly joined defendants dispute venue because jurisdiction is lacking.

d.   **Governing Law.** Subject to the Court's determination of the law that applies to the case, the parties (with the exception of the defendants newly joined in the Second Amended Complaint) believe and agree that the substantive issues regarding Plaintiffs' claims for breach of contract, breach of fiduciary duty, fraud and tortious interference are governed by Kansas law. The parties believe that Colorado law applies to the substantive issues regarding Plaintiffs' successor liability claim. The newly joined defendants dispute the application of Kansas law in a diversity case in which they believe jurisdiction is lacking.

2.   **STIPULATIONS.**

a.   The parties stipulate to the following facts for summary judgment purposes, although they reserve (i) all arguments at summary judgment regarding relevance or weight, and (ii) all objections as to admissibility and otherwise for trial.

i.   The country music festival called Thunder on the Mountain ("Thunder") was put on in 2013 but not in 2014.

ii.   Mosiman has been in the live music business for years. Leading up to the scheduled 2015 Thunder Festival, Mosiman had put on multiple music festivals.

iii.   A non-binding letter of intent ("LOI") dated July 28, 2014, was entered into.

iv.   The parties did not agree to the transaction contemplated by the LOI by the November 1, 2014 deadline.

v.      On or about August 28, 2014, Mosiman emailed Gordon regarding Thunder.

vi.     On or about October 9, 2014, Chris Brown sent an email regarding Thunder.

vii.    On or about November 4, 2014, Mosiman emailed Gordon regarding Thunder.

viii.   On or about November 6, 2014, Mosiman and Gordon exchanged emails regarding Thunder.

ix.     Plaintiffs obtained commitments from multiple artists to perform at Thunder 2015.

x.      Plaintiffs spent time in an effort to produce Thunder.

xi.     At least one of the Defendants paid $272,000 in artist deposits for Thunder before artists were announced to the public.

xii.    The deposits were paid directly to artists and/or their agents.

xiii.   Prior to meeting Plaintiffs, none of the Defendant companies had put on a music festival.

xiv.    The parties received emails at least periodically reflecting the then-current advance ticket sales.

xv.     On March 29, 2015, draft documents were sent to Plaintiffs.

xvi.    On or about April 7, 2015, counsel for Plaintiffs sent counsel for Defendants a letter.

xvii.   Thunder 2015 was cancelled on or about June 12, 2015.

xviii.  Thunder 2013 lost approximately $1.5 million, and was not put on in 2014.

xix.    On September 18, 2014, Mosiman wrote to Nathan Prenger.

xx.     The LOI had an expiration date of November 1, 2014.

xxi.    A draft of a revised LOI was prepared and sent to Plaintiffs in October of 2014, but was never signed.

xxii.   On November 24, 2014, Gordon emailed Mosiman and Prenger regarding Thunder.

xxiii.  At least one of the Defendants was represented by John Myers and John Murdock of Bradley Arant Boult Cummings LLP, and Chief Legal Officer Gary Burghart. Plaintiffs were represented by Matthew Gough of Barber Emerson, L.C.

xxiv.   On December 12, 2014, Burghart sent an email to Mosiman and Prenger attaching draft documents.

     xxv.     On December 15, 2014, Gary Burghart (then-General Counsel) received an email from Matt Gough regarding Thunder.

     xxvi.     On December 16, 2014, Murdock and Burghart had a call with Gough regarding Thunder.

     xxvii.     On December 23, 2014, Gough wrote to Burghart regarding Thunder. That same day, Mosiman wrote regarding Thunder.

     xxviii.     On January 7, 2015, Gough emailed Burghart, regarding Thunder. That same day, Mosiman wrote to Prenger regarding Thunder.

     xxix.     On February 10, 2015, Gough sent documents to Murdock and Burghart.

     xxx.     On November 4, 2014, March 23, 2015, and March 25, 2015, Plaintiffs sent budgets to Defendants.

     xxxi.     On March 29, 2015, counsel for Horsepower sent an email to counsel for Pipeline attaching documents on Thunder.

     xxxii.     HorsePower entered into an agreement to use the services of Sprocket Marketing.

     **b.**  The parties stipulate to the authenticity of the following exhibits for summary judgment purposes, although they reserve their rights to argue about relevance and weight. The parties have also stipulated to the following exhibits' authenticity (genuineness) for trial, and they will meet and confer in a good faith effort to agree upon the admissibility of trial exhibits:

     i.   <u>Exhibits identified by Plaintiffs:</u>

| | |
|---|---|
| Exhibit 2 | E-mail from Chris Brown to Brett Mosiman and Nate Prenger, 4/29/14 |
| Exhibit 3 | E-mail from Chris Brown to Brett Mosiman, Nate Prenger, Bryan Gordon, Seth Walkov, and Robert Walker, 5/15/14 |
| Exhibit 4 | E-mail exchange between Brett Mosiman, Bryan Gordon, Chris Brown, 7/26/14 |
| Exhibit 5 | E-mail between Chris Brown and Bentley Hodges, 8/28/14 |
| Exhibit 6 | E-mail exchange between Chris Brown and Bentley Hodges, 8/28/14 |
| Exhibit 7 | E-mail exchange between Chris Brown, Roger LeBlanc, Bryan Gordon, Bob Vogt, and Adam Spriggs, 9/13/14 |
| Exhibit 8 | E-mail exchange between Bryan Gordon, Brett Mosiman, Chris Brown, Nate, Josh Smith, 9/17/14 |
| Exhibit 9 | E-mail exchange between Chris Brown, Tracy Kirkeide, Bentley Hodges, Chris Brown, 10/7/14 |
| Exhibit 10 | E-mail exchange between Chris Brown, Seth Wolkov and Bentley Hodges, 9/3/14 |
| Exhibit 11 | E-mail from Bentley Hodges to Chris Brown, 9/18/14 |
| Exhibit 12 | E-mail from Max Bischmann, Nathan Prenger, Brett Mosiman, 11/26/14 |

| | | |
|---|---|---|
| Exhibit 13 | E-mail from Bentley Hodges to Catherine, 12/11/14 | |
| Exhibit 14 | E-mail from Max Bischmann to Bryan Gordon, Seth Walkov, Robert Walker, Chris Brown and Bentley Hodges, 1/19/15 | |
| Exhibit 15 | E-mail exchange between Bryan Gordon, Mike Merrill, Nathan Prenger, and Chris Brown, 1/23/15 | |
| Exhibit 25 | Emily Byer LinkedIn Page | |
| Exhibit 26 | E-mail from Emily Byer to Brett Mosiman and Max Bischmann, 12/5/14 | |
| Exhibit 27 | E-mail exchange between Emily Byer and Max Bischmann, 12/18/14 | |
| Exhibit 28 | E-mail from Max Bischmann to Emily Byer, 12/22/14 | |
| Exhibit 29 | E-mail from Max Bischmann to Aaron Stehman and Emily Byer, 12/23/14 | |
| Exhibit 30 | Email on behalf of Josh Smith to Emily Byer, Marty Rothchild, Amanda, Max Bischmann, and Aaron Stehman, 2/4/15 | |
| Exhibit 31 | E-mail from Bryan Gordon to Emily Byer, 2/18/15 | |
| Exhibit 32 | E-mail from Emily Byer to Max Bischmann, Nate Prenger, and Aaron Stehman 3/1/15 | |
| Exhibit 33 | E-mail exchange between Emily Byer, Taylor Gustafson, Max Bischmann, Nate Prenger, and Aaron Stehman, 3/2/15 | |
| Exhibit 34 | E-mail from Emily Byer to Brian Pilsl, Brian Wingerd, and Max Bischmann, 3/2/15 | |
| Exhibit 35 | E-mail from Brian Pilsl to Emily Byer, Max Bischmann, and Brian Wingerd, 3/2/15 | |
| Exhibit 36 | E-mail from Max Bischmann to Emily Byer, 3/3/15 | |
| Exhibit 37 | E-mail from Max Bischmann to Nate Prenger, Brett Mosiman, and Emily Byer, 3/4/15 | |
| Exhibit 38 | E-mail exchange between Rebecca Venkauskas, Max Bischmann and Emily Byer, 3/4/15 | |
| Exhibit 40 | E-mail from Bryan Gordon to Emily Byer, 3/9/15 | |
| Exhibit 41 | E-mail from Bryan Gordon to Emily Byer, 3/9/15 | |
| Exhibit 42 | E-mail exchanges between Emily Boyer, Brett Mosiman, and Alex Ryden, 3/19/15, 3/13/15, 3/5/15, 3/4/15 | |
| Exhibit 43 | E-mail exchanges between Bryan Gordon, Emily Byer, Brett Mosiman, and Max Bischmann, 3/23/15 | |
| Exhibit 44 | E-mail from Emily Byer to Brett Mosiman, Sheree Miller, Alex Ryden, Max Bischmann, Aaron Stehman, Lyndsay Ryan and Kelly, 3/23/15 | |
| Exhibit 45 | E-mail from Emily Byer to Bryan Gordon, Brett Mosiman, Nate Prenger, Max Bischmann, and Aaron Stehman, and Josh Smith, 4/7/15 | |
| Exhibit 50 | Independent Contractor Agreement | |
| Exhibit 51 | E-mail exchange between Rick Mueller and Paul Billings, 1/6/14 | |
| Exhibit 52 | E-mail exchange between Rich Mueller and Paul Billings, 1/6/14 | |
| Exhibit 53 | E-mail exchange between Roger LeBlanc, Robert Vogt, Bryan Gordon, and Chris Brown, 2/13/14 | |
| Exhibit 54 | E-mail exchange between A.J. Niland and Bryan Gordon, Chris Brown, and Robert Vogt, 3/3/14 | |
| Exhibit 55 | E-mail exchange between Robert Walker and Bryan Gordon, Seth Wolkov, Chris Brown, Paul Billings, Ciara Mackenzie, 3/17/14 | |
| Exhibit 56 | E-mail from Robert Vogt to Paul Billings, 5/21/18 | |

| | |
|---|---|
| Exhibit 57 | E-mail from Roger LeBlanc to Bryan Gordon, 6/27/14 |
| Exhibit 58 | E-mail from Seth Wolkov to Bryan Gordon, Chris Brown, Robert Vogt, and Terri Little, 2/20/14 |
| Exhibit 59 | E-mail from Robert Vogt to fcp@phillaw.com, 2/23/16 |
| Exhibit 60 | Email exchanges between Roger LeBlanc and Robert Vogt, 2/25/14 and 2/26/14 |
| Exhibit 61 | E-mail exchanges between Roger LeBlanc, Robert Vogt, Jason Miller, and Joseph Schwartz, 7/18/14, 7/21/14, and 7/22/14 |
| Exhibit 62 | Color photograph |
| Exhibit 63 | KAABOO Del Mar Investment Opportunity Manual, October 2014 |
| Exhibit 77 | Brian Pilsl LinkedIn Profile |
| Exhibit 78 | E-mail exchange between Bryan Gordon and Max Bischmann, Brian Pilsl, Brett Mosiman, Nate Prenger, and Brian Wingerd, 11/18/14 |
| Exhibit 79 | E-mail exchange between Bentley Hodges and Brian Pilsl, 11/19/14 |
| Exhibit 80 | E-mail exchange between Chris Brown, Brian Pilsl, Bentley Hodges, Max Bischmann, Julie Coleman, Bryan Gordon, Brian Wingerd, and Brett Mosiman, 11/22/14 |
| Exhibit 81 | E-mail exchange between Brian Pilsl, Brett Mosiman, Matthew Gough, Brian Wingerd, and Nathan Prenger, 1/8/15, 1/13/15, and 1/15/15 |
| Exhibit 82 | E-mail exchange between Bryan Gordon, Andrew Kelley, and Brian Pilsl, 2/2/15 and 1/29/15 |
| Exhibit 83 | E-mail from Brian Gordon to Emily Byer, 2/18/15 |
| Exhibit 84 | E-mail exchange between Bryan Gordon, Brian Pilsl and Max Bischmann, 3/3/15 |
| Exhibit 85 | E-mail exchange between Brian Pilsl, Bryan Gordon, Max Bischmann, and Brian Wingerd, 3/4/15 |
| Exhibit 86 | E-mail exchange between Brian Pilsl, Brian Gordon, Brett Mosiman, Brian Wingerd, and Nate, 3/7/15 |
| Exhibit 87 | E-mail exchange between Bryan Gordon, Brian Wingerd, Brian Pilsl, and Emily Byer, 3/9/15 |
| Exhibit 88 | Email exchange between Brian Wingerd, Bryan Gordon, Emily Byer, Brian Pilsl, 3/24/15 and 3/26/15 |
| Exhibit 89 | E-mail exchange between Bryan Gordon, Brian Wingerd, Brett Mosiman, Nate, Brian Pilsl, 3/15/15 |
| Exhibit 90 | E-mail exchange between Brian Pilsl and Bryan Gordon, 3/24/15 |
| Exhibit 91 | E-mail exchange between Brian Gordon, Brian Wingerd, Brett Mosiman, Nate, and Emily Byer, 3/24/15 |
| Exhibit 153 | About Madison Companies |
| Exhibit 154 | History of Madison Companies |
| Exhibit 155 | Madison Companies, LLC LinkedIn "About Us" page |
| Exhibit 156 | KAABOOWorks, LLC LinkedIn "About Us' page |
| Exhibit 157 | KAABOO Del Mar Investment Opportunity Manual |
| Exhibit 158 | E-mail from Robert Walker to Judy Michael, 8/7/14 |
| Exhibit 159 | San Diego Tribune online news article |
| Exhibit 162 | E-mail from Brett Mosiman to Bryan Gordon, 11/4/14 |
| Exhibit 356 | Suzanne M. Prieur Facebook Page |
| Exhibit 357 | Suzanne Bowman LinkedIn Page |
| Exhibit 358 | E-mail from Bryan Gordon to Suzanne Land, 3/10/15 |

Exhibit 359      E-mail from Suzanne Land to Bryan Gordon
Exhibit 360      E-mail exchange between Ken Hall, Gary Burghart, Matthew Gough, Tim Hutchinson, J Myers, Susanne Land, J Murdock, and Judy Michael, 3/18/15 and 3/17/15
Exhibit 361      E-mail exchange between Suzanne Land, Matthew Gough, Gary Burghart, Tim Hutchinson, J Myers, J Murdock, Judy Myers, and Ken Hall, 3/19/15 and 3/18/15
Exhibit 362      E-mail from Viiram McKenney to Suzanne Land, 3/19/15
Exhibit 363      E-mail exchange between Bryan Gordon and Suzanne Land, 3/20/15
Exhibit 364      E-mail exchange between Suzanne Land and Bryan Gordon, 3/20/15
Exhibit 365      E-mail from Suzanne Land to Bryan Gordon, 3/23/15
Exhibit 366      E-mail from Suzanne Land to Bryan Gordon, 3/25/15
Exhibit 367      E-mail from Suzanne Land to Jeanne Timmons, 4/15/15
Exhibit 368      E-mail from Suzanne Land to Nathan Prenger, Andrew Kelley, and Bryan Gordon, 4/15/15
Exhibit 369      E-mail exchange between Suzanne Land, Matthew Gough, Gary Burghart, Tim Hutchinson, J Myers, J. Murdock, Judy Michael, and Ken Hall, 3/18/15 and 3/31/15
Exhibit 370      E-mail from Seth Wolkov to Suzanne Land, Bryan Gordon and Robert Walker, 4/9/15
Exhibit 371      Non-Party Suzanne Land's Response to Production Requests
Exhibit 374      Find of Fact and Recommendation of the Board of Professional Conduct
Exhibit 375      Photo of Audio disc of T/C
Exhibit 377      E-mail from Suzanne Land to Nathan Prenger, Brett Mosiman, and Andrew Kelley, 4/15/15
Exhibit 378      E-mail from Suzanne Land to Brett Mosiman and Nathan Prenger, 4/6/15
Exhibit 380      E-mail from Tim Hutchinson to Suzanne Land, Ken Hall, and Gary Burghart, 3/17/15
Exhibit 381      Handwritten Ticket Distribution Agreement
Operating Agreement of Kaaboo-Del Mar, LLC
Operating Agreement of Kaaboo Works Services, LLC
Operating Agreement of KaabooWorks, LLC
Amended Operating agreement of Kaaboo, LLC
Fourth Amended Operating Agreement of KaabooWorks, LLC
Fourth amended Operating Agreement of Kaaboo, LLC
Written Consent of the Managing Members of The Madison Companies, LLC
Third Amended Operating Agreement of KaabooWorks, LLC
Amended Operating Agreement of KaabooWorks, LLC
Amended Operating Agreement of KaabooWorks Services, LLC
Third Amended Operating Agreement of Kaaboo, LLC
Operating Agreement of Kaaboo, LLC
Asset Purchase Agreement between Kaaboo and San Diego Fest
Operating Agreement of WarDawgz, LLC
Operating Agreement of Horsepower Entertainment, LLC
Certificate of Cancelation of Horsepower Entertainment, LLC
Kaaboo Works Services, LLC name change to Eventpro Services, LLC
Eventpro Services, LLC (Kaaboo Works Services, LLC) formation date

KaabooWorks, LLC Certificate of Formation
Email from Murdock to Bowman dated 6/4/15re: Prenger consulting agreement
Prenger Consulting Agreement(s)
Emails from Earnest to Gustafson dated July 2015 re: offer of employment
Email from Gordon to Pilsl dated 8/3/15 re: employment
Email from Gordon to Byer dated 10/4/15
Emails from Earnest to Pilsl dated October 2015 re: employment
Emails from Earnest to Wingerd dated October 2015 re: employment
Kaaboo Del Mar investment opportunity packet(s)
Letter to Prenger dated 4/15/15 re: draft of consulting agreement
Email from Land to Prenger and Gordon dated 5/29/15
Email to Murdock, Myers and Bowman dated 7/2/15 re: Prenger consulting agreement
Email to Prenger dated 5/11/15
Email from Murdock to Myers dated 6/23/15
Email from Timmons to Bowman dated 4/15/15
Email from Prenger to Gordon dated 7/3/15
Email from Murdock to Myers dated 6/23/15
Email from Myers to Bowman dated 6/4/15
Email from Bowman to Murdock dated 7/15/15
Email from Earnest dated 7/2/15 re: Gustafson
Email from Earnest dated 10/7/15 re: Pilsl
Email from Earnest dated 10/7/15 re: Wingerd
Email from Earnest dated 10/8/15 re: Wingerd
Email from Earnest dated 10/9/15 re: Pilsl
Summary of 2016 Kaaboo Del Mar
Kaaboo Del Mar Investment summaries
Kaaboo 2017 budget and YOY master
Kaaboo 2016 budget projected
Kaaboo Y1 budgets
Summary of investor information and financials
Kaaboo Del Mar operating cash flow 2015
Kaaboo Del Mary Key Operating Assumptions for 2015
Kaaboo Del Mary cash flow projections for 2016 event
Confidentiality and Inventions Assignment Agreement between Wingerd and KWS
Non-competition and Non-Solicitation Agreement between Wingerd and KWS
Email to Edwards dated 7/15/15 re: Change in email addresses from Horsepower to Kaaboo
Platform Financing Presentations
Email from Earnest dated 10/5/14 re: Pilsl and Wingerd Offer of employment between Kaaboo
Works and Pilsl
Offer of Employment between KaabooWorks and Wingerd
Email to Earnest from Sulser dated 10/6/15
Email to Earnest dated 7/2/15 re: Taylor Gustafson
Email from Gordon to Earnest dated 10/6/15 re: Pilsl
Email from Gordon to Earnest dated 10/6/154 re: Wingerd
Email from Wolkov to Earnest dated 10/6/15 re: Pilsl
Email from Wolkov to Earned dated 10/6/15 re: Wingerd

-8-

Email from Wolkov to Earnest dated 10/7/15
Email from Earnest to Gordon dated 10/9/15
Email from Gordon to Earnest dated 7/9/15 re: Gustafson
Email from Gordon to Edwards dated 10/4/15 re: new hires
Email from Walker to Earnest dated 10/6/15 re: offers of employment
Email from Earnest to Pilsl dated 10/7/15
Email from Pilsl to Earnest dated 10/8/15
Email from Wingerd to Earnest dated 10/9/15
Email from Gordon to Earnest dated 6/30/15 re: Gustafson
Email from Gustafson to Earnest dated 7/6/15
Email from Earnest to Endless Summer Productions dated 8/5/16
Email from Earnest to Harris dated 8/5/16
Email from Pilsl to Earnest dated 10/2/15
Email from Walker to Earnest dated 10/6/15
Email from Merrill to Earnest dated 7/10/15
Email from Pilsl to Earnest dated 10/8/15
Email from Wingerd to Earnest dated 10/9/15
Email from Gordon to Earnest dated 6/30/15
Email from Gustafson to Earnest dated 7/6/15
Email from Chapman to Prenger dated 9/22/16
Email from Prenger to Chapman dated 9/28/16
Email from Timmons dated 10/6/15
Expert Reports of Steve York
Expert Report of AJ Niland
Expert Report of Robert Downs

       ii.    <u>Exhibits identified by Defendants</u>:

Exhibit 104    E-mail from Matthew Gough to Gary Burghart, 12/15/14
Exhibit 105    E-mail exchange between Bryan Gordon and Brett Mosiman
Exhibit 106    E-mail exchange between Bryan Gordon and Brett Mosiman, 2/23/15
Exhibit 107    E-mail exchange between Bryan Gordon and Nathan Prenger, 11/24/14
Exhibit 108    E-mail exchange between Bryan Gordon and Brett Mosiman, 11/21/14 and 1/22/14
Exhibit 109    E-mail from Matthew Gough to Gary Burghart, 12/23/14
Exhibit 110    E-mail from Nathan Prenger to Brett Mosiman, 1/15/15
Exhibit 111    E-mail from Matthew Gough to John Myers and Jim Murdock, 2/24/15
Exhibit 112    E-mail from Gary Burghart to Brett Mosiman and Nathan Prenger, 12/12/14
Exhibit 113    E-mail from John Murdock to Matthew Gough, Brett Mosiman and Nathan Prenger, 1/29/15
Exhibit 114    E-mail from Matthew Gough to John Murdock, 2/03/15
Exhibit 115    E-mail from John Myers to Matthew Gough, 2/6/15
Exhibit 116    E-mail from Matthew Gough to Brett Mosiman and Nathan Prenger, 3/30/15
Exhibit 117    E-mail from John Murdock to Matthew Gough, 3/29/15
Exhibit 118    E-mail from John Murdock to Gary Burghart, Suzanne Land and John Myers, 3/29/15

Exhibit 119   E-mail from John Murdock to Gary Burghart, Suzanne Land and John Myers, 3/29/15

Exhibit 120   Letter from Horsepower Entertainment to Pipeline Productions, Inc., 7/28/14

Exhibit 121   Letter from Horsepower Entertainment to Pipeline Productions, Inc., 7/28/14

Exhibit 122   E-mail from Gary Burghart to Brett Mosiman and Nathan Prenger, 10/23/14

Exhibit 123   E-mail from Brett Mosiman to Jim Dorroh, 1/3/14

Exhibit 124   E-mail from Brett Mosiman to Brian Pilsl, 1/3/14

Exhibit 125   E-mail from Nathan Prenger to Brett Mosiman, 3/5/14

Exhibit 126   E-mail from Nathan Prenger to Brett Mosiman, 3/5/14

Exhibit 127   E-mail from Nathan Prenger to Brett Mosiman, 5/17/14

Exhibit 128   E-mail from Brett Mosiman to Bryan Gordon, 6/25/14

Exhibit 129   E-mail from Bryan Gordon to Brett Mosiman, 7/25/14

Exhibit 130   E-mail from Nathan Prenger to Brett Mosiman, 8/28/14

Exhibit 131   E-mail from Bryan Gordon to Brett Mosiman, 8/28/14

Exhibit 132   E-mail from Brett Mosiman to Chris Brown and Max Bischmann, 11/4/14

Exhibit 133   E-mail from Bryan Gordon to Brett Mosiman, 11/6/14

Exhibit 134   E-mail from Robert Walker to April Boulter, Carly Kosik, Mike Merrill, 1/5/15

Exhibit 135   E-mail from Nathan Prenger to Robert Walker, 1/6/15

Exhibit 136   E-mail from Robert Walker to Nathan Prenger, 1/6/15

Exhibit 137   E-mail from Robert Walker to Nathan Prenger, 1/6/15

Exhibit 138   E-mail from Brett Mosiman to Robert Walker and Nathan Prenger, 1/6/15

Exhibit 139   E-mail from Brett Mosiman to Bentley Hodges, Nathan Prenger and Max Bischmann,     3/23/15

Exhibit 140   E-mail from Brett Mosiman to Bentley Hodges, 3/25/15

Exhibit 141   E-mail from Matthew Gough to John Murdock, 1/7/15

Exhibit 142   E-mail from Nathan Prenger to Brett Mosiman, 1/8/15

Exhibit 143   E-mail from Nathan Prenger to Brett Mosiman, 3/20/15

Exhibit 144   E-mail from John Murdock to Ken Hall, 3/11/15

Exhibit 145   E-mail from Matthew Gough to John Murdock, 4/7/15

Exhibit 146   E-mail from Brett Mosiman to Jenna Vogel, 10/2/15

Exhibit 147   E-mail from Brett Mosiman to J.C., 7/3/15

Exhibit 148   Amended Complaint filed in this matter

Exhibit 149   E-mail from Brett Mosiman to Mr. Skepnek, 6/30/15

Exhibit 151   E-mail from Nathan Prenger to Brett Mosiman, 5/28/15

Exhibit 195   Organization chart

Exhibit 196   Pipeline org chart

Exhibit 196A   Pipeline org chart

Exhibit 204   Letter of intent

Exhibit 205   12/15/14 email from M. Gough

Exhibit 206   12/12/14 email from M. Gough

Exhibit 207   Email from G. Burghart

Exhibit 208   Email meeting invite

Exhibit 209   Email from M. Gough

Exhibit 210   Email meeting invite

Exhibit 211   Email from M. Gough

Exhibit 212   12/16/14 email from M. Gough

| | | |
|---|---|---|
| Exhibit | 213 | 12/18/14 email with attachments |
| Exhibit | 214 | 12/23/14 email from M. Gough |
| Exhibit | 215 | Email chain |
| Exhibit | 216 | Email chain |
| Exhibit | 217 | Email chain |
| Exhibit | 218 | Email chain |
| Exhibit | 219 | 2/5/15 email from M. Gough |
| Exhibit | 220 | Email from J. Myers |
| Exhibit | 221 | 3/2/15 email from M. Gough |
| Exhibit | 222 | Invites/confirmations-March 10 2015 phone call |
| Exhibit | 223 | Invites/confirmations-March 10 2015 phone call |
| Exhibit | 224 | Invites/confirmations-March 10 2015 phone call |
| Exhibit | 225 | 3/11/15 email from J. Murdock |
| Exhibit | 226 | Email chain |
| Exhibit | 227 | Email chain |
| Exhibit | 228 | Email chain |
| Exhibit | 229 | 3/23/15 email from J. Murdock |
| Exhibit | 230 | Reece Moore Pendergraft invoice |
| Exhibit | 231 | 2/26/15 email from J. Murdock |
| Exhibit | 232 | 1/29/15 email from J. Murdock with attachments |
| Exhibit | 233 | 2/3/15 email with attachments |
| Exhibit | 234 | 2/6/15 email from J. Myers |
| Exhibit | 235 | 2/10/15 email from M. Gough with attachment |
| Exhibit | 236 | 2/24/15 email from M. Gough |
| Exhibit | 237 | Email from J. Murdock |
| Exhibit | 238 | 2/6/15 email from M. Gough with attachments |
| Exhibit | 239 | 4/7/15 email from M. Gough with attachments |
| Exhibit | 240 | 4/16/15 email from M. Gough with attachments |
| Exhibit | 261 | Email attaching proposed letter of intent |
| Exhibit | 307 | Email chain |
| Exhibit | 311 | Email chain |
| Exhibit | 314 | Email chain |
| Exhibit | 315 | 11/4/14 email attaching Thunder on the Mountain budget |
| Exhibit | 316 | 3/23/15 email attaching Thunder on the Mountain budget |
| Exhibit | 317 | 3/17/15 email attaching Thunder ticketing sales summary |
| Exhibit | 318 | 3/25/15 email attaching Thunder on the Mountain budget |
| Exhibit | 321 | Email from Mr. Walker |
| Exhibit | 322 | 10/20/14 email chain |
| Exhibit | 324 | Email chain |
| Exhibit | 325 | Email chain |
| Exhibit | 326 | Email chain |
| Exhibit | 327 | 1/19/15 email |
| Exhibit | 328 | 1/21/15 email |
| Exhibit | 329 | 1/29/15 email |
| Exhibit | 330 | Email and attachment |
| Exhibit | 331 | Email chain |

Exhibit  334     e-mail chain
Exhibit  335     e-mail/offer sheets
Exhibit  336     ZBB contract
Exhibit  337     e-mail
Exhibit  338     e-mail
Exhibit  339     CU contract
Exhibit  340     e-mail/offer sheet
Exhibit  341     e-mail/offer sheet
Exhibit  342     e-mail
Exhibit  344     CU agreement
Exhibit  345     e-mail chain
Exhibit  346     e-mail chain
Exhibit  347     e-mail chain
Exhibit  348     e-mail
Exhibit  349     e-mail
Exhibit  350     e-mail
Exhibit  352     e-mail
Exhibit  431     1/27/15 E-mail
Exhibit  432     1/28/15 E-mail
Exhibit  433     3/10/15 E-mail
Exhibit  434     3/12/15 E-mail
Exhibit  435     3/16/15 E-mail
Exhibit  436     3/16/15 E-mail
Exhibit  437     3/18/15 E-mail
Exhibit  438     3/21/15 E-mail
Exhibit  439     3/21/15 Letter
Exhibit  440     3/31/15 E-mail
Exhibit  441     3/17/15 E-mail
Exhibit  442     Expert Report of Daniel Pine
Exhibit  443     Expert Report of Jeff Franklin
Exhibit  444     Expert Report of Robert Wunderlich
Exhibit  501     Notes
Exhibit  504     Thunder on the Mountain budget
Exhibit  505     5/28/15 budget
Exhibit  506     Email from T. Gustafson
Exhibit  507     6/16/15 email from C. Monzo
Exhibit  508     7/1/15 email from C. Monzo with attachment
Exhibit  523     7/1/15 email, re: notice Pipeline 005678
Exhibit  524     1/6/19 email thread, re: homework Pipeline 052060 - 052062
Exhibit  525     11/24/15 email thread Pipeline 030380 - 030381
Exhibit  526     12/21/15 email thread, re: communications equipment Pipeline 031897 - 031898
Exhibit  527     8/31/15 email thread, re: Phases 64 Pipeline 053776
Exhibit  528     6/17/15 letter to Pipeline Productions from Robert Tobolowsky pipeline 048523 - 048526
Exhibit  529     6/18/15 email thread, re: Pipeline DDChecklist.pdf attached
Exhibit  530     8/19/15 email thread, re: Wakarusa Analysis.xlsx attached Pipeline 048580

| Exhibit 620 | 10/6/15 email from c3@endlesssummerproductions.com to Brett Mosiman re WAKA |
| Exhibit 630 | 2/05/18 email from Hoy re Entity Ownership |
| Exhibit 631 | 12/18/17 Board Minutes (Pipeline Events, Pipeline Ticketing, OK Productions & Pipeline Productions) |
| Exhibit 632 | 3/06/17 Billing for the Skepnek Law Firm |
| Exhibit 633 | 5/09/12 Operating Agreement of Mulberry Holdings, L.L.C. |
| Exhibit 634 | 04/26/12 Operating Agreement of OK Property Holdings, LLC |
| Exhibit 635 | Pledge Agreement between Mulberry Holdings, LLC & OK Productions, Inc. |
| Exhibit 636 | 11/11/15 Email from Brett Mosiman to Dewey Patton re Mulberry Property |
| Exhibit 637 | 6/01/13 Shareholders' Agreement for Pipeline Events, Inc. |
| Exhibit 638 | 01/2015 Operating Agreement of POTM Holdings, KKC |
| Exhibit 639 | 9/12/13 Operating Agreement of Seven3Seven, LLC |
| Exhibit 640 | 6/05/15 Accountant's Compilation Report for OK Property Holdings, LLC |
| Exhibit 641 | 9/02/16 Accountant's Compilation Report for OK Property Holdings, LLC |
| Exhibit 642 | 3/17/15 Accountant's Compilation Report for Pipeline Ticketing, LLC |
| Exhibit 643 | 9/07/17 Accountant's Compilation Report for Pipeline Ticketing, LLC |
| Exhibit 644 | 6/05/15 Accountant's Compilation Report for OK Productions, Inc. |
| Exhibit 645 | 9/06/16 Accountant's Compilation Report for OK Productions, Inc. |
| Exhibit 646 | 9/11/17 Accountant's Compilation Report for OK Productions, Inc. |
| Exhibit 647 | 6/23/15 Accountant's Compilation Report for Pipeline Productions, Inc. |
| Exhibit 648 | 9/07/16 Accountant's Compilation Report for Pipeline Productions, Inc. |
| Exhibit 649 | 9/05/17 Accountant's Compilation Report for Pipeline Productions, Inc. |
| Exhibit 650 | 6/19/15 Accountant's Compilation Report for Pipeline Events, Inc. |
| Exhibit 651 | 9/02/16 Accountant's Compilation Report for Pipeline Events, Inc. |
| Exhibit 652 | 9/07/17 Accountant's Compilation Report for Pipeline Events, Inc. |
| Exhibit 653 | 9/16/14 Statement of Financial Condition of Brett & Brianna Mosiman |
| Exhibit 655 | 12/30/14 Email from Nathan Prenger to Brett Mosiman re here you go |
| Exhibit 657 | 1/05/15 Email from Nathan Prenger to Brett Mosiman re Phases Issue |
| Exhibit 658 | 10/06/15 Email from Brett Mosiman to Carl Monzo re FWD: Wakarusa financials |
| Exhibit 659 | 3/04/15 Email from Nathan Prenger to Brett Mosiman, Colleen Hodge re Phases start up |
| Exhibit 660 | 4/20/15 Email from Nathan Prenger to Brett Mosiman re Attempt to Settle |
| Exhibit 661 | 3/02/15 Email from Gordon to Mosiman re Thunder Marketing Upate (sic) Pipeline000209-211 |
| Exhibit 662 | 3/02/15 Email from Gordon to Mosiman re Thunder Marketing Upate (sic) Pipeline000212-215 |
| Exhibit 663 | 3/02/15 Email from Mosiman to Gordon re Thunder Marketing Upate (sic) DEFTS00027113-27115 |
| Exhibit 664 | 3/02/15 Email from Mosiman to Gordon re Thunder Marketing Upate (sic) Pipeline001725-1727 |
| Exhibit 665 | 3/02/15 Email from Mosiman to Prenger re Thunder Marketing Upate (sic) Pipeline049375-49379 |
| Exhibit 666 | 3/02/15 Email from Prenger to Mosiman re Thunder Marketing Upate (sic) Pipeline002718-2720 |

Exhibit 667    3/02/15 Email from Prenger to Mosiman re Thunder Marketing Upate (sic) Pipeline002727-2730

Exhibit 668    3/02/15 Email from Gordon to Mosiman re Thunder Marketing Upate (sic) Pipeline041124-41141

Exhibit 669    3/02/15 Email from Mosiman to Gordon re Thunder Marketing Upate (sic) Pipeline001725-1727

Exhibit 670    3/02/15 Email from Mosiman to Gordon re Thunder Marketing Upate (sic) Pipeline003626-3629

Exhibit 671    3/02/15 Email from Mosiman to Prenger re Thunder Marketing Upate (sic) DEFTS00027151-27154

Exhibit 672    Master Services Agreement between KAABOO –DEL MAR, LLC and Endless Summer Productions, LLC  DEFTS00039784-39793

Exhibit 673    8/17/16 Revised Offer of Employment from KAABOOWorks Services, LLC to Carl Monzo, III  DEFTS00039820-39823

Exhibit 674    5/01/19 Independent Contractor Agreement between Carl Monzo, III and KAABOO Cayman Eventco, LLC  DEFTS00039752-39767

Exhibit 675    8/23/16 Offer of Employment to Lowell Carrico from KAABOOWorks Services, LLC  DEFTS00040238-40239

Exhibit 676    8/25/17 Offer of Employment to Nate Hoffman from KABOOWorks Services, LLC  DEFTS00040280-40283

Exhibit 677    Pledge Agreement  Pipeline054501-054506

Exhibit 678    Proposal Options  Pipeline055207-55209

Exhibit 679    6/18/14 Email from Nathan Prenger to Brett Mosiman re CC debacle Pipeline009702

Exhibit 680    7/18/14 Email from Nathan Prenger to Brett Mosiman re Mulberry Holdings, Inc. Pipeline000422-425

Exhibit 681    8/30/14 Email from Nathan Prenger to Brett Mosiman Pipeline011781

Exhibit 683    10/06/14 Email from Brian Wingerd to brett@pipelineproductions.com re Harvest Map and Advance  Pipeline023186-23189

Exhibit 684    1/05/15 Email from Brett Mosiman to Nathan Prenger re Thunder Daily Sales Pipeline045720-45721

Exhibit 685    1/08/15 Email from Nathan Prenger to Brett Mosiman re liquor license Pipeline004116-4119

Exhibit 686    2/24/15 Email from Nathan Prenger to Brett Mosiman re Security Plan Pipeline006954-6955

Exhibit 687    2/24/15 Email from Matthew Gough to John Myers re Thunder Venue Agreements  DEFTS00028931-28960

Exhibit 689    3/17/15 Email from Max Bischmann to Bryan Gordon, Seth Wolkov, Robert Walker, Chris Brown, Bentley Hodges re Thunder Weekly Summary 3/17 DEFTS00027719

Exhibit 690    4/16/15 Email from Nathan Prenger to Brett Mosiman re Thunder on the Mountain Deposits  Pipeline003822-3823

Exhibit 691    5/8/15 Email from Nathan Prenger to Brett Mosiman, Josh Smith, Aaron Stehman re Waka Sales – Marketing Update  Pipeline008956

Exhibit 692    5/20/15 Email from Nathan Prenger to Brett Mosiman re modification Pipeline013322

Exhibit 693    5/22/15 Email from Nathan Prenger to Brett Mosiman re Report from Pipeline Ticketing LLC  Pipeline004661

Exhibit 694    5/22/15 Email from Nathan Prenger to Brett Mosiman re HWY 23 Update Pipeline004662-4663

Exhibit 695    5/26/15 Email from banjostobeatsbooking@gmail.com to Nathan Prenger re Hwy 23 Update Pipeline017963-17967

Exhibit 696    5/28/15 Email from Brett Mosiman to Katie Anderson re Thunder on the Mountain  Pipeline039295

Exhibit 698    6/11/15 Email from Nathan Prenger to Brett Mosiman re Fwd: 2015 TOTM Event Cancellation Proposal Pipeline013457-13480

Exhibit 699    6/13/15 Email from Nathan Prenger to Brett Mosiman re Thunder Announcement Pipeline005122

Exhibit 700    10/6/15 Email from Brett Mosiman to Carl Monzo re Fwd: Wakarusa financials Pipeline036166

Exhibit 701    5/28/15 Email from Brett Mosiman to Katie Anderson re Thunder on the Mountain  Pipeline039295

Exhibit 702    5/8/12 Real Estate Contract between Vernon S. Patton and Patricia D. Patton, Trustees of the Patton Family Trust dated December 7, 2011 and OK Property Holdings, LLC  DEFTS00004392-4413

Exhibit 703    5/9/12 Memorandum of Right of First Refusal DEFTS00001798-1829

Exhibit 704    6/24/15 Email from Carl Monzo III to Brett Mosiman re update Pipeline025131-25132

Exhibit 705    9/18/14 Email from Nathan Prenger to Brett Mosiman re 2015 Events Pipeline003337-3338

Exhibit 706    Shareholders Agreement for Pipeline Events Pipeline054511-54533

Exhibit 707    Operating Agreement of Backwoods Enterprises Pipeline054621-54643

Exhibit 708    Operating Agreement of Sasquatch Enterprises Pipeline054644-54666

Exhibit 709    Operating Agreement of Sprocket Marketing Pipeline054667-54692

Exhibit 710    Operating Agreement of Old Rooster Pipeline054693-54715

Exhibit 711    Operating Agreement of Pipeline Ticketing Pipeline054716-54745

Exhibit 712    Consulting Agreement between Pipeline Productions, Inc. and Horsepower Entertainment , LLC Pipeline000724-742

Exhibit 713    Consulting Agreement between Pipeline Productions, Inc. and Horsepower Entertainment , LLC Pipeline009298-9308

Exhibit 714    11/4/14 Email from Nathan Prenger to Gary Burghart re Fwd: KaaNoo Agreement  DEFTS00044227-44237

Exhibit 715    11/7/14 Email from Nathan Prenger to Bryan Gordon re Fwd: KaaBoo Agreement DEFTS00044083-44094

Exhibit 716    12/2/14 Email from Gary Burghart to Jeanne Timmons re Pipeline/ Kaaboo Consulting Agreement  DEFTS00045229-45240

Exhibit 725    10/14/16 Email from Brett Mosiman to David Clark re: signed docs Pipeline 051705-51728

3.     **FACTUAL CONTENTIONS.[1]**

a.     **Plaintiffs' Contentions.**

In early 2014, Mosiman met Gordon, who represented that he was Madison's principal. Gordon told Mosiman that Madison wanted to partner with Mosiman and his companies to produce music festivals, including Thunder on the Mountain ("Thunder"), by taking advantage of Mosiman's reputation and expertise and Madison's resources.   Defendants conducted due diligence on Plaintiffs' festival related businesses, including reviewing Plaintiffs' financial data.

On or about August 1, 2014, the parties entered into a Letter of Intent ("LOI"), in which Defendants would pay $6.56M in payments and investments for 51% of Plaintiff's festival businesses, including Thunder.   Mosiman emailed Gordon during the LOI period, on or about August 28, 2014, warning that he would be in a "very precarious and damaging position" of not being able to follow thru on artist offers if the LOI was not consummated.   Accordingly, he asked whether Defendants would proceed with partnering/funding on Thunder regardless of how the LOI deal worked out.   Gordon gave Mosiman his complete assurances.

In late October 2014, Defendants tried to dramatically change the terms of the LOI deal, which Plaintiffs could not accept.   The LOI was mutually rescinded.

After the LOI was rescinded, the parties continued to discuss doing business together. Mosiman would not have produced Thunder without Madison/Horsepower's financial

---

[1] The parties originally submitted detailed factual narratives of approximately nine pages each. At the final pretrial conference on April 9, 2019, the undersigned ordered the parties to limit their factual contentions to 2 ½ pages each in order to comply with the form pretrial order, which directs the parties to submit a "concise, non-argumentative statement of each party's version of the facts as they pertain to the pertinent issues in the case.   It is neither necessary nor appropriate to recite every factual nuance that will be presented at trial."   Therefore, these contentions are summaries of the parties' respective theories of the case rather than exhaustive lists of all the facts, arguments, or nuances that may be relevant to these theories.

involvement, as evidenced by no 2014 Thunder.  On November 3, 2014, Mosiman and Gordon talked about a Thunder-only deal.  The next day, Mosiman sent Gordon two alternative structures referred to as Options A and B.  Gordon accepted Option B, which provided that Defendants would pay Plaintiffs $700K and contribute a $500K line of credit, among other terms, for a 51% interest in Thunder.  Over the next several days Gordon repeatedly confirmed the parties' deal and assured Mosiman of their agreement.

Gordon accepted and adopted the parties' operating budget.  Gordon personally authorized artist offers and directed Mosiman to encumber the joint venture with over $2M of artist performance contracts.  Just over a month after the parties solidified their relationship regarding Thunder, Defendants' attorneys forwarded documents memorializing the parties' agreement on the joint venture.  All four terms of Option B were contained therein.

Meanwhile, in early December 2014, Plaintiffs put Thunder on sale to the public with Gordon's knowledge and approval.  And in early January 2015, Mosiman announced the Thunder lineup publicly, again with Gordon's approval.  From November 2014 through April 2015, Gordon and Defendants performed as full partners on Thunder in accordance with their agreement.  During those five months, Defendants and their employees undertook running Thunder as its majority owner – per the terms of their agreement with Plaintiffs.  Defendants approved bookings, marketing, and sponsorships, among other things.  Defendants got daily ticket counts (sales reports) from Plaintiffs, as per industry standards, a courtesy reserved only for equity partners.  Hundreds of emails and phone calls and meetings document these facts.

On or about March 29, 2015, however, Defendants attempted to materially change the terms of their agreement with Plaintiffs.  In their "new" version, none of the 4 financial terms of the November agreement survived.  On April 7, Plaintiffs responded through counsel to

-17-

Defendants' obvious attempt to materially breach their agreement.   In that letter, Plaintiffs asked Defendants to abide by their agreement and warned of the dire and far-reaching consequences and damages to Plaintiffs if Defendants backed out of their agreement just two months prior to the festival.  Without the promised funding from Defendants, Plaintiffs were forced to cancel the event in mid-June 2015, two weeks before it was scheduled to occur.

In a coordinated effort to destroy Plaintiffs ability to pursue remedy from Defendants' willful breach, Defendants sued Plaintiffs in Delaware while unilaterally cutting all ties with Plaintiffs and Thunder.   This left Plaintiffs holding the bag for all artist payments and festival expenses. Immediately after filing their lawsuit against Plaintiffs, Suzanne Land, a consultant with Madison, called Plaintiffs to inform them of the Delaware lawsuit and termination of the joint venture, and threatened scorched-earth litigation if they did not sign unconscionable documents concocted by Defendants regarding a fictitious loan agreement.   This threat came to pass as evidenced by not one, but two frivolous lawsuits Defendants have filed thus far in distant venues without jurisdiction.  Both cases were dismissed after nearly a year of litigation.  Further efforts to destroy Plaintiffs' business, reputation, and financial condition included negotiations to hire away Plaintiffs' partners and employees; sending false and damaging letters to industry agents; and breaching two other contracts with Plaintiffs related to Defendants' Kaaboo Del Mar festival.

Defendants' malfeasances were wanton and willful.   Evidence demonstrates a vast array of untruthful statements and obfuscation from Defendants' and their witnesses in this case. Defendants tried to hide their interference with Plaintiffs' businesses, but late-produced evidence shows that Defendants were negotiating with Plaintiffs' partner, Prenger, before the April 7, 2015 letter that they claim caused them to back out of Thunder.

Defendants also tried to make themselves judgment proof by "transitioning" their interests, assets, and businesses to other entities in the hopes of preventing Plaintiff's from attaining fair and just remuneration. Specifically, the owners of Madison and Horsepower transferred their music festival business from Madison and Horsepower to Kaaboo, LLC and Wardawgz, LLC, which they also owned, through a series of transfers of ownership and assets among the various related entities. These transfers were made without consideration and did not change the day-to-day business operations (*i.e.,* the owners, executives, employees and offices stayed the same). Defendants made these maneuvers after litigation, including this lawsuit, had begun. They also concealed these transfers, as well as documents clearly showing that the owners used Madison/Horsepower and Kaaboo entities to tortiously interfere with Plaintiffs' business relationships.

Because all Thunder money had gone to artists and festival expenses, Plaintiffs were unable to provide refunds for fans. Further, fan-initiated chargebacks were deducted from funds that were rightfully earmarked for Plaintiff's other businesses. A domino effect, which Defendants were warned of if they breached the Thunder agreement, Plaintiffs' festival-related businesses effectively lost as direct consequence of Defendants' breach. Defendants themselves valued these same businesses at approximately $13M in the LOI. Plaintiffs have been unable to produce a music festival since.

**b.      Defendants' Contentions.**

An entity related to plaintiff Brett Mosiman, who controls the plaintiff entities, put on a festival in 2013 called "Thunder on the Mountain" ("Thunder"). It lost $1.4 to $1.5 million. Mosiman did not put on Thunder in 2014.

Some of the parties in this case entered into a non-binding letter of intent dated July 24, 2014, which gave them until November 1, 2014 to try to come to agreement on a definitive written and signed contract to create a company to hold Thunder and other festivals operated by Plaintiffs or related entities. They were unable to do so, but continued having discussions to determine if there was a deal to be had. The parties knew it would be a long, involved process to try to create a mutually acceptable new company to hold music festivals. On September 18, 2014, Mosiman noted, "we haven't even begun the contract drafting phase which will be long and tedious."

Beginning on November 4, 2015, at Plaintiffs' suggestion, the parties began discussing a transaction involving a $700,000 investment for a 51% interest in just Thunder. Mosiman says he reached a deal with Bryan Gordon on the phone by November 6, but admits that he and Gordon and their respective lawyers needed to "flesh out" the deal and that they had not discussed many essential terms such as who would purchase an interest in Thunder and when monies would be paid. On November 24, 2014, Bryan Gordon, the head of the defendant entities, told Mosiman that, with respect to the proposed transaction to partner only on Thunder, "We're green to go, subject to docs, lease finalization and final due dili[gence]." On December 12, 2015, defendants' lawyer sent draft proposed operating and contribution agreements, explaining that, "These documents are drafts and subject to continuing review and comment by Bryan Gordon."

Four days later, plaintiffs' lawyer Matthew Gough spoke with defendants' lawyers about those drafts. Gough stated that plaintiffs disagreed with the drafts in key respects like what assets they would contribute in exchange for the proposed purchase price and who would have decision-making authority for the proposed venture (plaintiffs wanted veto rights though they would own only 49% of the proposed venture). On December 23, 2014, Mosiman wrote, "The lawyers seem to be down to 3 points of contention on the Thunder agreement." At the same time, his lawyer

-20-

wrote that "Brett Mosiman plans to reach out to Bryan Gordon to discuss several open deal points." On January 7, 2015, plaintiffs' counsel again contacted defendants' counsel, saying, "Brett Mosiman and Bryan Gordon continue to negotiate." Plaintiffs' counsel also noted that they still had to address "open issues," and he said that his office would prepare other proposed agreements that would be needed for a deal. By definition, the parties could not still be negotiating contractual deal points or conducting diligence if they already had a deal, or thought they had a deal. Negotiations and diligence precede the formation of a transaction; they do not follow it.

During this time, Defendants continued their due diligence alongside their contract negotiations because a number of diligence issues still existed. These included wildly optimistic budgets and forecasts from Plaintiffs, questions about who actually owned (and could therefore lease) the property on which Thunder was to be held, the ability of a newly formed company to sell beer, wine, and alcohol at the concert venue, and many others. However, the parties continued to negotiate, but were never able to agree upon, the necessary agreements that would lead to forming a joint company to hold the festival.

The parties always recognized and acknowledged that hurdles remained in trying to come to an agreement on an entire structure to form a new entity to pursue music festivals, and no one ever took the position that a deal had already been reached, or questioned why the parties were taking so much time and spending so much money negotiating deal points if they had already agreed upon a transaction. As this time-consuming process was unfolding, Defendants advanced $272,000 directly to artists contracted by plaintiff Mosiman as deposits for Thunder, because artists had to be booked if there was to be any chance of Thunder being held, and Mosiman's entities lacked the money for the booking deposits. There would have been nothing to continue negotiating over if Defendants had not advanced money for the talent deposits, because these are

-21-

routinely required to be paid well in advance. Although the parties had not reached a deal, the applicable Defendants were working in good faith to try to achieve one. They consequently decided to loan the money, in the absence of which any effort to pursue a possible transaction would have been stopped dead in its tracks. Although it ultimately turned out that no transaction was reached, such a loan allowed the parties to continue negotiating in an effort to determine if a deal was possible.

In the meantime, ticket sales were poor. On March 2, 2015, Mosiman's then-partner Nate Prenger suggested to Mosiman that they "strongly consider canceling" Thunder because of poor ticket sales. Mosiman himself was "worried." On March 23, 2015, Mosiman delivered a dire set of projections that contrasted sharply with the rosy projections he had sent on November 4, 2014, the same day he proposed an investment in Thunder only. Mosiman's November 4, 2014, budget had projected that Thunder would earn $306,575 in 2015 *if* 16,500 people attended. On March 23, 2015, Plaintiffs projected Thunder would make only $31,000 if 16,500 tickets were sold, and more ominously projected that Thunder would lose from $1.3 to $1.8 million at attendance levels of 6,000 to 9,000. By that time, Thunder had sold less than 3,500 tickets. Two days later, Mosiman stated, "I may have overshot the single days a little bit here as we did only about 12% in 2013 and I have pegged them between 30% - 35% in this model."

On March 29, 2015, HorsePower delivered a variety of proposed contracts to Plaintiffs to document the proposed investment in Thunder. On April 7, 2015, Plaintiffs' counsel responded, proposing no revisions and instead threatening litigation if HorsePower did not agree to a deal whereby it would receive a smaller share of Thunder (50% as opposed to 51%). Plaintiffs effectively ended the negotiations by acting as they did – including refusing to propose edits to the draft March 29 proposals, demanding to upend the parties' negotiating parameters and Plaintiffs'

own proposed deal point that Defendants would control (own 51% of) any newly formed company, and threatening (in their April 7 letter) to sue Defendants.

Notwithstanding the parties' failure to reach a deal, the website of Mosiman's company, Bottleneck, states that he continues to hold concerts featuring "national tours" with "some of the best names in modern music." According to Plaintiff's discovery responses, these include names such as Taylor Swift, Melissa Eldridge, Ziggy Marley, Indigo Girls, Ted Nugent, and Kool & the Gang, among many others.

On August 30, 2019, Plaintiffs' Second Amended Complaint joined several new defendants. New Defendants KAABOO, LLC, KAABOOWorks Services, LLC, KAABOOWorks, LLC, KAABOO Del Mar, LLC are not successors to either The Madison Companies or Horsepower Entertainment. The KAABOO mark was transferred only to KAABOOWorks, LLC. Neither KAABOOWorks Services, LLC, KAABOO, LLC, nor KAABOO Del Mar, LLC acquired any of Madison or Horsepower's assets, and therefore cannot be successors to either of those entities. Nor can KAABOO be a successor on the basis that the membership interest in KAABOOWorks, LLC was ultimately transferred to KAABOO because any of the LLC's obligations are not the personal obligations of the member of the company simply by virtue of holding the membership interest. Further, even if KAABOOWorks, LLC were deemed to be a successor by virtue of the transfer of the KAABOO mark, none of the four successor liability exceptions apply. The alleged transfers Plaintiffs cite were routine business transactions undertaken for legitimate business purposes and were made for valuable consideration. To the extent WarDawgz is deemed a party to this claim (*see* footnote 3, *infra*), there is no successor liability because it similarly did not acquire any assets of either Madison or HorsePower.

-23-

4.      **LEGAL CLAIMS AND DEFENSES.**

a.      **Plaintiffs' Legal Claims.** Plaintiffs assert that they are entitled to recover upon the following theories:

1. <u>Breach of Contract</u> (Count I) (against Madison/Horsepower).  Plaintiffs entered into a contract with Defendants in which Defendants agreed to (i) pay Backwood/Pipeline $750,000, (ii) fund $500,000 of operating capital for the festival, and (iii) pay $80,000 for production and operations, in consideration for which Defendants would receive a 51% interest in Thunder.  Defendants breached this contract by not paying them $750,000, paying only a portion of the $500,000 of operating capital, failing to pay production and operation expenses, and failing to pay their share of the festival's losses.

2. <u>Breach of Fiduciary Duty</u> (Count II) (against Madison/Horsepower).  The parties were joint venturers in a business enterprise to produce Thunder, this created a fiduciary duty between the two sides, and Defendants breached that duty by (i) trying to force Plaintiffs to accept a deal different than the one Plaintiffs assert was formed, (ii) filing a lawsuit against them and threatening to continue it if they did not agree to sign a fully executed promissory note for a non-existent loan, (iii) sending defamatory letters to artist agencies, (iv) pilfering Plaintiff's key partners, employees and agents (in particular, Prenger, Wingerd, Pilsl and Gustafson), and (v) filing suits against Plaintiffs in courts without jurisdiction to drive them out of business.

3. <u>Fraud</u> (Count III) (against Madison/Horsepower).  Defendants were guilty of fraud – namely, a promise of future events that they had no intention of performing at the time they were made.  Specifically, Defendants had no intention of performing their promises to fund Thunder at the time they made these promises; did not perform their promise to fund Thunder as they said they would; made the promises to fund Thunder with the intent to deceive and for the purpose of

-24-

inducing Plaintiffs to proceed and later force them to accept a terrible deal. Plaintiffs reasonably relied on and acted upon Defendants' promising by booking bands and preparing for the festival.

    4. <u>Tortious Interference</u> (Count IV) (against Madison/Horsepower and Kaaboo).[2] Defendants knew of the business relationship that they had with Prenger, Wingerd, Pilsl and Gustafson, and the probable economic benefit of those relationships to Plaintiffs, but interfered with Plaintiffs' relationships with them for the purpose of damaging Plaintiffs' business.

    5. <u>Successor Liability</u> (Count V) (against Kaaboo).[3] Plaintiffs seek to hold the Kaaboo entities liable for damages on all counts under the doctrine of successor liability based on the allegations that Madison/Horsepower transferred their music festival business, assets, and employees to Kaaboo after this litigation began. Plaintiffs assert successor liability is appropriate here because: (i) the transactions amount to a consolidation or merger of Madison/Horsepower and Kaaboo, (ii) Kaaboo is merely a continuation of Madison/Horsepower, or (iii) the transactions were entered into fraudulently in order to escape liability for judgment in this case. Plaintiffs also contend that the Court should disregard the corporate forms (*i.e.*, pierce the corporate veil) of the Kaaboo entities to hold them jointly and severally liable in this case.[4]

---

    [2] The parties agree that Plaintiffs assert this tortious interference claim against "Kaaboo Entities" to include at least Kaaboo, LLC, Kaaboo Del Mar, LLC, KaabooWorks, LLC, and KaabooWorks Services, LLC, but they dispute whether Plaintiffs' Second Amended Complaint also asserts this claim against WarDawgz. The parties have already raised this dispute in Defendants' pending Motion to Dismiss and related briefing (ECF Nos. 614, 615 & 645), and therefore this issue is presently before the presiding U.S. District Judge.

    [3] The parties dispute whether Plaintiffs' Second Amended Complaint asserts this claim against KAABOOWorks Services, LLC, KAABOOWorks, LLC, KAABOO-Del Mar, LLC, and WarDawgz. Again, this issue is presently before the presiding U.S. District Judge.

    [4] Defendants objected to Plaintiffs including the last sentence of this paragraph regarding disregarding the corporate form, piercing the corporate veil, and joint and several liability. The undersigned overruled that objection. This sentence accurately tracks the allegations in Plaintiffs' Second Amended Complaint, which gives Defendants fair notice of this theory. *See, e.g.*, Second Am. Compl. (ECF No. 570) ¶¶ 192-193 & Prayer, at 26; *see also id.* ¶¶ 94-142, at 14-19.

**b.** **Defenses.**

Defendants' primary overall defense is that there never was any joint venture agreement or other agreement to create a new company to put on Thunder or any other festival. The only way Defendants would have agreed to any such arrangement would have been through a newly formed business entity with contracts and foundational documents clearly and completely delineating all of the rights and powers of the company and the parties. Therefore, they could not have breached, fraudulently or otherwise improperly tried to renegotiate, or never have intended to perform under, the non-existent agreement. In terms of specific affirmative defenses, although Defendants' Answer to Plaintiff's Second Amended Complaint is not yet due, they presently anticipate asserting the following affirmative defenses:

1. Unclean hands, estoppel, and waiver.

2. Failure to mitigate damages.

3. Set-off.

4. The economic loss doctrine.

5. Fraud in the inducement.

6. Statute of limitations.

7. In the case of the newly joined defendants, lack of personal jurisdiction and improper venue.

**c.** **Counter-Claimants' Legal Claims.**

Counter-Claimants assert that they are entitled to recover against (i) Pipeline Productions, Inc.; (ii) Backwood Enterprises, LLC; (iii) OK Productions, Inc.; and (iv) Brett Mosiman, upon the following theories:

1. <u>Declaratory Relief</u> (first count). Defendants abandon this claim for relief.

2.   Declaratory Relief (second count).  Defendants abandon this claim for relief.

3.   Breach of Contract (third count). Defendants contend that their expenditure of approximately $272,000 for talent deposits at Plaintiffs' request for performers selected by Plaintiffs constituted a contract that Plaintiffs breached in failing and refusing to repay this sum, or any portion of it.

4.   Promissory Estoppel (fourth count). Defendants contend that they advanced approximately $272,000 for talent deposits at Plaintiffs' request for performers selected by Plaintiffs, that Plaintiffs knew this was not a gift or a contribution to some non-existent, never-formed entity, and that Plaintiffs promised to repay this sum but have failed and refused to do so.

5.   Quantum Meruit/Unjust Enrichment (fifth count).  Defendants contend that they advanced Plaintiffs approximately $272,000 for talent deposits for performers selected by Plaintiffs, that Plaintiffs knew of, requested, and desired that these payments be made, and benefitted from them, and that Plaintiffs are obliged to repay this sum, but have not done so.

**d.   Defenses.[5]**

1.   Plaintiffs never entered into any loan agreement with Defendants.

2.   When Defendants backed out of Thunder, they tried to take their $272,000 in artist deposit payments pursuant to their Agreement and turn it into a loan as a cover story.

3.   Defendants have never attempted to collect any loan from Prenger, who they employ through a related entity.

4.   None of the alleged loan proceeds went to Plaintiffs.

---

[5] Plaintiff will not pursue any affirmative defenses set forth in the pleadings but not set forth below, and such affirmative defenses are abandoned.

-27-

5.      Defendants fail to state claims for promissory estoppel and/or unjust enrichment because those claims are based on breach of contract they claim (affirmative defense no. 1).

6.      Defendants are guilty of unclean hands, should be estopped from asserting their claims, and have waived any such claims (affirmative defense no. 2).

7.      Defendants failed to mitigate any potential damages by abandoning the festival (affirmative defense no. 3).

8.      Any amount owed to Defendants should be offset by the amount Defendants owe to Plaintiffs by reason of the claims (affirmative defense no. 6, 7, 9 and 10).

9.      Defendants' claims are barred in whole or in part by the economic loss doctrine (affirmative defense no. 13).

## 5.      DAMAGES AND NON-MONETARY RELIEF REQUESTED.

a.      Plaintiffs seek $12,001,267 in actual damages, together with fees, costs and interest. Plaintiffs further seek punitive damages to punish Defendants for their conduct toward Plaintiffs and to prevent them from engaging in this type of behavior in the future.

b.      Defendants/Counter-claimants seek $272,000 in damages, together with fees, costs, and interest. Defendants/Counter-claimants abandon their request for punitive damages.

## 6.      AMENDMENTS TO PLEADINGS.

Not applicable.

## 7.      DISCOVERY.

Under the scheduling order and any amendments, all discovery was to have been completed by **November 1, 2019**, and expert discovery must be completed by **November 29, 2019**. Unopposed discovery may continue after the deadline for completing discovery so long as it does

not delay briefing or ruling on dispositive motions or other pretrial preparations. Although discovery may be conducted beyond the deadline for completing discovery if all parties are in agreement to do so, under these circumstances the court will not be available to resolve any disputes that arise during the course of such extended discovery.

**8.    MOTIONS.**

   **a.    Pending Motions.**

      i.    Defendants' Motion to Dismiss the Second Amended Complaint (ECF No. 614); and

      ii.   Defendants' Motion for Leave to Exceed the Page Limitation (ECF No. 653).

   **b.    Additional Pretrial Motions.**

   After the pretrial conference, the parties intend to file the following motions:

      i.    <u>Plaintiffs</u>. Plaintiffs intend to file motions to exclude two or more of Defendants' retained experts and/or their opinions.

      ii.   <u>Defendants</u>. Defendants plan to file (1) a summary judgment motion, (2) a motion to bifurcate liability and damages, and (3) a motion to exclude plaintiffs' retained and non-retained experts and opinions.

   The dispositive motion deadline, as established in the scheduling order and any amendments, is **November 18, 2019**. The parties should follow the summary-judgment guidelines available on the court's website:

   *http://ksd.uscourts.gov/wp-content/uploads/2015/10/Summary-Judgment-*

   *Guidelines.pdf*

The arguments and authorities section of briefs or memoranda must not exceed 30 pages, absent an order of the court fixing a different limit.

   **c.    Motions Regarding Expert Testimony.** All motions to exclude testimony of expert witnesses pursuant to Fed. R. Evid. 702-705, *Daubert v. Merrell Dow Pharmaceuticals,*

-29-

*Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), or similar case law, must be filed no later than 42 days before trial.

**9.    TRIAL.**

The trial docket setting, as established in the scheduling order and any amendments, is **9:00 a.m. on February 3, 2020, in Topeka, Kansas**. This case will be tried by jury. The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial. If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge will convene another pretrial conference to discuss, among other things, the setting of deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

IT IS SO ORDERED.

Dated November 15, 2019, at Topeka, Kansas.

<u>s/ Angel D. Mitchell</u>
Angel D. Mitchell
U. S. Magistrate Judge