# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| PIPELINE PRODUCTIONS, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | No. 15-4890-KHV |
| | ) | |
| THE MADISON COMPANIES, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

On May 21, 2015, Pipeline Productions, Inc. and Backwood Enterprises, LLC sued Horsepower Entertainment and The Madison Companies, LLC. Complaint (Doc. #1). On June 19, 2017, OK Productions, Inc. and Brett Mosiman joined as plaintiffs. Amended Complaint (Doc. #56). On August 30, 2019, plaintiffs added as defendants Kaaboo LLC, KaabooWorks Services LLC ("KWS"), KaabooWorks LLC, Kaaboo Del Mar LLC ("KDM") and WarDawgz, LLC. Second Amended Complaint (Doc. #570) ("SAC"). Plaintiffs allege that defendants reneged on their promise to partner in the production of a music festival, and bring claims for breach of contract (Count I), breach of fiduciary duty (Count II), fraud (Count III), tortious interference (Count IV) and successor liability (Count V). This matter is before the Court on Defendants' Motion To Dismiss Plaintiffs' Second Amended Complaint (Doc. #614) filed October 11, 2019. For reasons stated below, the Court sustains defendants' motion in part.

## Factual Background

Highly summarized, plaintiffs' SAC alleges as follows:[1]

Brett Mosiman is a producer of live music festivals, and is the principal of OK Productions, Backwood Enterprises and Pipeline Productions – music festival entities. Bryan Gordon, Seth Wolkov and Rob Walker own Madison, which is a venture capital firm. In turn, Madison wholly owns its music festival business, Horsepower. In November 2014, Madison and Horsepower formed Kaaboo and KDM. In June 2015, Madison and Horsepower formed KaabooWorks and KWS. In December 2016, Gordon, Wolkov and Walker (the owners of Madison), along with Barbara O'Hare, formed WarDawgz.

In January 2014, Mosiman met Gordon, who expressed interest in producing music festivals by using Mosiman's reputation in the live music business and Madison's significant resources. Gordon proposed that Madison, Horsepower and the Mosiman companies produce music festivals on an ongoing basis, including the Thunder festival. On July 28, 2014, after months of negotiating and substantial due diligence, Gordon (on behalf of Madison and Horsepower) and Mosiman (on behalf of Backwood and Pipeline) entered into a non-binding letter of intent ("LOI") for Madison and Horsepower to purchase 51 per cent of plaintiffs' music festival business.

On August 28, 2014, Mosiman emailed Gordon to inform him of a "major concern" regarding the LOI and Thunder. Specifically, Mosiman would not be able to follow through with

---

[1]    The Amended Pretrial Order (Doc. #660) filed November 15, 2019 supersedes the SAC, and controls the subsequent course of litigation. See Fed. R. Civ. P. 16(e). As Judge Angel Mitchell explained in her pretrial order, however, the amended pretrial order does not contain every factual allegation that the parties make. Amended Pretrial Order (Doc. #660) at 16 n.1 (contentions in pretrial order are "summaries of the parties' respective theories of the case rather than exhaustive lists of all the facts, arguments, or nuances"). Accordingly, in deciding defendants' motion to dismiss, the Court may look to the SAC for specific factual allegations regarding plaintiffs' theories of recovery.

artist offers if the parties did not consummate the LOI. Accordingly, Mosiman asked whether Madison and Horsepower would partner on Thunder regardless whether they completed the deal. Gordon gave Mosiman his assurance that Madison and Horsepower would cover the finances for Thunder even if the LOI fell through. Having this commitment, plaintiffs began to book artists to appear at Thunder.

On October 23, 2014, approximately a week before the LOI was set to expire, Madison and Horsepower proposed a substantially different agreement for significantly less money. Plaintiffs rejected the proposal, which constituted a revocation of the LOI.

On November 4, 2014, Mosiman proposed to Gordon a new agreement between Backwood/Pipeline and Madison/Horsepower for the limited purpose of owning and producing the Thunder festival. Mosiman's proposal gave Gordon two options. On behalf of Madison and Horsepower, Gordon agreed to a modified version of "Option B." Under this final version ("the Agreement"), Madison and Horsepower would pay Backwood and Pipeline $750,000 for a 51 per cent interest in Thunder, fund $500,000 of operating capital for the festival and pay Backwood and Pipeline $80,000 to produce and operate Thunder. On November 6, 2014, Mosiman sent an email to Gordon seeking confirmation of Madison/Horsepower's acceptance, which Gordon provided. Mosiman then asked Gordon, as the controlling owner, about booking Carrie Underwood – to which Gordon responded, "Do it, Please!"

On November 19, 2014, Madison and Horsepower created four entities to produce Thunder, all with different variations of the name "Thunder on the Mountain." In reliance on the Agreement, plaintiffs spent over 4,000 hours producing Thunder, which included making industry commitments to artists, selling tickets, engaging vendors, creating infrastructure and marketing. During this time, Mosiman obtained commitments from approximately 50 artists, including Carrie

Underwood, Zac Brown, Big & Rich, the Eli Young Band and Sarah Evans. Pursuant to the Agreement, Madison and Horsepower funded $272,000 by making deposit payments directly to artists. Madison and Horsepower also exercised significant control over Thunder's operations – Gordon decided which bands to book and how much to pay them, and he was heavily involved in marketing and scheduling.

On December 12, 2014, Madison and Horsepower sent various draft documents to formalize the Agreement, which reflected the key terms that they had negotiated. The documents included an additional $150,000 in payments to plaintiffs, and several other new terms.

When the parties began selling tickets, plaintiffs updated Madison and Horsepower daily about advance sales. From this information, plaintiffs were able to forecast that like most new festivals, Thunder would operate at a loss in 2015. On March 29, 2015, just months before the start of the festival, Madison and Horsepower became increasingly nervous and attempted to change the terms of the Agreement. On April 7, 2015, plaintiffs' counsel emailed Madison/Horsepower's counsel to reiterate the terms of the Agreement and demand performance. Plaintiffs' counsel also warned of the significant financial and reputational damage that plaintiffs would incur if Madison and Horsepower did not perform.

On April 14, 2015, while plaintiffs continued to produce Thunder, Madison and Horsepower filed a lawsuit in Delaware, in which they denied and repudiated the Agreement, the promises that Gordon had made and the five months of performance that had already occurred. On April 15, 2015, Suzanne Land, a Madison consultant who was now in charge of Thunder, notified plaintiffs of the lawsuit and that Madison and Horsepower would no longer participate in Thunder. Land gave plaintiffs two options: (1) execute a fully-secured promissory note for an alleged loan that never existed; or (2) face scorched-earth litigation from Gordon, Madison and

Horsepower. Madison and Horsepower refused to provide the remaining payments, reneged on their responsibility for Thunder losses and simply walked away. They did not attempt to mitigate Thunder losses or reimburse Thunder ticket holders, vendors or sponsors. Defendants also sent defamatory letters to artist agencies about their relationship with plaintiffs, knowing that the letters would substantially harm plaintiffs' reputation.

In April 2015, the second round of artist payments became due. Because Madison and Horsepower had breached the Agreement, plaintiffs had to borrow money from other festivals in an attempt to keep Thunder afloat. Plaintiffs searched for an alternative financial partner, but could not find one in the short time before the festival. Accordingly, plaintiffs could not satisfy the contracts with Thunder artists, and the artists consequently refused to appear. As a result, plaintiffs had to cancel Thunder.

In addition to breaching the Agreement, Madison and Horsepower attempted to destroy plaintiffs' businesses by hiring away their key partners, employers and agents. Using Madison and Horsepower email addresses and letterhead, defendants communicated with plaintiffs' partners, employees and agents about positions and consulting deals with defendants.

Moreover, in order to become judgment-proof, Gordon, Wolkov and Walker (the owners) transferred Madison/Horsepower's music festival business to several other entities that they owned after this litigation began. Specifically, they transferred the music festival business – without receiving value in return – to KaabooWorks, including its assets, employees and the Kaaboo marks and goodwill. Around the same time, the same individuals (Gordon, Wolkov and Walker) then transferred ownership of KaabooWorks itself to WarDawgz. Finally, the owners of WarDawgz (Gordon, Wolkov, Walker and O'Hare) transferred KaabooWorks to Kaaboo, which WarDawgz also owns. Despite these transactions, nothing about Madison's music festival business actually

changed except its name. Contracts and agreements that previously belonged to Madison and Horsepower now belong to Kaaboo. The executives and employees of Madison and Horsepower hold those same positions for the new Kaaboo entities and they all use the same offices, computers, servers and cloud-based platforms. As a result, Madison and Horsepower have almost no assets or employees, and no longer work in the music festival industry.

**Legal Standards**

## I. Personal Jurisdiction

When defendants file a motion to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), plaintiffs must establish personal jurisdiction over each defendant. Rockwood Select Asset Fund XI (6)-1, LLC v. Devine, Millimet & Branch, 750 F.3d 1178, 1179-80 (10th Cir. 2014). At these preliminary stages of litigation, plaintiffs' burden to prove personal jurisdiction is light. AST Sports Sci., Inc. v. CLF Distrib. Ltd., 514 F.3d 1054, 1056 (10th Cir. 2008). To defeat the motion, plaintiffs need only make a prima facie showing of personal jurisdiction. Id. They can do so by showing facts, via affidavit or other written materials, that if true would support jurisdiction over each defendant. Id. When evaluating the prima facie case, the Court must resolve all factual disputes in favor of plaintiffs. Id.

## II. Failure To State A Claim

In ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court assumes as true all well-pleaded factual allegations and determines whether they plausibly give rise to an entitlement of relief. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim which is plausible – and not merely conceivable – on its face. Id. at 679-80; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). To determine whether a complaint states a plausible claim for relief, the Court draws on

its judicial experience and common sense. Iqbal, 556 U.S. at 679. Plaintiffs make a facially plausible claim when they plead factual content from which the Court can reasonably infer that defendants are liable for the misconduct alleged. Id. at 678. However, plaintiffs must show more than a sheer possibility that defendants have acted unlawfully – it is not enough to plead facts that are "merely consistent with" defendants' liability. Id. (quoting Twombly, 550 U.S. at 557). Where the well-pleaded facts do not permit the Court to infer more than the mere possibility of misconduct, the complaint has alleged – but has not "shown" – that the pleader is entitled to relief. Id. at 679. The degree of specificity necessary to establish plausibility and fair notice depends on context; what constitutes fair notice under Fed. R. Civ. P. 8(a)(2) depends on the type of case. Robbins v. Okla., 519 F.3d 1242, 1248 (10th Cir. 2008).

The Court need not accept as true those allegations which state only legal conclusions. See Iqbal, 556 U.S. at 678; Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991). Rather, plaintiffs bear the burden of framing their complaint with enough factual matter to suggest that they are entitled to relief; it is not enough to make threadbare recitals of a cause of action accompanied by conclusory statements. Twombly, 550 U.S. at 556. A pleading that offers labels and conclusions, a formulaic recitation of the elements of a cause of action or naked assertions devoid of further factual enhancement will not stand. Iqbal, 556 U.S. at 678.

Although the statute of limitations is an affirmative defense, the Court may appropriately resolve a statute of limitations question on a Rule 12(b) motion "when the dates given in the complaint make clear that the right sued upon has been extinguished." Aldrich v. McCulloch Props., Inc., 627 F.2d 1036, 1041 n.4 (10th Cir. 1980).

## Analysis

Under Fed. R. Civ. P. 12(b)(2), defendants assert that the Court should dismiss Kaaboo,

KDM, KaabooWorks, KWS and WarDawgz because the Court lacks personal jurisdiction over these defendants. Moreover, under Fed. R. Civ. P. 12(b)(6), defendants assert that the Court should dismiss several of plaintiffs' causes of action because they fail to state a claim upon which relief can be granted.

## I.     Personal Jurisdiction Over Kaaboo, KDM, KaabooWorks, KWS and WarDawgz

Defendants argue that the Court lacks personal jurisdiction over Kaaboo, KDM, KaabooWorks, KWS and WarDawgz.

For the Court to exercise personal jurisdiction in a diversity action, plaintiffs must show that personal jurisdiction is proper under the laws of the forum state and that doing so comports with the due process requirements of the United States Constitution. See Newsome v. Gallacher, 722 F.3d 1257, 1264 (10th Cir. 2013). The Kansas long-arm statute permits the exercise of any jurisdiction that is consistent with the United States Constitution. See Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Coop., 17 F.3d 1302, 1304-05 (10th Cir. 1994); see also K.S.A. § 60-308(b)(1)(L). Accordingly, the Court need not conduct a separate personal jurisdiction analysis under Kansas law, and instead may proceed directly to the due process inquiry. See Niemi v. Lasshofer, 770 F.3d 1331, 1348 (10th Cir. 2014) (where long-arm statute confers maximum jurisdiction consistent with Due Process Clause, statutory inquiry effectively collapses into constitutional analysis). The due process analysis requires the Court to determine (1) whether defendants have "minimum contacts with the forum state such that [they] should reasonably anticipate being hailed into court there" and (2) if defendants' actions establish minimum contacts, whether the exercise of personal jurisdiction over them "offends traditional notions of fair play and substantial justice." AST Sports Sci., 514 F.3d at 1057.

Here, defendants limit their due process challenge to the first prong, asserting that plaintiffs have not established that Kaaboo, KDM, KaabooWorks, KWS and WarDawgz have had minimum contacts with Kansas. To satisfy the "minimum contacts" standard, plaintiffs can establish that the Court has either (1) specific jurisdiction or (2) general jurisdiction. Rockwood Select, 750 F.3d at 1179. The Court has specific jurisdiction if defendants "purposely directed" their activities at residents of the forum state, and plaintiffs' alleged injuries "arise out of" the forum-related activities. Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1071 (10th Cir. 2008). The aim of the "purposeful direction" doctrine is to ensure that defendants are not bound to appear to account for merely "random, fortuitous, or attenuated contacts" with the forum state. Id. (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)).

Plaintiffs assert that the Court has specific jurisdiction over Kaaboo, KDM, KaabooWorks, KWS and WarDawgz. They argue that Madison, Horsepower, Kaaboo, KDM, KaabooWorks, KWS and WarDawgz operate as a single entity. Accordingly, because the Court has specific jurisdiction over Madison and Horsepower,[2] it also has specific jurisdiction over Kaaboo, KDM, KaabooWorks, KWS and WarDawgz. In other words, plaintiffs argue that their allegations establish a prima facie case for personal jurisdiction based on alter ego liability.[3]

A corporation that transacts business through the instrumentality of an alter ego corporation is subject to service for causes of action arising therefrom. See Cotracom Commodity Trading AG v. Seaboard Corp., 94 F. Supp. 2d 1189, 1195 (D. Kan. 2000); see also AKH Co., Inc. v.

---

[2]     The parties do not dispute that the Court has personal jurisdiction over Madison and Horsepower. See Amended Pretrial Order (Doc. #660) at 2.

[3]     In their motion to dismiss, defendants argue that plaintiffs did not assert an alter ego claim in their SAC. Judge Mitchell resolved this issue in the amended pretrial order, finding that the SAC sufficiently put defendants on notice of this theory of recovery. Id. at 25 n.4.

Universal Underwriters Ins. Co., No. 13-2003-JAR, 2018 WL 4111717, at *5 (D. Kan. Aug. 29, 2018). Thus, if a subsidiary corporation, acting as the mere alter ego of its parent corporation, transacts business in Kansas, the Court "may treat the two corporations as one and consider the subsidiary's relationship with Kansas to establish jurisdiction over the parent corporation." Cotracom, 94 F. Supp. 2d at 1195.

To treat corporations as alter egos – or pierce the corporate veil – plaintiffs must show "such domination of finances, policy, and practices that the controlled corporation has no separate mind, will, or existence of its own and is but a business conduit for its principal."[4] AKH Co., Inc., 2018 WL 4111717, at *5. To determine whether plaintiffs have satisfied this standard, the Court consults a non-exhaustive list of factors that include (1) whether the parent owns all or a majority of the capital stock of the subsidiary, (2) whether the parent and subsidiary have common directors or officers, (3) whether the parent finances the subsidiary, (4) whether the parent subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation, (5) whether the subsidiary has grossly inadequate capital, (6) whether the parent pays the salaries, expenses or losses of the subsidiary, (7) whether the subsidiary has substantially no business except with the parent or no assets except those that the parent conveys to it, (8) whether the parent's papers and statements of its officers refer to "the subsidiary" as such or as a department or division, (9) whether the directors or executives of the subsidiary act independently in the interests of the subsidiary but take direction from the parent and (10) whether entities observe the formal legal requirements of the subsidiary as a separate and independent corporation. Id.

---

[4] The Court applies Kanas law to determine whether defendants could be liable as alter egos for purposes of personal jurisdiction. Luc v. Krause Werk GMBH & Co., 289 F. Supp. 2d 1282, 1288 (D. Kan. 2003) (for purposes of personal jurisdiction, plaintiff must make prima facie showing that application of Kansas law would result in imposing alter ego liability).

Here, plaintiffs have established a prima facie case for personal jurisdiction on the basis of alter ego liability. In short, plaintiffs allege that after litigation commenced, to render Madison and Horsepower judgment-proof, their owners altered the structure of their music festival business by transferring the business and its assets from Madison and Horsepower to other entities that they owned. SAC (Doc. #570) ¶ 193. Specifically, plaintiffs allege that Bryan Gordon, Seth Wolkov and Robert Walker built the following corporate structure: Gordon, Wolkov and Walker own Madison. Id. ¶ 94. Madison, in turn, wholly owns their music festival business – Horsepower. Id. ¶ 95. In November 2014, Madison and Horsepower formed Kaaboo and KDM. Id. ¶ 97. In June 2015, Madison and Horsepower formed KaabooWorks and KWS. Id. ¶ 103. In December 2016, Gordon, Wolkov and Walker (the owners of Madison), along with Barbara O'Hare, formed WarDawgz. Id. ¶ 109.

Plaintiffs also allege that after this litigation commenced, Gordon, Wolkov and Walker initiated a shell game by making a series of transactions through various entities that merely changed the name and organizational structure of their music festival business. Although the details regarding some of the transactions and the resulting corporate structure are somewhat convoluted, plaintiffs allege as follows: after litigation began, Gordon, Wolkov and Walker transferred their music festival business – without receiving value in return – from Madison and Horsepower to KaabooWorks, including its assets, employees[5] and the Kaaboo marks and goodwill. Id. ¶ 111, 141. Around the same time, the same individuals (Gordon, Wolkov and Walker) then transferred ownership of KaabooWorks itself to WarDawgz. Id. Finally, the owners

---

[5] Defendants argue that this transfer of employees does not show that Madison and the Kaaboo entities were alter egos because these were not Madison's employees, and instead were employees of M Capital Services. Plaintiffs allege, however, that M Capital itself was the employing entity for Madison. Second Amended Complaint (Doc. #570) ¶ 108.

of WarDawgz (Gordon, Wolkov, Walker and O'Hare) then transferred KaabooWorks to Kaaboo, which WarDawgz also owns. Id. ¶ 14, 141. In short, plaintiffs allege that despite these transactions, nothing about Madison's music festival business actually changed except its name. Id. ¶ 115, 192. Contracts and agreements that previously belonged to Madison and Horsepower now belong to Kaaboo, the executives and officers of Madison and Horsepower hold those same positions for the new Kaaboo entities and these leaders – along with the employees that "moved" to the Kaaboo entities – "use the same offices, computers, servers, and cloud-based platforms as Madison/Horsepower did." Id. ¶ 116, 119, 191. In fact, Madison and Horsepower merely switched the primary email addresses for their music festival employees from "@horsepowerent.com" to "@kaabooworksllc.com." Id. ¶ 105. In the end, Gordon, Wolkov and Walker simply chose to run their music festival business under the Kaaboo name, effectively leaving Madison and Horsepower as shell corporations that have almost no assets and that are no longer involved in the musical festival business. Id. ¶ 117. These allegations plausibly establish that Kaaboo, KDM, KaabooWorks, KWS and WarDawgz are alter egos of Madison and Horsepower. Accordingly, plaintiffs have established a prima facie case that the Court has personal jurisdiction over these entities. See AKH Co., Inc., 2018 WL 4111717, at *5 (finding personal jurisdiction over entities that received defendants' assets after suit commenced based on alter ego theory).

## II.     Failure To State A Claim

Defendants assert that the Court should dismiss several of plaintiffs' causes of action because they fail to state a claim upon which relief can be granted. Specifically, defendants assert that the Court should dismiss (1) the tort claims by Mosiman and OK Productions (Counts II, III and IV), (2) all of the tortious interference claims (Count IV), (3) all of the successor liability claims (Count V) and (4) all of the claims against WarDawgz.

## A. Tort Claims By Mosiman And OK Productions (Counts II, III, IV)

Defendants assert that under the Kansas statute of limitations, the Court must dismiss the tort claims by Mosiman and OK Productions (Counts II, III and IV). Specifically, defendants seek to dismiss the breach of fiduciary duty claims (Count II), the fraud claims (Count III) and the tortious interference claims (Count IV). According to defendants, these causes of action are time-barred because each began to accrue more than two years before Mosiman and OK Productions joined as plaintiffs. See K.S.A. 60-513(a)(3),(4).

Plaintiffs do not dispute that Mosiman and OK Productions filed their claims more than two years after their tort claims began to accrue. Plaintiffs argue instead that pursuant to Fed. R. Civ. P. 15(c)(1)(B), the claims by Mosiman and OK Productions relate back to the date of the original complaint, which they filed within the limitations period. See Complaint (Doc. #1) filed May 21, 2015. Under Rule 15(c)(1)(B), an amendment to a pleading relates back to the date of the original pleading when it "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Accordingly, plaintiffs argue that because the tort claims by Mosiman and OK Productions are based on the events asserted in the original complaint, the claims relate back to when plaintiffs filed it.

Plaintiffs' analysis is incomplete. When an amendment adds new defendants to the action – as opposed to simply adding new claims – Rule 15(c)(1)(C) imposes additional prerequisites for the relation back doctrine. Under Rule 15(c)(1)(C), an amendment relates back when it:

> changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

In other words, when the amendment "changes the party . . . against whom a claim is asserted," it will only relate back when (1) the basic claim arose out of the conduct set forth in the original pleading, (2) the added party received notice such that the addition will not prejudice its ability to maintain its defense, (3) the added party knows or should have known that, but for the mistake concerning identity, it should have been a party to the original action and (4) the second and third requirements occurred within the prescribed limitation. See Brown v. Uniroyal, Inc., 108 F.3d 1306, 1307 (10th Cir. 1997). The amended complaint must satisfy each of these requirements. See id; Benavidez v. Sandia Nat'l Labs., No. 15-0922-JB, 2017 WL 2266854, at *28 (D.N.M. Jan. 17, 2017), on reconsideration in part, No. 15-0922 JB, 2017 WL 3052765 (D.N.M. June 21, 2017), appeal dismissed, No. 17-2137, 2018 WL 949219 (10th Cir. Jan. 9, 2018).

While it is well established that Rule 15(c)(1)(C) applies to the addition of new defendants, courts are split as to whether and how it applies to the addition of new plaintiffs. See Benavidez, 2017 WL 2266854, at *28. The first issue – *whether* Rule 15(c)(1)(C) applies to new plaintiffs – stems from the apparent inconsistency between the Rule's language and its advisory committee notes. Although Rule 15(c)(1)(C) governs circumstances when "the amendment changes the party . . . against whom a claim is asserted" – apparently referencing the addition of new defendants – the drafters of the Rule clearly contemplated that it would also apply to the addition of new plaintiffs. See id. (apparent that drafters contemplated application to new plaintiffs); see also Ambraziunas v. Bank of Boulder, 846 F. Supp. 1459, 1467 (D. Colo. 1994) (same). The advisory notes state that "the attitude taken in revised Rule 15(c) toward change of defendants extends by analogy to amendments changing plaintiffs." Fed. R. Civ. P. 15(c) Advisory Committee's Note. Accordingly, most courts allow for the addition of both new defendants and new plaintiffs under Rule 15(c)(1)(C). See Benavidez, 2017 WL 2266854, at *28 (most courts do not automatically

dismiss amendments proposing to add new plaintiffs and instead generally apply same standard for new defendants); see also Wright, Miller, Kane, Marcus, Spencer & Steinman, 6A Fed. Prac. & Civ. Proc. § 1501, Relation Back of Amendments Changing Parties—New Plaintiffs (3d ed.) (August 2019) (collecting cases).

Courts are also split as to the second issue: *how* Rule 15(c)(1)(C) applies to new plaintiffs. The split relates to whether new plaintiffs must satisfy each of the four express requirements under the Rule. This issue arises most often at last element, where the Court asks whether defendants knew or should have known that, *but for a mistake concerning the proper party's identity*, the new plaintiffs would have been a party to the original action. Fed. R. Civ. P. 15(c)(1)(C). Some courts "dispense with examination of each of the literal requirements of Rule 15(c), and instead focus on the questions of fair notice and absence of undue prejudice." Olech v. Vill. of Willowbrook, 138 F. Supp. 2d 1036, 1042 (N.D. Ill. 2000) (collecting cases); see Wright, Miller, Kane, Marcus, Spencer & Steinman, 6A Fed. Prac. & Civ. Proc. § 1501 (some courts recognize relation back unless defendant lacked adequate notice or lack of identity of interest between new and existing plaintiffs). By contrast, other courts – including those within the Tenth Circuit – hold that the new plaintiffs must satisfy each of the four express requirements under the Rule. See Benavidez, 2017 WL 2266854, at *28; Ambraziunas, 846 F. Supp. at 1467; see also Levy v. U.S. General Accounting Office, No. 97-4016, 4488, 1998 WL 193191 (S.D.N.Y. April 22, 1998), aff'd, 175 F.3d 254 (2nd Cir. 1999); Nelson v. County of Allegheny, 60 F.3d 1010, 1013-1015 (3rd Cir. 1995); United States v. Educ. Mgmt. Corp., 871 F. Supp. 2d 433, 461 (W.D. Pa. 2012). This approach makes sense. Not only does it follow the Rule's express terms, but as the Third Circuit has explained:

> Statutes of limitations ensure that defendants are "protected against the prejudice of having to defend against stale claims, as well as the notion that, at some point,

claims should be laid to rest so that security and stability can be restored to human affairs." In order to preserve this protection, the relation-back rule requires plaintiffs to show that the already commenced action sufficiently embraces the amended claims so that defendants are not unfairly prejudiced by these late-coming plaintiffs and that plaintiffs have not slept on their rights.

Nelson, 60 F.3d at 1014-1015 (citations omitted).

Here, the tort claims by Mosiman and OK Productions do not relate back under Rule 15(c). Even if Rule 15(c) permits claims from new plaintiffs to relate back, Mosiman and OK Productions do not satisfy the Rule's requirements for doing so. As Rule 15(c) expressly provides, and as other courts in the Tenth Circuit have recognized, the claims from new plaintiffs do not relate back unless plaintiffs demonstrate that "but for a mistake concerning the proper party's identity," they would have included the new plaintiffs in the original complaint. See Benavidez, 2017 WL 2266854, at *28 (plaintiffs did not show mistake); see also Ambraziunas, 846 F. Supp. at 1467 (same). Plaintiffs in this case did not do so – they did not mention Rule 15(c)(1)(C), let alone show that they mistakenly omitted Mosiman and OK Productions from the original complaint. Indeed, it would be difficult for them make this claim. Pipeline and Backwood were plaintiffs in the original complaint. By their own admission, OK Productions is the parent company of Backwood, and Mosiman owns *all three entities*. Plaintiffs' Memorandum In Opposition To Defendants' Motion To Dismiss (Doc. #645) at 29. Accordingly, it is difficult to imagine how – after more than two years of litigation[6] – plaintiffs could argue that they omitted Mosiman and OK Productions because of a "mistake concerning the proper party's identity." Fed. R. Civ. P. 12(c)(1)(C). Because they do not relate back, the two-year statute of limitations bars the tort claims by Mosiman and OK Productions. Therefore, the Court dismisses these claims.

---

[6]     On May 21, 2015, plaintiffs filed their Complaint (Doc. #1). On June 19, 2017, they filed their Amended Complaint (Doc #56), which added Mosiman and OK Productions as plaintiffs.

## B.      Tortious Interference Claims (Count IV)

Defendants assert that the Court should dismiss all tortious interference claims under Count IV because they fail to state a claim on which relief can be granted.

To succeed on a claim for tortious interference with a prospective business advantage under Kansas law,[7] plaintiffs must show (1) a business relationship or expectancy with probable future economic benefit to plaintiffs, (2) defendants knew of the relationship or expectancy, (3) but for defendants' conduct, plaintiffs were reasonably certain to have continued the relationship or realized the expectancy, (4) defendants engaged in intentional misconduct and (5) plaintiffs sustained direct and proximate damages.  Pipeline Prods., Inc. v. Horsepower Entm't, No. 15-4890-KHV, 2017 WL 4536420, at *5 (D. Kan. Oct. 11, 2017) (citing Byers v. Snyder, 237 P.3d 1258, 1269 (Kan. App. 2010)).

Here, defendants limit their challenge to the fourth element, asserting that plaintiffs have not shown that they engaged in intentional misconduct.  Specifically, defendants argue that their actions constitute lawful competition, which does not satisfy the misconduct element under Kansas law.  Generally, allegations of "intent to do a harmful act without reasonable justification" satisfy the intentional misconduct element.  Id. (citing Linden Place, LLC, v. Stanley Bank, 167 P.3d 374, 380 (Kan. App. 2007)).  When plaintiffs and defendants are business competitors, however, defendants can avoid liability by satisfying a series of requirements.  U.S. Transp., Inc. v. Torley, No. 08-1403-MLB, 2011 WL 3704723, at *5 (D. Kan. Aug. 23, 2011).[8]  One such requirement is

_____

[7]      In Kansas, the law of the state where plaintiffs felt the wrong governs tortious interference claims.  Snyder v. Am. Kennel Club, 661 F. Supp. 2d 1219, 1230 (D. Kan. 2009), aff'd, 402 F. App'x 397 (10th Cir. 2010).  Here, the parties agree that Kansas law applies.

[8]      These requirements come from Restatement (Second) of Torts § 768.  Although the Kansas Supreme Court has not yet addressed the issue, the Tenth Circuit has determined that the Kansas Supreme Court would apply these requirements in competitor cases.  See DP-Tek, Inc. v. AT & T Global Info. Solutions Co., 100 F.3d 828, 832 (10th Cir. 1996).

that defendants did not employ "wrongful means." Id. at 6. The Tenth Circuit has defined "wrongful means" as independently actionable conduct, or conduct which itself could form the basis for liability. Id.

Even assuming that plaintiffs and defendants are "competitors" for purposes of a tortious interference claim,[9] plaintiffs have sufficiently alleged independently actionable conduct with respect to Madison and Horsepower. Under Kansas law, independently actionable conduct includes a breach of a fiduciary duty. Ayres v. AG Processing Inc., 345 F. Supp. 2d 1200, 1214 (D. Kan. 2004). Here, plaintiffs expressly assert a breach of fiduciary duty claim against Madison and Horsepower. See Amended Pretrial Order (Doc. #660) at 24. Under Count II, plaintiffs allege that Madison and Horsepower owed them a fiduciary duty as part of their joint venture to produce Thunder, and that Madison and Horsepower breached that duty by "pilfering plaintiffs' employees, partners and agents." Second Amended Complaint (Doc. #570) ¶ 159. Because plaintiffs have plausibly alleged that Madison and Horsepower engaged in independently actionable conduct, they have satisfied the misconduct element of a tortious interference claim for these defendants.[10]

Plaintiffs have not alleged independently actionable conduct with respect to the other defendants under Count IV – Kaaboo, KDM, KaabooWorks and KWS.[11] Like with Madison and

---

[9]     The parties disagree whether they are actually competitors.

[10]     In reply to plaintiffs' response to the motion to dismiss, defendants for the first time assert that plaintiffs' allegations are insufficient to support a claim for breach of fiduciary duty. Specifically, defendants argue that the allegations do not plausibly show that they entered into a joint venture, which is the basis for the alleged fiduciary duty. Defendants' initial motion did not assert that plaintiffs failed to state a claim for breach of fiduciary duty. Accordingly, the Court disregards this argument. See Higgins v. Potter, No. 08-2646-JWL, 2009 WL 2993816, at *1 n.2 (D. Kan. Sept. 17, 2009) (Court will not address arguments in reply that defendant did not raise in opening memorandum).

[11]     The SAC does not assert Count IV against WarDawgz. Count IV lists only Madison, Horsepower and "the Kaaboo entities." The SAC definition of "Kaaboo entities"

(continued…)

Horsepower, plaintiffs rely exclusively on their breach of fiduciary duty claims to satisfy the requirement of independently actionable conduct. The problem, however, is that plaintiffs don't actually assert that Kaaboo, KDM, KaabooWorks and KWS breached a fiduciary duty. Count II (the breach of fiduciary cause of action) only names Madison and Horsepower, and never mentions the Kaaboo entities. Indeed, the SAC does not allege that the Kaaboo entities owed plaintiffs a fiduciary duty. This makes sense, as the alleged fiduciary duty stemmed from an alleged joint venture to which the Kaaboo entities were not parties; the SAC alleges that the only parties to this joint venture were plaintiffs, Madison and Horsepower. Id. ¶ 155, 156.

This is also the reason why plaintiffs cannot revert to the argument that they were not competitors with the Kaaboo entities, and thus the competitor privilege should not apply in the first place. Plaintiffs' sole argument that they were not competitors is that they were engaged in a joint venture. Again, plaintiffs never allege that the Kaaboo entities were part of the joint venture. Accordingly, absent a showing of any independently actionable conduct other than the breach of fiduciary duty (which does not apply to the Kaaboo entities), plaintiffs' allegations are insufficient to support a claim for tortious interference with respect to Kaaboo, KDM, KaabooWorks and KWS. Therefore, the Court dismisses those claims.

### C. Successor Liability Claims (Count V)

Defendants assert that the Court should dismiss all of plaintiffs' successor liability claims

---

[11](continued…)
includes only Kaaboo, KWS, KaabooWorks and KDM – not WarDawgz. Second Amended Complaint (Doc. #570) ¶ 5 n.1. Moreover, WarDawgz does not appear in any allegation within Count IV. Consequently, WarDawgz is entirely absent from any allegations relating to tortious interference. Since plaintiffs' do not allege a tortious interference claim against WarDawgz, the Court overrules as moot the motion to dismiss with respect to this issue.

under Count V.[12]  Specifically, defendants first argue that the Court should dismiss the successor liability claims against KDM, KaabooWorks, KWS and WarDawgz because plaintiffs did not assert that cause of action against those defendants.  Second, defendants argue that regardless of which defendants fall under this cause of action, plaintiffs' allegations are inadequate to support a claim for successor liability.

### 1. Defendants Under Successor Liability Cause Of Action

Defendants assert that the Court should dismiss the successor liability claims against KDM, KaabooWorks, KWS and WarDawgz because plaintiffs did not assert these claims against them. Specifically, defendants argue that the SAC names "Kaaboo" as the only defendant under Count V.

Under Fed. R. Civ. P. 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Rule 8 "serves the important purpose of requiring plaintiffs to state their claims intelligibly so as to inform the defendants of the legal claims being asserted."  Kelley v. Smith's Food & Drug Centers, Inc., 2019 WL 6358469, at *2 (10th Cir. Nov. 27, 2019) (quoting Mann v. Boatright, 477 F.3d 1140, 1148 (10th Cir. 2007)).  In other words, the complaint "must provide defendants with fair notice of the nature of the claims" against them.  Gorenc v. Klaassen, No. 18-2403-DDC, 2019 WL 4805983, at *4 (D. Kan. Sept. 30, 2019).

Here, plaintiffs adequately asserted successor liability claims against Kaaboo, KDM, KaabooWorks, KWS and WarDawgz.  Although only Kaaboo appears in the heading, Count V proceeds to consistently make its allegations against "the Kaaboo entities."  See Second Amended

---

[12]     Although Count V is titled "Successor Liability," it actually contains claims for both successor liability and alter ego liability.  See Amended Pretrial Order (Doc. #660) at 25 n.4 (finding that SAC asserted alter ego claims).  In this section, the Court only addresses the successor liability claims under Count V.

Complaint (Doc. #570) ¶ 177, 180, 183, 189, 191, 192, 193. The SAC explicitly defines "Kaaboo entities" to include Kaaboo, KWS, KaabooWorks and KDM. Second Amended Complaint (Doc. #570) ¶ 5 n.1. Accordingly, Count V includes Kaaboo, KWS, KaabooWorks and KDM under the express terms of the SAC.

Count V also sufficiently informs defendants that plaintiffs assert the successor liability claims against WarDawgz. While Count V asserts its allegations against "Kaaboo entities," which does not include WarDawgz under the SAC's definition, it also asserts the allegations against WarDawgz. See id. at ¶ 192, 193. All of these allegations appear beneath the heading titled "Successor Liability." Although plaintiffs certainly could have drafted Count V more clearly, the Court declines to adopt an overly-technical interpretation of the SAC for purposes of the motion to dismiss. The SAC satisfies Rule 8 by adequately notifying defendants that plaintiffs assert the successor liability claims under Count V against WarDawgz.

## 2. Sufficiency Of Allegations

Defendants assert that plaintiffs' allegations are insufficient to support a successor liability claim. Under Colorado law,[13] a corporation that acquires the assets of another is generally not liable for the predecessor's obligations unless (1) the successor either expressly or impliedly assumed liability, (2) the transaction results in a merger of the two corporations, (3) the successor is a mere continuation of the predecessor or (4) the transfer is for the fraudulent purpose of escaping liability. IT Portfolio, Inc. v. NER Data Corp., No. 15-00179-WYD, 2018 WL 3055767, at *5 (D. Colo. May 17, 2018). While Colorado law does not require that the acquisition of assets

---

[13] The Kansas Supreme Court has determined that the law of the place of transfer governs claims for successor liability. Brown v. Kleen Kut Mfg. Co., 238 Kan. 642, 646, 714 P.2d 942 (Kan. 1986). Here, the parties agree that Colorado law applies to plaintiffs' successor liability claims.

occur by *sale*, it does require a transfer of some kind. <u>Bd. of Cty. Com'ns of Cty. of Park v. Park Cty. Sportsmen's Ranch, LLP</u>, 271 P.3d 562, 572 (Colo. App. 2011) (transfer of assets a prerequisite).

Here, plaintiffs assert that Kaaboo, KaabooWorks, KDM, KWS and WarDawgz are liable as successors to Madison and Horsepower. Specifically, plaintiffs allege that Madison and Horsepower transferred their music festival business and its assets to these entities through several transactions, and that their allegations satisfy three exceptions to the general rule regarding successor liability: merger, continuation and fraudulent transfer. Defendants respond that plaintiffs have not asserted a plausible claim for successor liability because (1) plaintiffs do not allege any transfer with respect to some defendants and (2) even for defendants that were allegedly involved in a transfer, the allegations do not satisfy any of the exceptions.

First, defendants assert that regardless of which exception applies, plaintiffs do not have a successor liability claim with respect to KDM, KWS and WarDawgz because the SAC does not allege any transfers from Madison and Horsepower to these entities. This argument is unpersuasive. The SAC consistently asserts that Madison and Horsepower made a variety of transfers to the "the Kaaboo entities," including their assets and their employees. <u>See Second Amended Complaint</u> (Doc. #570) ¶ 177, 180, 183, 189, 191, 192, 193. The SAC explicitly defines "Kaaboo entities" to include KDM and KWS. <u>Id.</u> ¶ 5 n.1. Accordingly, viewing the facts in the light most favorable to plaintiffs, the SAC sufficiently alleges the requisite transfers to these defendants. The same is true for WarDawgz. The SAC alleges that Gordon, Wolkov and Walker transferred their music festival business (including its assets) from Madison and Horsepower to KaabooWorks, and then transferred KaabooWorks itself to WarDawgz. These allegations plausibly establish the transfer required for a successor liability claim.

Second, defendants assert that plaintiffs' allegations do not satisfy any of the exceptions to the general rule regarding successor liability. This argument is also unpersuasive. As described above, plaintiffs assert that their allegations satisfy three exceptions, including the "mere continuation" exception. In support of this theory of recovery, plaintiffs specifically allege that Gordon, Wolkov and Walker transferred their music festival business – without receiving value in return – from Madison and Horsepower to KaabooWorks, including its assets, employees[14] and the Kaaboo marks and goodwill. Id. ¶ 111, 141. Around the same time, the same individuals (Gordon, Wolkov and Walker) then transferred ownership of KaabooWorks itself to WarDawgz. Id. Finally, the owners of WarDawgz (Gordon, Wolkov, Walker and O'Hare) transferred KaabooWorks to Kaaboo, which WarDawgz also owns. Id. ¶ 14, 141. Through this complicated series of transactions, Madison effectively changed the name of its music festival business to Kaaboo while maintaining the same day-to-day operations. Contracts and agreements that previously belonged to Madison and Horsepower now belong to the Kaaboo entities. Also, the executives and employees of Madison and Horsepower hold those same positions for the new Kaaboo entities, while using "the same offices, computers, servers, and cloud-based platforms as Madison/Horsepower did." Id. ¶ 116, 119, 191. As a result, Madison and Horsepower no longer have a musical festival business or any real assets. Id. ¶ 117, 120, 123. These allegations plausibly suggest that for purposes of a successor liability claim, Kaaboo, KaabooWorks, KDM, KWS and WarDawgz are mere continuations of Madison and Horsepower.

---

[14] Defendants argue that this transfer of employees does not show that Madison and was a predecessor to the Kaaboo entities because these were not Madison employees, and instead were employees of M Capital Services. Plaintiffs allege, however, that M Capital itself was the employing entity for Madison. Second Amended Complaint (Doc. #570) ¶ 108.

### D. Claims Against WarDawgz

Defendants assert that the Court should dismiss all claims against WarDawgz because plaintiffs failed to assert a cause of action against it. Specifically, defendants point out that each cause of action in the SAC contains a heading that specifies the particular defendant or defendants against which it is asserted. Notably, WarDawgz does not appear in any of those headings. Plaintiffs respond that Count V asserted claims against WarDawgz, alleging that WarDawgz is liable for each cause of action as a successor or alter ego of Madison and Horsepower.

As explained above, Count V adequately asserts a claim for successor liability against WarDawgz. Count V also asserts a claim for alter ego liability against WarDawgz. While addressing personal jurisdiction, the Court explained that plaintiffs plausibly alleged that WarDawgz is an alter ego of Madison and Horsepower. Accordingly, Count V sufficiently alleges that WarDawgz is liable for each cause of action against Madison and Horsepower.

**IT IS THEREFORE ORDERED** that <u>Defendants' Motion To Dismiss Plaintiffs' Second Amended Complaint</u> (Doc. #614) filed October 11, 2019 is **SUSTAINED in part**. The Court dismisses the tort claims under Counts II, III and IV by Mosiman and OK Productions. The Court also dismisses the tortious interference claims under Count IV against Kaaboo, KWS, KaabooWorks and KDM. Moreover, the Court overrules as moot the motion to dismiss the tortious interference claim under Count IV against WarDawgz.

The following claims remain for trial on February 3, 2020: breach of contract against Madison and Horsepower (Count I), breach of fiduciary duty against Madison and Horsepower (Count II), fraud against Madison and Horsepower (Count III), tortious interference against Madison and Horsepower (Count IV), successor liability against Kaaboo, KDM, KaabooWorks, KWS and WarDawgz (Count V) and alter ego liability against Kaaboo, KDM, KaabooWorks,

KWS and WarDawgz (Count V).

Dated this 19th day of December, 2019 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge