# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

PIPELINE PRODUCTIONS, INC.,  )
BACKWOOD ENTERPRISES, LLC,  )
OK PRODUCTIONS, INC., and  )
BRETT MOSIMAN,  )
                              )
              Plaintiffs,  )
                              )   CIVIL ACTION
v.  )   CASE NO. 5:15-cv-04890-KHV ADM
                              )
THE MADISON COMPANIES, LLC,  )
AND HORSEPOWER ENTERTAINMENT  )
LLC, KAABOO, LLC, KAABOOWORKS  )
SERVICES, LLC, KAABOOWORKS, LLC,  )
KAABOO DEL MAR, LLC and  )
WARDAWGZ, LLC  )
              Defendants.

# DEFENDANTS' DAUBERT MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFFS' EXPERT, TODD CODER

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF FACTS ......................................................................................3

     A.      Initial Disclosures of Mr. Coder's Testimony ..........................................3

     B.      Plaintiffs' Untimely Supplemental Disclosure .........................................4

     C.      Plaintiffs Elicit Opinion Testimony from Mr. Coder on Topics that Were Never Disclosed .................................................................................4

     D.      Mr. Coder's Qualifications as an Expert...................................................5

III.    LEGAL STANDARD................................................................................................5

IV.     MR. CODER'S OPINIONS SHOULD BE EXCLUDED..........................................7

     A.      Mr. Coder May Not Testify as to the Opinions Regarding Artists Deposits Because He Lacks a Factual Basis for Each of Them .............................7

          1.      Mr. Coder's Opinion That Producers Who Cancel Music Festivals Have To Pay Higher Deposits Should Be Excluded...................................7

          2.      Mr. Coder's Opinion  That The Norm For Deposit Percentages Of Producers Who Don't Cancel Festivals Is 10 To 25 Percent Because It Lacks A Factual Basis ............................................................11

          3.      Mr. Coder's Opinion That A Festival Cancellation Will Lead Deposit Percentages To Rise And Destroy Cash Flow Must Be Excluded ..............................................................................................12

          4.      Any Opinion as to Reputational Harm Should Be Excluded Because it Was Not Disclosed and Would Be Irrelevant ..........................14

     B.      Mr. Coder's Opinion as to the Purported Industry Standard of Refunding Tickets After a Cancellation Cannot be Admitted Because It Is Both Based on His Personal Belief and Irrelevant ...................................................15

     C.      Mr. Coder May Not Testify As to the Effects of the Cancellation of Thunder on Plaintiffs' Music Festival Business ....................................17

     D.      Any Testimony of Mr. Coder Concerning Valuations of Thunder or Plaintiffs Should Be Excluded ..............................................................18

          1.      Mr. Coder Was Not Identified as an Expert on Value ..............................18

          2.      Mr. Coder Is Not Qualified to Opine on Value and Has No Basis for Doing So Here ..................................................................................19

     E.      Any Testimony on Other Topics Not Disclosed Should Not Be Admitted Into Evidence ..........................................................................................21

V.      CONCLUSION........................................................................................................23

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>FEDERAL CASES</u>

*Atl. Richfield Co. v. Farm Credit Bank of Wichita*,
226 F.3d 1138 (10th Cir. 2000) ............................................................................................21

*Berndt v. Levy*,
No. 08–1067–WEB, 2010 WL 3913240 (D. Kan. Sept. 30, 2010) ..........................................7

*Castro v. Oklahoma*,
71 F.3d 1502 (10th Cir.1995) ................................................................................................22

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)...................................................................................................... *passim*

*Dodge v. Cotter Corp.*,
328 F.3d 1212 (10th Cir. 2003) ....................................................................................6, 8, 22

*Energy Intelligence Grp., Inc. v. CHS McPherson Refinery, Inc.*,
300 F. Supp. 3d 1356 (D. Kan. 2018).........................................................................11, 14, 16

*Foster v. USIC Locating Servs., LLC*,
No. 16-2174-CM, 2018 WL 3757577 (D. Kan. Aug. 8, 2018) ..........................................7, 22

*General Electric Co. v. Joiner*,
522 U.S. 136 (1997)...................................................................................................................6

*Goebel v. Denver & Rio Grande W. R.R. Co.*,
346 F.3d 987 (10th Cir. 2003) ..................................................................................................6

*Graves v. Mazda Motor Corp.*,
675 F. Supp. 2d 1082 (W.D. Okla. 2009) ..................................................................................5

*Harvey v. United States*,
No. CIVA04CV00188WYDCBS, 2005 WL 3164236 (D. Colo. Nov. 28, 2005).............14, 18

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)...................................................................................................................6

*Lone Star Steakhouse & Saloon, Inc. v. Liberty Mut. Ins. Grp.*,
343 F. Supp. 2d 989 (D. Kan. 2004)..................................................................................10, 15

*Martinez v. Target Corp.*,
384 F. App'x 840 (10th Cir. 2010) ..................................................................14, 18, 19, 21

## TABLE OF AUTHORITIES
### (Continued)

**Page**

*Mehus v. Emporia State Univ.*,
   222 F.R.D. 455 (D. Kan. 2004) ............................................................................7

*Munoz v. Orr*,
   200 F.3d 291 (5th Cir. 2000) ............................................................................18

*Ralston v. Smith & Nephew Richards, Inc.*,
   275 F.3d 965 (10th Cir. 2001) ........................................................................5, 6

*Smith v. Rasmussen*,
   57 F. Supp. 2d 736 (N.D. Iowa, 1999), *aff'd in part and denied in part*, 249 F.3d
   755 (8th Cir. 2001) ..........................................................................................19

*Thomas v. FAG Bearings Corp.*,
   846 F. Supp. 1382 (W.D. Mo. 1994) ..............................................................16

*Turpin v. Merrell Dow Pharmaceuticals, Inc.*,
   959 F.2d 1349 (6th Cir. 1992) ........................................................................16

*United States v. Kime*,
   99 F.3d 870 (8th Cir. 1996) ......................................................................10, 15

*United States v. Nacchio*,
   519 F.3d 1140 (10th Cir. 2008) ........................................................................6

*United States v. Rodriguez–Felix*,
   450 F.3d 1117 (10th Cir. 2006) ........................................................................6

*Yeager v. Buxton*,
   No. 17-2368-KGG, 2018 WL 4620884 (D. Kan. Sept. 26, 2018) ....................7

## RULES

Fed. R. Civ. Pro. Rule 26 ............................................................................14, 18

Fed. R. Civ. Pro. Rule 26(a) ..................................................................1, 18, 21

Fed. R. Civ. Pro. Rule 26(a)(2) ........................................................................14

Fed. R. Civ. Pro. Rule 26(a)(2)(C)(ii) ..............................................................18

Fed. R. Civ. Pro. Rule 37 ....................................................................................1

Fed. R. Civ. Pro. Rule 37(c)(1) ..................................................................14, 18

**TABLE OF AUTHORITIES**
**(Continued)**

**Page**

Fed. R. Evid. Rule 702............................................................................................................5, 6, 10

I.      **INTRODUCTION**

This motion seeks to exclude certain opinion testimony of Todd Coder, a non-retained expert identified by plaintiffs.  Much of Mr. Coder's testimony concerning industry practices and the likely repercussions of the cancellation of the Thunder on the Mountain music festival is inadmissible because it was not properly disclosed and, more importantly, is based either on his personal beliefs, hearsay from one of the plaintiffs (Brett Mosiman), or vague discussions with people whose identities he cannot recall.  Mr. Coder is also not qualified to give certain of is opinions due to his limited experience.  Moreover, plaintiffs sought to elicit at Mr. Coder's deposition additional opinions for which he was not designated.  Those non-disclosed opinions— per Fed. R. Civ. Pro. 26 and 37—should be barred.  The collection of opinions at issue are found in a September 19, 2018 Disclosure of Expert Witnesses, plaintiffs' Second Supplemental [Rule 26(a)] Disclosures, an email from plaintiffs' counsel sent the morning of Mr. Coder's deposition, and that deposition.  They can be organized as follows:

General topic *one* consists of opinions concerning "deposits that promoters [of music festivals] are required to pay to book bands":  (a) "[p]romoters work hard to establish and maintain a reputation with artists and agencies to keep the amount they are required to deposit when booking bands as low as possible.  10 to 25% down is an outstanding percentage;" (b) "[p]romoters work hard to establish and maintain a reputation with artists and agencies to keep the amount they are required to deposit when booking bands as low as possible [and] 10 to 25% down is an outstanding percentage;" (c) "deposit amounts are dramatically increased for promoters after cancelled events;" and (d)  "[c]ancelling a festival can have a devastating effect on a promoter's ability to keep low deposit percentages and destroy the cash flow required to operate a festival [and] [p]ercentages can be as high as 90 to 100% down after cancellation."

This general topic is inadmissible as a topic of Mr. Coder's expert testimony because Mr. Coder admits that his factual basis for specific opinions on the topic are either insufficient or lacking altogether and because it is irrelevant.

General topic *two* consists of opinions regarding purported "industry standards for reimbursing fans who purchased tickets for events that are cancelled when testifying about unpaid artist, ticketholders and vendors in this case":  (a) "it is industry standard to reimburse ticket holders for the price they paid for their tickets to a cancelled festival;" and (b) "[f]ans who purchased tickets to Thunder should be reimbursed for the amount they paid."  Based on his own words, Mr. Coder has no factual basis for or expertise to give these opinions, which are his personal opinions only.  In addition, the opinions are irrelevant.

General topic *three* is "the effect that cancellation of Thunder had on Plaintiffs' music festival business":  (a) "[t]he cancellation of Thunder has likely made it difficult for Mr. Mosiman to put on festivals going forward;" and (b) "[it's impact on] Mr. Mosiman's ability to book bands for festivals after the cancellation of Thunder."  This topic too inadmissible because, again, Mr. Coder established in his deposition that he either lacks or has an insufficient factual basis for opinions on such a topic, and it again is irrelevant.

Topic *four* is "valuation of music festivals and damage to reputation due to cancellation of concerts."  Mr. Coder cannot testify on these matters because his deposition reveals that he is not qualified to do so, and this topic was never disclosed in the expert witness disclosures.

Finally, Mr. Coder should not be permitted to testify to other opinions he was asked to give at deposition but that were not disclosed in plaintiffs' Disclosure of Expert Witnesses or Second Supplemental Disclosures—e.g., (1) that "ticket counts [are] fairly confidential information in the industry," and (2) that of producers who cancel music festivals are

"blackballed,"; or (3) the (purported) industry standard for music festivals in "increasing the initial amount of entertainers' deposits" for producers who cancel music festivals.  These opinions also should be excluded because Mr. Coder has no expertise or knowledge that qualifies him as an expert.

## II.    STATEMENT OF FACTS

### A.    INITIAL DISCLOSURES OF MR. CODER'S TESTIMONY

Plaintiffs designated Mr. Coder as both a fact witness and an unretained expert respectively in their Second Supplemental Disclosures of July 13, 2018 and Disclosure of Expert Witnesses on September 19, 2018.  (Declaration of Benjamin Scheibe ["Scheibe Decl."], Exs. 802 & 803.)  In the former, plaintiffs stated that Mr. Coder "has knowledge regarding valuation of music festivals and damage to reputation due to cancellation of concerts" despite the fact that such a topic is not the testimony of a factual witness.  (*Id*. at Ex. 803.)  When plaintiffs subsequently submitted their Disclosure of Expert Witnesses, however, they identified Mr. Coder's anticipated opinions as:

(1) "deposits that promoters [of music festivals] are required to pay to book bands;"

(2) "how deposit amounts are dramatically increased for promoters after cancelled events;"

(3) "Mr. Mosiman's ability to book bands for festivals after the cancellation of Thunder;"

(4) "the effect that cancellation of Thunder had on Plaintiffs' music festival business;" and

(5) "industry standards for reimbursing fans who purchased tickets for events that

are cancelled when testifying about unpaid artist, ticketholders and vendors in this case." (*Id*. at Ex. 802.) Notably, the Disclosure of Expert Witnesses, unlike the earlier Supplemental Disclosures, did not state that Mr. Coder would opine on the "valuation of music festivals."

B.   PLAINTIFFS' UNTIMELY SUPPLEMENTAL DISCLOSURE

On October 17, 2018, the very morning of Mr. Coder's deposition, plaintiffs' counsel sent an email purporting to supplement their disclosure with the following additional opinions:

(1) "Promoters work hard to establish and maintain a reputation with artists and agencies to keep the amount they are required to deposit when booking bands as low as possible. 10 to 25% down is an outstanding percentage;"

(2) "Cancelling a festival can have a devastating effect on a promoter's ability to keep low deposit percentages and destroy the cash flow required to operate a festival. Percentages can be as high as 90 to 100% down after cancellation;"

(3) "The cancellation of Thunder has likely made it difficult for Mr. Mosiman to put on festivals going forward;"

(4) "Regardless of the language on a ticket, it is industry standard to reimburse ticket holders for the price they paid for their tickets to a cancelled festival;" and

(5) "Fans who purchased tickets to Thunder should be reimbursed for the amount they paid." (Scheibe Decl., Ex. 804.)

C.   PLAINTIFFS ELICIT OPINION TESTIMONY FROM MR. CODER ON TOPICS THAT WERE NEVER DISCLOSED

Even after purporting to supplement the opinions via the last-minute email, counsel for plaintiffs went on to try to elicit other opinions never identified in either the Disclosure of Expert Witnesses, the Second Supplemental Disclosures, or the email sent the morning of the deposition. Specifically, counsel sought the following opinions:

4

(1) that "ticket counts [are] fairly confidential information in the industry;" and

(2) the (purported) industry standard for music festivals in "blackballing" producers who cancel music festivals.

### D.   MR. CODER'S QUALIFICATIONS AS AN EXPERT

Mr. Coder's involvement with music festivals is limited to acting as a booking agent. (Scheibe Decl., Ex. 785 at 9:13-13:19.)  Beyond that, it is limited to working on only two such festivals (though those festivals both were produced in multiple years).  (*Id*. at 143:10-144:2.) Although he has worked on other events, he conceded that ""it is different to book a festival than it is to book a club." (*Id*. at 20:4-6.)  Booking for music festivals is different than booking for specific venues like clubs because, for example (1) the latter is a "hard ticket . . . or one-off event" where the dates come to the talent buyer [from the artist], while the former is a "soft ticket event" where the talent buyer goes after the specific artists; (2) the "terms of artist compensation" are different (e.g., artists are paid more [at music festivals] than if they're playing a club or theatre)"; and (3) artists get paid a "flat fee" for a festival while it "is . . . usual . . . that an artist . . . get[s] a percentage of the gate [for clubs and theaters]." (*Id*. at 19:17-22:13.)

## III.   LEGAL STANDARD

Admission at trial of expert testimony is governed by Fed. R. Evid. 702, which imposes on the district court a gatekeeper function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).  "[T]he *Daubert* gatekeeping function is undertaken by means of a two-step analysis." *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001).

The first inquiry is whether the witness is qualified, and whether the opinions expressed fall within his or her area of expertise. *Graves v. Mazda Motor Corp.*, 675 F. Supp. 2d 1082,

1092 (W.D. Okla. 2009). The party offering an expert witness bears "the burden of demonstrating to the district court that [the proffered expert is] qualified to render an expert opinion." *United States v. Nacchio*, 519 F.3d 1140, 1171-72 (10th Cir. 2008); *see also Ralston*, 275 F.3d at 970. Second, even if the proposed expert is qualified, Rule 702 "imposes on a district court a gatekeeper obligation to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003). As the Tenth Circuit has explained, where the expert's "testimony's factual basis, data, principles, methods or their application are called sufficiently into question ... the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Id.* at 1221-22 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)). Self-proclaimed knowledge and experience are not enough: as the Supreme Court explained in *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997), "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert." "***Any*** step that renders the analysis unreliable renders the expert's testimony inadmissible." *Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 992 (10th Cir. 2003) (emphasis added).

Upon finding an opinion reliable, a court considers "other non-exclusive factors to determine whether the testimony will assist the trier of fact," including (1) relevancy of the testimony; (2) whether the testimony "is within the juror's common knowledge and experience; and (3) whether it will usurp the juror's role of evaluating a witness's credibility." *United States v. Rodriguez–Felix*, 450 F.3d 1117, 1122-23 (10th Cir. 2006) (citations omitted). The touchstone for relevance is whether "the evidence or testimony [will] assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591. The burden of proving

admissibility of expert testimony is on the party proffering such testimony.  *Mehus v. Emporia State Univ.*, 222 F.R.D. 455, 460 (D. Kan. 2004) (citing *Daubert,* 509 U.S. at 592 n. 10.

The *Daubert* analysis applies to non-retained experts as well as retained experts.  See, e.g., *Berndt v. Levy*, No. 08–1067–WEB, 2010 WL 3913240, *6 (D. Kan. Sept. 30, 2010) (granting motion to exclude testimony of non-retained attorney expert); *Yeager v. Buxton*, No. 17-2368-KGG, 2018 WL 4620884, *1 (D. Kan. Sept. 26, 2018).  Plaintiffs cannot carry their burden here.  The Court, in its gatekeeping function, should exclude Mr. Coder's proffered testimony and opinions.

## IV.   MR. CODER'S OPINIONS SHOULD BE EXCLUDED

### A.   MR. CODER MAY NOT TESTIFY AS TO THE OPINIONS REGARDING ARTISTS DEPOSITS BECAUSE HE LACKS A FACTUAL BASIS FOR EACH OF THEM

The first category of topics identified in the introduction, (*see*, *supra*, § I, p. 1) is "deposits that promoters have to pay to book bands."  Specifically, that:  (1) deposit amounts are increased for promoters who cancel events; (2) promoters try to keep deposits low, and 10 to 25% down is the norm; and (3) deposit amounts will rise as high as 90 to 100% for producers who cancel events.   Mr. Coder may not testify because he has no factual basis for any of the specific opinions; they are instead based on common sense or hearsay from plaintiff Brett Mosiman, or undermined by his own deposition testimony.

#### 1.   Mr. Coder's Opinion That Producers Who Cancel Music Festivals Have To Pay Higher Deposits Should Be Excluded

The first general opinion—that producers who cancel music festivals will have to pay higher deposits to artists—should be excluded for several reasons.  First, an expert's non-scientific opinion, to be reliable, must be "based on actual knowledge, not 'subjective belief or unsupported speculation.'"  *Foster v. USIC Locating Servs., LLC*, No. 16-2174-CM, 2018 WL

3757577, at *2-3 (D. Kan. Aug. 8, 2018) (citing *Dodge*, 328 F.3d at 1222) (expert's testimony that future earning potential of plaintiff was $ 8-10/hour had an "[in]sufficient factual foundation" because expert's own testimony undermined such a conclusion), *reconsideration denied*, No. 16-2174-CM, 2018 WL 4184931 (D. Kan. Aug. 31, 2018).  The basis for this opinion is:  (1) Mr. Coder's experiences as a talent booking agent for two cancelled music festivals (NiFi and Thunder) and (2) "industry conversation" with people whose identities he is unable to recall.  (Scheibe Decl., Ex. 785 at 102:8-15; 104:18-105:17.)  First, his experience while booking talent for NiFi cannot be the basis for his opinion because, although deposits did go up for Huku Entertainment, Mr. Coder admits he cannot attribute the rise to the cancellation[1] and acknowledges that "artists have been demanding larger deposits in general."  (*Id*. at 51:19-52:2.)

Mr. Coder cannot base his opinion on Pipeline's experience after the cancellation of Thunder because he did no work for Pipeline after the cancellation and only knows what plaintiff Brett Mosiman told him.[2]  Mosiman cannot bootstrap his own assertion into expert opinion on

---

[1]      Q: Did you experience any change in the deposit structure for Pemberton as result of the NiFi cancellation?
        A: ***I can't specifically say that it was a direct result***, but deposit structures for me specifically did change.  (Scheibe Decl., Ex. 785 at 49:18-33 (emphasis added).)

        Q: And did you, in doing so, experience any change in deposit structures for Pemberton?
        A: Yes.  As I referred to earlier, our deposit structure specifically, has always been ten percent deposit at confirmation.  Those deposit structures went up.  ***I cannot say for certain that it was in direct relation to NiFi***, but regardless, they did go up."  (*Id*. at 51:11-18 (emphasis added).)

[2]      Q: [A]fter Thunder was cancelled, you didn't do any further work for Mr. Mosiman or his companies, did you?
        A: I did not.
        Q: So you don't have any knowledge as to whether there were increases in deposit structure for Mr. Mosiman as a result of cancellations of Thunder, do you?

industry practices by telling Mr. Coder that Pipeline's deposit percentages went up and then have

Mr. Coder opine, based on what Mosiman told him, that that is what happens in the industry.[3]

Nor was Mr. Coder able to link any personal experience he had in booking talent *for other*

*businesses* to the cancellation of Thunder.  (Scheibe Decl., Ex. 785 at 50:7-11, 52:5-53:21.)  And

Mr. Coder's purported "industry conversation[s]" cannot be the basis of his opinion because he

cannot identify a single person he talked to, or any producer that suffered higher deposit costs

because of a previous cancellation.[4]

---

. . .

A:  We've had conversations about situations that he was put into based on what
happened to Thunder.
Q:  So whatever knowledge you have on that topic is what Brett Mosiman told you?
A:  That is correct.
Q:  You don't have personal knowledge?
A:  I do not."  (*Id.* at 46:12-47:6.)

[3]     In fact, Pipeline Productions never put on another festival after cancelling Thunder and
claims it was financially unable to do so due to defendants' alleged breach of contract.  (*See*
Scheibe Decl., Ex. 805 [Mosiman 10/30/19 30(b)(6) Depo. Tr.], at 151:8-25; Ex. 806 [Mosiman
12/21/18 30(b)(6) Depo. Tr.], at 266:3-13.)
[4]     Q: [D]o you have any opinion as to whether deposits are dramatically increased for
promoters after cancelled events?
A: Yes. As we mentioned early on in testimony, the repercussions can be quite severe
and they can go anywhere from an increase in deposit structure . . . that is a common punishment
for some promoters if they have had a situation or event that has cancelled.
Q:  You say that's common, but you haven't had any experience with that, correct?
A:  With myself, personally?
Q:  Yes.
A:  . . . I know of it from industry conversation.
Q:  Okay.  Who do you know had their deposit structures increased as a result of
cancellation of a festival?
A:  I can't specifically name a promoter or event in the past, but conversations have been
had.
Q:  Okay.  Tell me as best you can what those conversations entailed.
A:  Everything that I just said.  Nothing more than that really.
Q:  Do you recall who told you that?
A: It - - social conversations between different agents and promoters generally at
conferences.

Mr. Coder's complete lack of any basis for giving an expert opinion was thus can be summed up in this exchange:

> Q:  [Y]ou're expected to testify that cancelling a festival can have a devastating effect on a promoter's ability to keep low deposit percentages.  I think we've established – and I hate to keep repeating it, but you don't have personal experience with that?
>
> A:  No personal knowledge or experience.
>
> Q:  Okay. So what is that based on other than perhaps common sense?
>
> A:  Just, yeah, common sense is one of them.  Just knowledge of the industry over the last 20 years.
>
> …
>
> Q:  Can you identify any situation in which a festival was cancelled and the promoters thereafter was forced to pay higher deposit percentages?
>
> A:  No, I cannot.

(Scheibe Decl., Ex. 785 at 114:4-115:2.)

Mr. Coder's opinion is based on nothing but "common sense."  But "[t]he advisory committee's notes make it clear that when the layman juror would be able to make a common sense determination of the issue without . . . an expert, the expert testimony should be excluded as superfluous."  *United States v. Kime*, 99 F.3d 870, 884 (8th Cir. 1996) (citing Fed. R. Evid. 702, advisory committee's note); *see also Lone Star Steakhouse & Saloon, Inc. v. Liberty Mut. Ins. Grp.*, 343 F. Supp. 2d 989, 1015-16 (D. Kan. 2004) (opinions as to matters "that can be adequately explained to the jury without expert testimony" or that "contain factual conclusions as to which a jury is fully qualified to make on its own determination from the evidence presented" should be excluded).  The jury does not need Mr. Coder's "common sense"

---

Q:  Okay.  Can you identify any of them for me?
A:  I can't.  (Scheibe Decl., Ex. 785 at 104:3-105:17.)

perception.

Moreover, this opinion is irrelevant.  The Court must exclude expert opinions that have "no relevance to this case . . . ."  *Energy Intelligence Grp., Inc. v. CHS McPherson Refinery, Inc.,* 300 F. Supp. 3d 1356, 1382 (D. Kan. 2018); *Daubert*, 509 U.S. at 589 (trial judge "must ensure that any and all scientific testimony or evidence admitted is . . . relevant").  Here, plaintiffs do not contend that they were unable to put on festivals because they faced higher deposit requirements.  They instead assert that they were financially devastated by the alleged breach of contract and subsequent cancellation of Thunder and were unable to put on any festivals at all.  (Ex. 805 at 151:8-25; Ex. 806 at 266:3-13.)  Accordingly, Mr. Coder's attempt to regurgitate what Mosiman told him, even if otherwise proper (it is not), should be barred as irrelevant.

 2. **Mr. Coder's Opinion  That The Norm For Deposit Percentages Of Producers Who Don't Cancel Festivals Is 10 To 25 Percent Because It Lacks A Factual Basis**

The second specific opinion under the topic of "artists deposits" is that festival promoters who don't cancel their festivals pay deposits of 10 to 25 percent.  This opinion is inadmissible for many of the same reasons.  First, Mr. Coder admits that he has "do[es]n't have th[e] knowledge" that it is "still the case that festival promoters . . . are getting deposit terms of 10 to 25 percent."  (Scheibe Decl., Ex. 785 at 113:10-14.)  In other words, industry standards may have changed for all promoters, whether or not they have cancelled a festival, and Mr. Coder in fact acknowledges that "artists have been demanding larger deposits in general."  (*Id.* at 51:19-52:2.)  Second, the opinion is again irrelevant.  Plaintiffs do not contend that they were unable to put on festivals because they faced higher deposit requirements.  They instead assert that they were financially devastated by the alleged breach of contract and subsequent cancellation of

Thunder and were unable to put on any festivals at all.  (Ex. 805 at 151:8-25; Ex. 806 at 266:3-13.)

**3.**      **Mr. Coder's Opinion That A Festival Cancellation Will Lead Deposit Percentages To Rise And Destroy Cash Flow Must Be Excluded**

The third opinion concerning "artists deposits" is that "[c]ancelling a festival can have a devastating effect on a promoter's ability to keep low deposit percentages and destroy the cash flow required to operate a festival [and] [p]ercentages can be as high as 90 to 100% down after cancellation."  But Mr. Coder has no factual basis for opining that cancelling a festival causes artists to raise their deposit percentages (as shown above) and admitted he has no knowledge or experience showing that higher deposit percentages ever "destroyed the cash flow required to operate [any] festival."[5]  And while he suggested that his deposit percentages for other types of

---

[5]      Q: Okay. The e-mail [Mr. McInnes' email the morning of Mr. Coder's deposition] goes on to say that you're expected to testify that if that happens, it can destroy the cash flow required to operate a festival.  What do you mean by that?

A:  So the larger the deposit, the more of a strain it puts on cash flow, especially if you have to pay 75, 100 percent, even 50 percent upfront before you announce the event.  You haven't had the opportunity to put a single ticket on sale yet, so you would have theoretically millions of dollars out with no revenue coming in before the event is even announced.

Q:  [. . .] ***Do you yourself have any personal experience with a situation in which percentages for a festival were increased and that caused a problem with the ability to put on a festival?***

A:  ***No, not with a festival specifically***.

Q:  Do you have any knowledge of any other festival with you which you weren't affiliated where deposit percentages were increased and caused a problem?

A:  I do not.

Q:  Okay. Now, your testimony a minute ago suggested you had some experience with that situation occurring in a hard ticket event?

A:  Correct.

Q:  Can you explain that?

A:  In terms of just deposit structures increasing from a 10 percent to a 50 percent.

Q:  Okay.

A:  That – I know that happened to me on a number of occasions immediately after Thunder.

Q:  And did that prevent you from booking those bands?

events went up after Thunder was cancelled, he again could not attribute that to the cancellation and, more importantly, admitted it did <u>not</u> stop him from booking these artists!  (See testimony quoted in footnote 5.)  Likewise, he could provide no support for the assertion in counsel's morning-of-the-deposition email that "if you cancel a festival the artist are going to charge you 90 to 100 percent down":

> Q:  Do you have any information that you can point to that says if you cancel a festival the artists are going to charge you 90 to 100 percent down?
>
> …
>
> A:   I do not specifically have – have that.

(Scheibe Decl., Ex. 785 at 121:19-122:3.)

Second, the opinion is again irrelevant.  Again, plaintiffs do not contend that they were unable to put on festivals because they faced higher deposit requirements.  They instead assert that they were financially devastated by the alleged breach of contract and subsequent cancellation of Thunder and were unable to put on any festivals at all.  (Ex. 805 at 151:8-25; Ex. 806 at 266:3-13.)  In sum, Mr. Coder cannot give the three specific opinions relating to "artists' deposits" because they have no factual foundation, and are supported solely by hearsay, speculation, and "common sense."

---

A: ***It did not prevent me from booking those bands***, but it could have prevented others, I suppose.
Q:  In your situation at least, you were still able to book the bands?
A:  I was.
Q:  Put on the event?
A:  Correct.
Q:  And whatever profits and losses occurred, occurred regardless of your deposit structure being increased?
A:  Correct.  (Scheibe Decl., Ex. 785 at 115:18-117:9.)

13

**4.      ANY OPINION AS TO REPUTATIONAL HARM SHOULD BE EXCLUDED BECAUSE IT WAS NOT DISCLOSED AND WOULD BE IRRELEVANT**

Mr. Coder's testimony as to the reputational harm that supposedly occurs if a festival is cancelled should be excluded for multiple reasons.  It was not disclosed, is irrelevant, and would not be helpful to the jury.  This opinion was not disclosed in plaintiffs' Disclosure of Expert Witnesses.  A failure to disclose an expert or their anticipated topic of testimony per Fed. R. Civ. Pro. Rule 26 will incur penalties under Fed. R. Civ. Pro. Rule 37(c)(1), and the expert will not be permitted to testify on that topic if the proponent of the expert cannot show (1) substantial justification for the omission, or (2) that the error was harmless.  *Martinez v. Target Corp.*, 384 F. App'x 840, 847-48 (10th Cir. 2010).  "[T]he rationale for *timely* expert designations under Rule 26(a)(2) does not distinguish between retained and non-retained experts." *Harvey v. United States*, No. CIVA04CV00188WYDCBS, 2005 WL 3164236, *11 (D. Colo. Nov. 28, 2005) (emphasis in original).  Plaintiffs' conduct is worse than in *Martinez*, because they have never submitted a disclosure for this particular topic *at all*.  Even if they were to add a supplementary disclosure, it would be prejudicial because it is after defendants filed their motion for summary judgment, and no permission to supplement the expert disclosures was sought.

Such testimony is also irrelevant.  *Energy Intelligence Grp.,* 300 F. Supp. 3d at 1382; *Daubert*, 509 U.S. at 589 (trial judge "must ensure that any and all scientific testimony or evidence admitted is . . . relevant").  This is not a defamation case.  It is a breach of contract case.  Plaintiffs' reputation, good or bad, is irrelevant.  Accordingly, any opinion as to reputational harm to producers who cancel festivals, even had it been properly disclosed, should be excluded because it lacks foundation and is irrelevant.  Lastly, even if relevant, such opinion would not be helpful to the jury as the idea that canceling a festival might harm a promoter's reputation is a self-evident concept that does not require an expert for a jury to understand.  *See*

*United States v. Kime*, 99 F.3d at 884; *Lone Star Steakhouse.*, 343 F. Supp. 2d at 1015-16.

**B.**   **MR. CODER'S OPINION AS TO THE PURPORTED INDUSTRY STANDARD OF REFUNDING TICKETS AFTER A CANCELLATION CANNOT BE ADMITTED BECAUSE IT IS BOTH BASED ON HIS PERSONAL BELIEF AND IRRELEVANT**

Next is Mr. Coder's supposed opinions that "[r]egardless of the language on a ticket, it is industry standard to reimburse ticket holders for the price they paid for their tickets to a cancelled festival;" and therefore, "[f]ans who purchased tickets to Thunder should be reimbursed for the amount they paid."  (*See* Scheibe Decl., Ex. 804.)  This opinion should be excluded because Mr. Coder has no specialized knowledge or training that allows him to give it, as he freely admitted, and because it is irrelevant.

At deposition, Mr. Coder admitted that he had no specialized basis for his opinion-personal belief that ticket holders should be reimbursed after a festival cancellation:

> Q:  Mr. Mosiman . . . expects you to testify about industry standards for reimbursing fans who purchased tickets for events that have cancelled.  Are there industry standards?
>
> A:  I believe standards is probably the best term to use.  It is understood and expected that the fans always be reimbursed.
>
> Q:  Okay.  What's that based on?  What's your understanding based on?
>
> A:  *You know, I honestly can't tell you specifically the foundation for that.* That's just a – a belief that I believe everyone in the industry shares, that if an event is cancelled, the fans should be refunded for their tickets.
>
>      . . .
>
> Q:  Are there any festivals or concerts that you are aware of and can identify where there was a cancellation and the fans did get their money back?
>
> A:  Not off the top of my head.  I'm sure there are a number, but I can't name them for you right now.
>
> Q:  Other than your personal belief, valid as it may be, that fans should get their money back if there's a cancellation, do you have any basis for your testimony that that's standard practice in the industry?

. . .

A:  I don't have anything that can necessarily back that up per se.  Again, it's -- it's more of just a – it's not a written rule in the industry.  *It's just more of a belief.*

Q:  More of what?

A:  *More of a belief.*

Q:  *Your belief*?

. . .

A:  Yeah.  I think I made that clear.

(Scheibe Decl., Ex. 785 at 107:15-110:12 (emphasis added).)

"Opinions of an expert need not be accepted when they are based on nothing more than personal opinion or belief, instead of an understandable scientific [or experiential] basis." *Thomas v. FAG Bearings Corp.*, 846 F. Supp. 1382, 1393 (W.D. Mo. 1994) (citing *Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349 (6th Cir. 1992).)  Accordingly, Mr. Coder's testimony as to the music festival industry's standard practice of refunds for cancellations should not be admitted into evidence.  Furthermore, even proper evidence as to whether or not there is an industry standard as to ticket refunds would be inadmissible because it is irrelevant.  *Energy Intelligence Grp.*, 300 F. Supp. 3d at 1382.  The issue of ticket refunds is the subject of a separate action brought by the ticketholders themselves.[6]  Mr. Coder's personal belief that Thunder ticketholders deserve a refund is likewise neither admissible as expert opinion (because based solely on personal opinion and not any industry standard) nor relevant.

---

[6]     As set forth in defendants' pending motion for summary judgment, plaintiffs' efforts to recover monies on behalf of third party ticketholders is meritless.  (*See* Doc. 664 at 78.)

**C.    MR. CODER MAY NOT TESTIFY AS TO THE EFFECTS OF THE CANCELLATION OF THUNDER ON PLAINTIFFS' MUSIC FESTIVAL BUSINESS**

The third topic plaintiffs want Mr. Coder to opine on is "the effect that cancellation of Thunder had on Plaintiffs' music festival business." Specifically, they expect him to say that "[t]he cancellation of Thunder has likely made it difficult for Mr. Mosiman to put on festivals going forward;" and impacted his "ability to book bands for festivals after the cancellation of Thunder." This opinion is inadmissible for the same reasons. Again, Mr. Coder admitted in deposition that he lacks a sufficient factual basis for this opinion and that the sole support for that opinion is what Mosiman told him:

> Q:  The e-mail [the one sent to counsel on the morning of Mr. Coder deposition] goes on to state that you're expected to testify that the cancellation of Thunder has likely made it difficult for Mr. Mosiman to put on festivals going forward. Do you have any direct personal knowledge about that?
>
> A:  How it has affected him?
>
> Q:  Yes.
>
> A:  Direct in terms of what he had told me.
>
>  . . .
>
> Q:  And do you have any experience from your years in the field that corroborates that or supports that?
>
> . . .
>
> A:  Other than conversation with other industry colleagues, no.
>
> Q:  Who in the industry have you spoken to about whether cancelling a festival would make it more difficult to put on additional festivals going forward?
>
> A:  No one that I can name.

(Scheibe Decl., Ex. 785 at 122:4-123:7.)

Mr. Mosiman is not a reliable source of information on which to base expert testimony because he is a plaintiff, and Mr. Coder made no effort to verify Mr. Mosiman's claim that "the

cancellation of Thunder has likely made it difficult for Mr. Mosiman to put on festivals going forward." *See Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000) (one reason for inadmissibility of expert report and testimony was that [the expert] "relied on plaintiffs' compilations of data, which gives rise to a 'common-sense skepticism' regarding the expert's evaluation . . . and did not seek to verify the information presented to him"). Nor is it proper for Mr. Coder to present plaintiffs'' self-serving assertions in the guise of expert opinion. And, again, the opinion is irrelevant. Again, plaintiffs do not contend that they were unable to put on festivals because they could not book artists. They instead assert that they were financially devastated by the alleged breach of contract and subsequent cancellation of Thunder and were unable to put on any festivals at all. (Ex. 805 at 151:8-25; Ex. 806 at 266:3-13.) Mr. Coder's opinion therefore must be excluded because he has no basis for giving that opinion and because it is irrelevant.

### D.   ANY TESTIMONY OF MR. CODER CONCERNING VALUATIONS OF THUNDER OR PLAINTIFFS SHOULD BE EXCLUDED

#### 1.   MR. CODER WAS NOT IDENTIFIED AS AN EXPERT ON VALUE

Plaintiffs' Disclosure of Expert Witnesses did not identify valuation or reputational harm as areas on which Mr. Coder would testify, let alone provide the "summary of the facts and opinion[ ]" required by Rule 26(a)(2)(C)(ii). (Scheibe Decl., Ex. 803 at 4.) (While valuation was mentioned in the earlier Rule 26(a) disclosures, it was a topic apparently abandoned at the time experts were identified.) A failure to disclose an expert or their anticipated topic of testimony per Fed. R. Civ. Pro. Rule 26 will incur penalties under Fed. R. Civ. Pro. Rule 37(c)(1), and the expert will not be permitted to use testify on that topic if the proponent of the expert cannot show (1) substantial justification for the omission, or (2) that the error was harmless. *Martinez*, 384 F. App'x at 847-48; *see also Harvey*, 2005 WL 3164236, at *11. As

noted the harm here is worse than in *Martinez*, because plaintiffs never submitted an expert

disclosure for this topic *at all* and never sought leave to supplement their disclosure.  Defendants

summary judgment motion is pending and trial is 40 days away.  Mr. Coder should be precluded

from opining on this topic on this ground alone.

### 2.    MR. CODER IS NOT QUALIFIED TO OPINE ON VALUE AND HAS NO BASIS FOR DOING SO HERE

Leaving aside that he was not designated to testify as to valuation, Mr. Coder is not

qualified to discuss value and has not done the work necessary to form an opinion even if he

were qualified.  "[T]he Supreme Court ha[s] made clear that a person, although qualified as an

expert in one area of expertise, may be precluded from offering opinions beyond that area of

expertise, or that are not founded on a reliable methodology."  *Smith v. Rasmussen*, 57 F. Supp.

2d 736, 766 (N.D. Iowa, 1999) (disqualifying expert—a psychiatrist specializing on sexual

disorders—from testifying on gender identity disorders because he had only worked with one

patient with such disorder and read medical journals on topics), *aff'd in part and denied in part*,

249 F.3d 755, 765-66 (8th Cir. 2001).  Mr. Coder is a talent booking agent (or talent buyer).

(Scheibe Decl., Ex. 785 at 9:13-13:19.)  He "go[es] after the specific artists that [promoters]

want to perform at the festival and tr[ies] to engage with the artist's representative who is the

agent, sometimes the manager, and will start the offer process in that manner."  (Id. at 20:16-20.)

He has never bought or sold a music festival.  (*Id.* at 42:7-9.)  Helping book artists for a festival

does not qualify one to assess the value of those festivals.

Moreover, Mr. Coder acknowledged that, even if he were generally qualified to value a

festival or festival business, he does not have the information he believes is necessary to value

Pipeline or Thunder:

Q:  Do you have knowledge as to how music festivals are valued?

A:  I do.

Q:  Okay.  What is your knowledge on that?

A:  Just based off of the value of the property itself, the festival property, and the valuation determined based off of previous years' ticket sales and budget.

Q:  And when you say festival property, are you talking about actually the land on which the festival is operated?

A:  Only if applicable.  But the festival property meaning the festival entity.

Q:  Is there some rule of thumb that you believe existed with respect to how you would value a music festival based on either the real property or the ticket sales and budget?

A:  Ticket sales obviously – revenues versus the expenses in determining the success of the event and what the event can be worth.

Q:  *But for example, are you aware of any industry standard that says a buyer will pay, just to pick a number, three times ticket sales to purchase a festival or five times or one time?*

A:  *I'm not aware of these specifics.*

Q:  *So if, just hypothetically, a festival had $500,000 in ticket sales, do you have any opinion as to its value?*

A:  *No, not without seeing the overall operating budget.*

Q:  And what would the overall operating budget tell you that would allow you to come up with a value."

A:  Itemized expenses and itemized revenue sources.

Q:  And would you look at the bottom line profit numbers?

A:  Uh-huh.

Q:  You have to answer yes or no.

A:  Yes.  I'm sorry.

Q:  *Okay.  And once you had an overall bottom line profit number, what would you do with it to assess the value of a festival?*

A.  *You know, me specifically could be different than someone else.  I think*

*you have to look at how the festival has performed in the past and how you expect it to perform in the future. So you don't just take those numbers alone. There are other intangibles and variables that come into play, and also, you know, what you deem is the true value of the event itself and what you can do with the event.*

(Scheibe Decl., Ex. 785 at 42:10-44:16, emphasis added.)

Mr. Coder also admits that he is not aware of any "rule of thumb" method of valuing a music festival. (*Id* at. 43:1-12 (emphasis added).) Yet Mr. Coder here had none of the information he believes would be needed for him to come up with a value for Pipeline or Thunder while at the same time conceding that, even he did his value "could be different than someone else." *See Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1167 (10th Cir. 2000) (upholding exclusion of expert's testimony valuing an oil and gas lease where expert did not consider all sales data in determining value). No one in fact has even asked him to do what would be necessary to assess the value of Thunder and he has (at least of the time of his deposition) formed no opinion as to its value. (*Id*. at 44:17-2.) He should not be allowed to pull a number out of his hat at trial.

### E. ANY TESTIMONY ON OTHER TOPICS NOT DISCLOSED SHOULD NOT BE ADMITTED INTO EVIDENCE

At deposition, Mr. Coder gave opinion testimony on at least two topics that were not mentioned in the Disclosure of Expert Witnesses, the Rule 26(a) Second Supplemental Disclosures, or even counsel's morning-of-the-deposition email. Specifically, he agreed with a leading question from plaintiffs' counsel that (1) "ticket counts [are] fairly confidential information in the industry;" and (2) stated that there is an industry practice of "blackballing" producers who cancel music festivals. These opinions first should be excluded because they were not disclosed. *Martinez*, 384 F. App'x at 847-48. Beyond that, they are inadmissible for substantive reasons as well.

As to the first opinion, Mr. Coder is not qualified to testify about the confidentiality of ticket sales.  Even if one is generally qualified for a certain field of knowledge, that does not make them qualified as an expert on sub-specialties in that field.  *See Castro v. Oklahoma*, 71 F.3d 1502, 1515 (10th Cir.1995) (questioning expert's—a psychiatrist—competency to testify in a capital murder trial where his specialty was in child and geriatric specialty, not forensic psychiatry).  Mr. Coder is a talent buyer.  Booking artists does not qualify him to testify as to how music festival promoters treat information about their ticket sales.

The second completely undisclosed opinion, the purported industry practice of "blackballing" producers who cancel music festivals, is inadmissible because Mr. Coder's factual basis for such knowledge not only fails to support, and instead undermines, his testimony. An expert's non-scientific opinion, to be reliable, must be "based on actual knowledge, not 'subjective belief or unsupported speculation.'"  *Foster*, 2018 WL 3757577, at *2-3 (D. Kan. Aug. 8, 2018) (citing *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003)) (testimony that future earning potential of plaintiff was $ 8-10/hour had an "[in]sufficient factual foundation" because expert's own testimony undermined such a conclusion).

Mr. Coder states that his opinion is based on his experiences as a booking agent for two cancelled music festivals (NiFi and Thunder.  (Scheibe Decl., Ex. 785 at 45:9-18.)  However, he acknowledges that the producer of NiFi, Huka Entertainment, *was able to continue hiring artists and put on a different music festival after NiFi failed*,[7] and accordingly, admitted that he had no

---

[7]     Q: You mentioned that a potential consequence or repercussion from a cancelled festival is being blackballed.  Did you encounter that with respect to the cancellation of NiFi?
    A: I did not.  (Scheibe Decl., Ex. 785 at 53:22-54:3.)

    Q: And Huka was able to put on other festivals after the cancellation of NiFi, was it not?
    A: Correct.  (*Id*. at 48:3-6.)

personal knowledge of any producers being "blackballed" after cancelling a festival.[8]  As for

Thunder, Mr. Coder did not work for plaintiffs after it was cancelled (Scheibe Decl., Ex. 785 at

53:22-54:7) and therefore relies only on self-serving hearsay from Brett Mosiman.  (Id. at 47:8-

12.)  Again, Mosiman cannot create expert testimony by telling Mr. Coder he was "blackballed"

in the industry then offer Mr. Coder to testify that, as a matter of industry practice, promoters are

"blackballed" if they cancel a festival.  This opinion is unreliable because it lacks any basis

whatsoever.

## V.    CONCLUSION

For the forgoing reasons, the above-described opinion testimony should be excluded.

These opinions were either not properly disclosed, or are beyond Mr. Coder's expertise, or are

unsupported an unreliable, or are unhelpful to the jury (or all of the above).

Respectfully submitted this
23rd day of December 2019

/s/ *Whitney L. Casement*
Whitney L. Casement #25466
Timothy A. Shultz #16060
Goodell, Stratton, Edmonds & Palmer, LLP
515 S. Kansas Ave.
Topeka, KS 66603-3999
Tel.: 785.233.0593
Fax: 785.233.8870
wcasement@gseplaw.com
tshultz@gseplaw.com

/s/ *Eric M. George*
Eric M. George (Cal. Bar No. 166403)
(admitted pro hac vice)
Benjamin D. Scheibe (Cal. Bar No. 101327)

---

[8]     Q:  And I think we've established that you don't have any personal experience with promoters not being able to book bands for festivals after cancellations."

A:  Correct.  (Scheibe Decl., Ex. 785 at 107:10-14.)

Browne George Ross LLP
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Tel.: 310.274.7100
Fax: 310.275.5697
bscheibe@bgrfirm.com
ibibbero@bgrfirm.com
mchun@bgrfirm.com

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of December 2019, a true and correct copy of the foregoing was filed with the Clerk of Court via CM/ECF and served on counsel for Plaintiffs through the Notice of Electronic Filing.

Jack D. McInnes, #21898
McInnes Law LLC
4300 Shawnee Mission Parkway, Suite 100
Fairway, KS 66205
Phone: 816.508.7588
Email: jack@mcinnes-law.com
Attorney for Plaintiffs

Anthony W. Bonuchi (KSD #78567)
Bonuchi Law, LLC
601 Walnut, Suite 300
Kansas City, MO 64106
Tel.: 816-944-3232
Fax: 816-944-3233
Email: anthony@bonuchilaw.com
Co-Counsel for Plaintiffs

Sean Cooper (KSD #26517)
PAUL LLP
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Tel: (816) 984-8100
FAX (816) 984-8101
Email:  Sean@PaulLLP.com
Counsel for Interested Non-Parties Grant Williams
and Settlement Class:

*/s/ Whitney L. Casement*