# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

PIPELINE PRODUCTIONS, INC.,     )
BACKWOOD ENTERPRISES, LLC,     )
OK PRODUCTIONS, INC., and     )
BRETT MOSIMAN,     )
     )   CIVIL ACTION
           Plaintiffs,     )   CASE NO. 5:15-cv-04890-KHV ADM
     )
v.     )
     )
THE MADISON COMPANIES, LLC,     )
AND HORSEPOWER ENTERTAINMENT     )
LLC, KAABOO, LLC, KAABOOWORKS     )
SERVICES, LLC, KAABOOWORKS, LLC,     )
KAABOO DEL MAR, LLC and     )
WARDAWGZ, LLC     )

           Defendants.

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF FACTS ......................................................................................2

III.    APPLICABLE LEGAL STANDARD ....................................................................3

IV.     LEGAL ARGUMENT ............................................................................................6

      A.      Mr. Niland May Not Testify as to the Effect that Pipeline's Cancellation
of Thunder Festival Had on Its Ability to Put on Future Music Festivals
Because There Is No Basis for Such an Opinion And It Will Not Assist the
Jury.........................................................................................................................6

      B.      Mr. Niland May Not Testify as to Reputational Harm Resulting From The
Cancellation of Music Festivals Because the Topic Was Never Disclosed,
Has No Factual Basis, and Is Irrelevant ...............................................................8

      C.      Mr. Niland May Not Testify as to the Value of Plaintiffs or Their Festivals ..........9

      D.      Mr. Niland May Not Testify as to Industry Standards For Refunding
Tickets After a Cancelled Festival Because The Opinion Has No Factual
Basis, Is Irrelevant, and Was Undisclosed ...........................................................10

      E.      Mr. Niland May Not Testify as to the Industry Standard of Paying Artist
Deposits After a Cancelled Music Festival Because The Opinion Has No
Factual Basis and Was Not Disclosed ...................................................................12

      F.      Mr. Niland May Not Testify as to the Industry Standard of "Blacklisting"
After a Cancelled Music Festival Because The  Opinion Lacks a Factual
Basis and Was Not Disclosed ...............................................................................13

      G.      Mr. Niland May Not Testify that "Handshake Deals" Are "Fairly
Commonplace in the Industry" Because the Opinion's Factual Basis
Belies It And It Was Never Disclosed ..................................................................14

V.      CONCLUSION......................................................................................................17

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. 1497 (D. Kan. 1995) .....................................5

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)......................................................................................................3

*Arista Records LLC v. Usenet.com*,
    No. 07 Civ. 8822 (HB), 2009 WL 185992 (S.D.N.Y. Jan. 26, 2009)....................................3, 4

*Berndt v. Levy*,
    No. 08–1067–WEB, 2010 WL 3913240 (D. Kan. Sept. 30, 2010) ...........................................6

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)...................................................................................................3, 4, 5, 6, 9

*Dodge v. Cotter Corp.*,
    328 F.3d 1212 (10th Cir. 2003) ................................................................................................4

*Energy Intelligence Grp., Inc. v. CHS McPherson Refinery, Inc.*,
    300 F. Supp. 3d 1356 (D. Kan. 2018) ................................................................................9, 11

*First Savings Bank*, FSB v. US Bancorp,
    117 F. Supp. 2d 1078 (D.Kan.2000) ........................................................................................6

*Foster v. USIC Locating Servs., LLC*,
    No. 16-2174-CM, 2018 WL 3757577 (D. Kan. Aug. 8, 2018*)* .......................................10, 12

*General Electric Co. v. Joiner*,
    522 U.S. 136 (1997)...................................................................................................................5

*Goebel v. Denver & Rio Grande W. R.R. Co.*,
    346 F.3d 987 (10th Cir. 2003) ..................................................................................................5

*Gomez v. Martin Marietta Corp.*,
    50 F.3d 1511 (10th Cir. 1995) ..................................................................................................5

*Graves v. Mazda Motor Corp.*,
    675 F. Supp. 2d 1082 (W.D. Okla. 2009) .............................................................................3, 4

*Harvey v. United States*,
    No. CIVA04CV00188WYDCBS, 2005 WL 3164236 (D. Colo. Nov. 28,
    2005) .........................................................................................................................................8

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)) ...........................................................................................4

*Lone Star Steakhouse & Saloon, Inc. v. Liberty Mut. Ins. Grp.*,
  343 F. Supp. 2d 989 (D. Kan. 2004)......................................................................7

*Martinez v. Target Corp.*,
  384 F. App'x 840 (10th Cir. 2010) .............................................8, 11, 13, 14, 16

*Mehus v. Emporia State Univ.*,
  222 F.R.D. 455 (D. Kan. 2004).............................................................................5

*Ralston v. Smith & Nephew Richards, Inc.*,
  275 F.3d 965 (10th Cir. 2001) ...........................................................................3, 4

*Smith v. Rasmussen*,
  249 F.3d 755 (8th Cir. 2001) ...............................................................................13

*Stagl v. Delta Air Lines, Inc.*,
  117 F.3d 76 (2d Cir. 1997)....................................................................................4

*Thomas v. FAG Bearings Corp.*,
  846 F. Supp. 1382 (W.D. Mo. 1994) ...................................................................10

*Turpin v. Merrell Dow Pharmaceuticals, Inc.*,
  959 F.2d 1349 (6th Cir. 1992) .............................................................................10

*United States v. Fredette*,
  315 F.3d 1235 (10th Cir. 2003) .............................................................................7

*United States v. Kime*,
  99 F. 3d 870 (8th Cir. 1996) ..................................................................................7

*United States v. Nacchio*,
  519 F.3d 1140 (10th Cir. 2008) .............................................................................4

*United States v. Rodriguez–Felix*,
  450 F.3d 1117 (10th Cir. 2006) .............................................................................5

*United States v. Williams*,
  506 F.3d 151 (2d Cir. 2007)...................................................................................3

*Yeager v. Buxton*,
  No. 17-2368-KGG, 2018 WL 4620884 (D. Kan. Sept. 26, 2018)..........................6

*Zaremba v. Gen. Motors Corp.*,
  360 F.3d 355 (2d Cir. 2004)...................................................................................4

**Other Authorities**

Fed. R. Civ. Pro. 26(a)(2) ........................................................................................................1, 8, 9

Fed. R. Civ. Pro. 26(a)(2)(C)(ii) ....................................................................................................6

Fed. R. Civ. Pro. 37(c)(1) .........................................................................................................1, 8

Fed. R. Evid. 702 ......................................................................................................................3, 4

29 WRIGHT & GOLD, FEDERAL PRACTICE & PROCEDURE § 6265, at 246 (2008)) ..........................4

### DEFENDANTS' DAUBERT MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFFS' EXPERT, ABEL J. NILAND

## I.    INTRODUCTION

Defendants bring this motion to exclude certain portions of Abel J. Niland's anticipated expert testimony.  Much of Mr. Niland's testimony is inadmissible as expert opinion because his testimony about the practices within the music festival industry and the likely repercussions of the cancellation of Thunder on plaintiffs is based on his personal beliefs, solely relies on hearsay from one of the plaintiffs—Brett Mosiman, or is irrelevant to the issues of this case.  Mr. Niland also cannot provide expert testimony on many topics (listed and organized according to their subject matters in the following paragraphs) because plaintiffs failed to properly identify those topics.  Any topic that was raised for the first time during Mr. Niland's deposition by plaintiffs' counsel should be—per Fed. R. Civ. Pro. 26 and 37—excluded.

The only topic actually identified in plaintiffs' Disclosure of Expert Witnesses—(a) "the effect that Thunder's cancellation had on Plaintiffs' music festival business"—is unreliable and inadmissible because Mr. Niland has no knowledge of how Pipeline was affected by the cancellation except for the limited, vague and self-evident notion that a festival cancellation has some degree of negative effect on the producer.  The topics identified only in plaintiffs' Second Supplemental Disclosures—(b) reputational damages resulting from the cancellation of music festivals, and (c) valuation of music festivals—are inadmissible because they were not properly disclosed and because they lack a factual basis.  And the opinions that plaintiffs' counsel elicited from Mr. Niland during his deposition but were never previously disclosed in any way, shape, or form—such as music festival industry standards for (d) ticket refunds, (e) paying artists fees despite a festival cancellation, and (f) blacklisting producers after a festival cancellation, and (g) the commonality of "handshake" deals in the industry—are inadmissible because they were

never disclosed and because they are irrelevant, and lack a factual basis.

## II.   STATEMENT OF FACTS

Plaintiffs designated Niland as both a fact witness and an un-retained expert respectively in their Second Supplemental Disclosures of July 13, 2018 and Disclosure of Expert Witnesses on September 19, 2018.  (Declaration of Benjamin Scheibe ["Scheibe Decl."], Exs. 802 & 803.) In the former, plaintiffs stated that "Mr. Niland has knowledge of the . . . valuation of music festivals, damage to reputation due to cancellation of concerts, and Defendants' pattern and practice of fraudulent conduct, including bait and switch tactics." (*Id*., Ex. 802 at 4.)  In the latter, plaintiffs stated only that "Plaintiffs anticipate that Mr. Niland will testify . . . about the effect that Thunder's cancellation had on Plaintiffs' music festival business" but did not identify the opinion he was expected to give.  (*Id*., Ex. 803 at 1-2.)  Notably, the Disclosure of Expert Witnesses, unlike the earlier Supplemental Disclosures, did not state that Mr. Niland would opine on the "valuation of music festivals."

During Mr. Niland's deposition on December 17, 2019, plaintiffs' counsel sought to elicit other opinions from Mr. Niland that were not disclosed in either the Second Supplemental Disclosures of July 13, 2018 or the Disclosure of Expert Witnesses.  Specifically, Mr. Niland was asked his opinions on such topics as:  (1) the industry standard of refunding tickets after a festival cancellation (Scheibe Decl., Ex. 807 at 181:5-7), (2) the commonality of "handshake" deals in the music festival industry (*id*. at 172:17-19), and (3) the industry standard of returning artists' deposits after a festival cancellation (*id*. at 181:22-23).

It was also learned during Mr. Niland's deposition that plaintiffs' original plan had been to retain – and pay – him as a retained expert.  But plaintiffs apparently decided they did not want to pay him and therefore did not designate him as a retained expert.  (Scheibe Decl., Ex. 807 at 71:8-72:3.)  Niland therefore stopped developing his opinions as to the effect cancelling a

festival might have on a promoter's reputation.  (*Id*. at 74:25-76:8.)  Nevertheless, plaintiffs used

the deposition of Niland to ask about those very undeveloped opinions (without paying him of

course)!  Having been told that he would not be paid for his opinions, Niland stated that he did

not attend to appear and testify at trial.  (*Id*. at 73:10-14.)

III.     **APPLICABLE LEGAL STANDARD**

          Admission at trial of expert testimony is governed by Fed. R. Evid. 702, which imposes

on the district court a gatekeeper function to "ensure that any and all scientific testimony or

evidence admitted is not only relevant, but reliable."  *Daubert v. Merrell Dow Pharms.*, *Inc.*, 509

U.S. 579, 589 (1993).  Federal Rule of Evidence 702, amended in 2000 to incorporate *Daubert*'s

formulation of the gate-keeping task, sets forth the test for determining the admissibility of

expert testimony:

> If scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form
> of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has applied the
> principles and methods reliably to the facts of the case.

Fed. R. Evid. 702; *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (quoting

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)); *Arista Records*

*LLC v. Usenet.com*, No. 07 Civ. 8822 (HB) (THK), 2009 WL 185992, at *8 (S.D.N.Y. Jan. 26,

2009).  "[T]he *Daubert* gatekeeping function is undertaken by means of a two-step analysis."

*Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001).

          The first inquiry is whether the witness is qualified, and whether the opinions expressed

fall within his or her area of expertise.  *Graves v. Mazda Motor Corp.*, 675 F. Supp. 2d 1082,

1092 (W.D. Okla. 2009).  In other words, "the issue with regard to expert testimony is not the

qualifications of a witness in the abstract, but whether those qualifications provide a foundation

for a witness to answer a specific question."  *Id.*; *see also Arista Records LLC* 2009 WL 185992,

at *8 (S.D.N.Y. Jan. 26, 2009) ("A court must consider 'the totality of a witness's background

when evaluating the witness's qualifications to testify as an expert.'") (quoting 29 WRIGHT &

GOLD, FEDERAL PRACTICE & PROCEDURE § 6265, at 246 (2008)).  To ensure that these

requirements are met, the district court must determine whether an expert (1) is qualified to give

expert testimony, and (2) will be giving opinions on issues that are within his or her area of

expertise.  *Arista Records*, 2009 WL 185992, at *8 (citing *Stagl v. Delta Air Lines, Inc.*, 117 F.3d

76, 81 (2d Cir. 1997)).  "In some circumstances . . . . a district court may properly conclude that

witnesses are insufficiently qualified despite the relevance of their testimony because their

expertise is too general or too deficient."  *Stagl*, 117 F.3d at 81; *see Zaremba v. Gen. Motors

Corp.*, 360 F.3d 355, 360 (2d Cir. 2004) (noting that where a witness lacked qualifications, an

analysis of the remaining *Daubert* factors "seems almost superfluous").  The party offering an

expert witness bears "the burden of demonstrating to the district court that [the proffered expert

is] qualified to render an expert opinion."  *United States v. Nacchio*, 519 F.3d 1140, 1171-72

(10th Cir. 2008); *see also Ralston* 275 F.3d 965, at 970 (10th Cir. 2001).

Second, even if the proposed expert is qualified, Rule 702 "imposes on a district court a

gatekeeper obligation to 'ensure that any and all scientific testimony or evidence admitted is not

only relevant, but reliable.'"  *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003).  As

the Tenth Circuit has explained, where the expert's "testimony's factual basis, data, principles,

methods or their application are called sufficiently into question ... the trial judge must determine

whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant]

discipline.'"  *Id.* at 1221-22 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)).

Self-proclaimed knowledge and experience are not enough: as the Supreme Court explained in

*General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997), "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert."   "***Any*** step that renders the analysis unreliable renders the expert's testimony inadmissible."  *Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 992 (10th Cir. 2003) (emphasis added).

Even after finding an opinion reliable, the Court still must consider "other non-exclusive factors to determine whether the testimony will assist the trier of fact," including (1) relevancy of the testimony; (2) whether the testimony "is within the juror's common knowledge and experience; and (3) whether it will usurp the juror's role of evaluating a witness's credibility." *United States v. Rodriguez–Felix*, 450 F.3d 1117, 1122-23 (10th Cir. 2006) (citations omitted). The touchstone for relevance, in this context, is whether "the evidence or testimony [will] assist the trier of fact to understand the evidence or to determine a fact in issue."  *Daubert*, 509 U.S. at 591.  The burden of proving admissibility of expert testimony is on the party proffering such testimony.  *Mehus v. Emporia State Univ.*, 222 F.R.D. 455, 460 (D. Kan. 2004) (citing *Daubert*, 509 U.S. at 592 n. 10 (1993)).

Testimony of even a qualified expert will be excluded where "there is simply too great an analytical gap between the data and the opinion proffered."  *General Elec. Co.*, 522 U.S. 136, at 146 (1997) (affirming exclusion of expert testimony).  "[A]n expert opinion must be based on 'facts which enable [her] to express a reasonably accurate conclusion as opposed to conjecture or speculation . . . .'"  *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir. 1995) (citation omitted); *In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. 1497, 1507 (D. Kan. 1995) (excluding expert opinion "based on unjustified assumptions").  The Court must also exclude an opinion where the expert "based his opinion on an assumption of the very fact that his report is intended to prove, and that he improperly attributed all of plaintiff's losses to the

defendants' allegedly illegal acts, despite the presence of significant other factors." *First Savings Bank*, FSB v. US Bancorp, 117 F. Supp. 2d 1078, 1084 (D.Kan.2000) (excluding expert testimony).

The *Daubert* analysis applies to non-retained experts as well as retained experts. *See*, e.g., *Berndt v. Levy*, No. 08–1067–WEB, 2010 WL 3913240, *6 (D. Kan. Sept. 30, 2010) (granting motion to exclude testimony of non-retained attorney expert); *Yeager v. Buxton*, No. 17-2368-KGG, 2018 WL 4620884, *1 (D. Kan. Sept. 26, 2018). Plaintiffs cannot carry their burden here. The Court, in its gatekeeping function, should exclude Mr. Niland's proffered testimony and opinions.

## IV.   LEGAL ARGUMENT

### A.   MR. NILAND MAY NOT TESTIFY AS TO THE EFFECT THAT PIPELINE'S CANCELLATION OF THUNDER FESTIVAL HAD ON ITS ABILITY TO PUT ON FUTURE MUSIC FESTIVALS BECAUSE THERE IS NO BASIS FOR SUCH AN OPINION AND IT WILL NOT ASSIST THE JURY

The Disclosure of Expert Witnesses identifies only one subject matter for Mr. Niland's opinion—"the effect that Thunder's cancellation had on Plaintiffs' music festival business." (Ex. 803 at 4.) Even then, the Disclosure fails to provide the "summary of the facts and opinion[ ]" as required by Rule 26(a)(2)(C)(ii). That alone is a basis for its exclusion. But even if this failure to properly identify the opinion is overlooked, Mr. Niland may not testify that Pipeline's cancellation of 2015 Thunder had a negative effect on its ability to put on future music shows first because he acknowledges that he does not know how Pipeline was affected by the cancellation. When pointedly asked whether the cancellation of Thunder had affected Mr. Mosiman and/or Pipeline, Mr. Niland only answered: "I don't know a festival that hasn't been – that's cancelled that hasn't affected the promoter. *I don't know what to [sic] degree though*." (Scheibe Decl., Ex. 807 at 186:20-21.) In other words, he only vaguely knows that there had to

6

be an effect, but does not exactly what or how severe the effect was.  Mr. Niland cannot opine that Pipeline suffered negative effects from the cancellation of 2015 Thunder if he does not exactly know what the effects are.  He lacks a factual basis for such an opinion, and therefore it must be excluded from evidence.[1]

Furthermore, one does not need an expert to inform the jury of the obvious, common-sense proposition that a promoter's cancellation of a music festival business will likely have negative consequences.  Expert testimony should be excluded when a layman may make a common-sense determination of the issue without the expert testimony.  *E.g.*, *United States v. Fredette*, 315 F.3d 1235, 1240 (10th Cir. 2003) (affirming exclusion of opinion where expert "would have added nothing to the trial that a juror could not understand on the basis of common sense"); *United States v. Kime*, 99 F. 3d 870, 884 (8th Cir. 1996).  *Lone Star Steakhouse & Saloon, Inc. v. Liberty Mut. Ins. Grp.*, 343 F. Supp. 2d 989, 1015-16 (D. Kan. 2004) (opinions as to matters "that can be adequately explained to the jury without expert testimony" or that "contain factual conclusions as to which a jury is fully qualified to make on its own determination from the evidence presented" should be excluded).  Accordingly, Mr. Niland's opinion that plaintiffs' cancellation of Thunder caused some undetermined negative consequence for plaintiffs should be barred because he has no factual basis for that opinion, and it would not be helpful to the jury.

/ / /

/ / /

---

[1]     This of course was the opinion Niland began developing when asked to act as a retained expert, but stopped developing when told he would not be retained and paid as an expert. (Scheibe Decl., Ex. 807 at 71:8-76:8.)  Having done so, it is obvious that Niland would have no basis to give any opinion beyond the generic, commonsense, and irrelevant statement quoted in the text.

### B. MR. NILAND MAY NOT TESTIFY AS TO REPUTATIONAL HARM RESULTING FROM THE CANCELLATION OF MUSIC FESTIVALS BECAUSE THE TOPIC WAS NEVER DISCLOSED, HAS NO FACTUAL BASIS, AND IS IRRELEVANT

Mr. Niland's testimony as to the reputational damage to plaintiffs should not be admitted into evidence because:  (1) such a topic was never disclosed, (2) he has no factual basis for such an opinion, and (3) it is irrelevant.

This opinion was not disclosed in plaintiffs' Disclosure of Expert Witnesses.  A failure to disclose an expert or their anticipated topic of testimony per Fed. R. Civ. Pro. Rule 26 will incur penalties under Fed. R. Civ. Pro. Rule 37(c)(1), and the expert will not be permitted to testify on that topic if the proponent of the expert cannot show (1) substantial justification for the omission, or (2) that the error was harmless.  *Martinez v. Target Corp.*, 384 F. App'x 840, 847-48 (10th Cir. 2010).  "[T]he rationale for *timely* expert designations under Rule 26(a)(2) does not distinguish between retained and non-retained experts."  *Harvey v. United States*, No. CIVA04CV00188WYDCBS, 2005 WL 3164236, *11 (D. Colo. Nov. 28, 2005) (emphasis in original).  Plaintiffs' conduct is more egregious than that of the plaintiff in *Martinez*, because they have never submitted a disclosure for this particular topic *at all*.  Even if they were to add a supplementary disclosure, it would be prejudicial because it is after defendants filed their motion for summary judgment, and no permission to supplement the expert disclosures was sought.

This opinion is also inadmissible because it lacks a factual basis.  Although Mr. Niland claims that plaintiffs' reputation was "good," when pressed as to what he had actually heard about plaintiffs, he admits that he heard *nothing*—indeed, the basis for his opinion that Mosiman had a good reputation is that Niland hadn't heard anything about Mosiman![2]  Accordingly,

---

[2]        "Q:  And, generally, what do you believe the reputation of Mr. Mosiman and his Pipeline

without any knowledge about plaintiffs' reputation, Niland has no factual basis to opine as to how plaintiffs' reputation has been damaged, and therefore, such testimony should be barred.

Such testimony is also irrelevant. The Court must exclude expert opinions that have "no relevance to this case . . . ." *Energy Intelligence Grp., Inc. v. CHS McPherson Refinery, Inc.,* 300 F. Supp. 3d 1356, 1382 (D. Kan. 2018); *Daubert,* 509 U.S. at 589 (trial judge "must ensure that any and all scientific testimony or evidence admitted is . . . relevant"). This is not a defamation case. It is a breach of contract case. Plaintiffs' reputation, good or bad, is irrelevant. Accordingly, any opinion by Mr. Niland as to the reputational harm to plaintiffs, even had it been properly disclosed, should be excluded because it lacks foundation and is irrelevant.

### C.       MR. NILAND MAY NOT TESTIFY AS TO THE VALUE OF PLAINTIFFS OR THEIR FESTIVALS

Plaintiffs say in their Supplemental Disclosures—but not in their Disclosure of Expert Witnesses—that they expect Mr. Niland to testify on the "valuation of music festivals." (Scheibe Decl., Ex. A at 4.) As shown above, the failure to comply with Rule 26 should bar any such opinion. But we need not rely on that violation as it is clear Mr. Niland has no basis on which to offer an opinion as to the value of plaintiffs' music festivals, and any opinion on the value of music festivals in general is irrelevant and unhelpful to the jury.

At deposition, Niland testified he had not formed and had no opinion as to the worth of

---

business was in the industry?
…
        "A:  Good. My opinion of it was good.
        "Q:  Did you hear from others in the industry that talked about Mr. Mosiman or his music festivals?
        "A:  Not that I can recall.  It's kind of a – one of those things that if you're not hearing about somebody, it's usually good.  And if you're hearing about them, somebody is probably complaining . . . ."  (Scheibe Decl., Ex. 807 at 158:14-159:5.)

Thunder or Pipeline prior to the cancellation of Thunder.[3]  When asked if it would "surprise" him that the Letter of Intent ascribed a particular value ($13 million) to plaintiffs' businesses (it did not, in fact), Niland answered that, "without doing the diligence myself, I -- I wouldn't be able to personally take any number."  (Ex. 807 at 162:4-17.)  Without having actually considered facts about Pipeline's finances and other relevant information, Mr. Niland cannot opine about the value of plaintiffs or Thunder on the Mountain, or any increase or decrease in value attributable to the cancelation of Thunder.

Nor would testimony about the value of music festivals in general be of any assistance to the jury, even if Niland had such an opinion.  Plaintiffs did not even seek to elicit a "freebie" opinion on this topic at the deposition so we do not know what opinion, if any Niland might have, on what it would be based, or how it would relate to any issue in this case.

### D. MR. NILAND MAY NOT TESTIFY AS TO INDUSTRY STANDARDS FOR REFUNDING TICKETS AFTER A CANCELLED FESTIVAL BECAUSE THE OPINION HAS NO FACTUAL BASIS, IS IRRELEVANT, AND WAS UNDISCLOSED

Mr. Niland may not testify that, if a producer cancels a festival, tickets must be refunded. This opinion has no factual basis to support it, only the personal beliefs of Mr. Niland.  Mere personal belief is an insufficient factual foundation for expert testimony.  *Foster v. USIC Locating Servs., LLC*, No. 16-2174-CM, 2018 WL 3757577, at *2 (D. Kan. Aug. 8, 2018*), reconsideration denied*, No. 16-2174-CM, 2018 WL 4184931 (D. Kan. Aug. 31, 2018) ("[E]xpert's testimony must be 'based on actual knowledge, not 'subjective belief . . . .'"); *Thomas v. FAG Bearings Corp.*, 846 F. Supp. 1382, 1393 (W.D. Mo. 1994) (citing *Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349 (6th Cir. 1992) ("Opinions of an expert need

---

[3]       "Q: At this point in time, so 2015, did you form any opinion as to what Pipeline or Thunder was worth?
        "A:  No."  (Scheibe Decl., Ex. 807 at 141:18-20.)

not be accepted when they are based on nothing more than personal opinion or belief, instead of an understandable scientific [or experiential] basis.")).  In his deposition, Mr. Niland effectively stated that there was no industry standard for such circumstances, and that whether refunds were made depended on a "case-to-case basis."[4]  Accordingly, he has no factual basis for a blanket opinion that a producer should refund tickets when a festival is cancelled, only his personal belief.[5]

Additionally, Mr. Niland's testimony about the industry standards as to ticket refunds is inadmissible because it is irrelevant.  *Energy Intelligence Grp.*, 300 F. Supp. 3d at 1382.  The issue of ticket refunds is the subject of a separate action brought by the ticketholders themselves.  As set forth in defendants' pending motion for summary judgment, plaintiffs' efforts to recover monies on behalf of third party ticketholders is meritless.  (*See* Doc. 664 at 78.)

Furthermore, this specific opinion was also never disclosed as a subject matter of Niland's anticipated testimony.  It was not mentioned in either plaintiffs' Second Supplemental Disclosures or their Disclosure of Expert Witnesses.  It should be excluded on this ground as well.  *Martinez*, 384 F. App'x at 847-48.  Accordingly, Mr. Niland's testimony about industry standards for ticket refunds should be excluded.

---

[4]     "Q:  Okay.  Is there a standard in the industry for when an event is canceled, what to do about fans that have purchased tickets?
            …
        "A:  There's no written regulations for anything in the music business. It just happens on a case-by-case basis.  There's sort of general best practices.  Usually the fans ticket money is refunded.  Agents will argue for artist deposits on top of that.  I don't know that –
        "Q:  In your experience –
        "A:  -- I don't know that there's ever been two festivals get cancelled in the same way."  (Scheibe Decl., Ex. 807 at 181:5-21.)

[5]     "Q: If a promoter cancels a show in general, do you believe that the ticket-buying fans are entitled to a refund?
        "A: Yes."  (Scheibe Decl., Ex. 807 at 193:11-14.)

**E.**     **MR. NILAND MAY NOT TESTIFY AS TO THE INDUSTRY STANDARD OF PAYING ARTIST DEPOSITS AFTER A CANCELLED MUSIC FESTIVAL BECAUSE THE OPINION HAS NO FACTUAL BASIS AND WAS NOT DISCLOSED**

As for Mr. Niland's supposed opinion that artist deposits should be paid if a festival is cancelled, the ostensible factual basis for that opinion not only fails to support it, but instead undermines that opinion.  An expert's testimony is inadmissible and unreliable if the factual basis for their opinion supports a conclusion contradictory to their opinion.  *Foster*, 2018 WL 3757577 at *2-3 (expert's testimony that plaintiff's future earning potential was $8-10/hour was inadmissible where he admitted that this opinion would change if plaintiff was medically cleared for work, and plaintiff was).  In his deposition, Mr. Niland acknowledged that artists need not always be paid their contractual guarantees.[6]

Moreover, as with the prior opinion, this one too is irrelevant.  Plaintiffs do not contend that they paid artists after cancelling Thunder (they did not) and do not seek recoupment for these (nonexistent) payments.  And plaintiffs do not assert that they are the champions for these artists and therefore seeking unpaid guarantees from defendants to turn over to the artists.  As a result, the non-opinion has no relevance and cannot possibly assist the jury.

Lastly, this specific opinion too was never disclosed as a subject matter of expected expert testimony.  It was not mentioned in either plaintiffs' Second Supplemental Disclosures or

---

[6]     "Q: If a promoter cancels a show or an event, in general is your opinion that artists should be paid their contractual guarantees?
            . . .
        "A: That's a new question.  My personal feeling is it's entirely specific to the situation with the artist.  It depends on, you know, how – whether they had cost-in or not, what may have -- what may have – opportunity cost they lost, that sort of thing.
        "And it all really depends on the time at which it cancels.  If it cancels one month after going on sale, six months before the event, there's little to no reason to pay them.  If it happens two days before the event, they've traveled a great distance to get there, then in those situations there's a conversation to be had."  (Scheibe Decl., Ex. 807 at 194:5-24.)

their Disclosure of Expert Witnesses.  It should be excluded on this ground as well.  *Martinez*, 384 F. App'x at 847-48.  Accordingly, Mr. Niland's testimony about industry standards for paying artist deposits should be excluded.

### F. MR. NILAND MAY NOT TESTIFY AS TO THE INDUSTRY STANDARD OF "BLACKLISTING" AFTER A CANCELLED MUSIC FESTIVAL BECAUSE THE OPINION LACKS A FACTUAL BASIS AND WAS NOT DISCLOSED

Mr. Niland may not testify as to an industry standard of artists "blacklisting" or refusing to further deal with producers who cancel music festivals because the factual basis for such an opinion—his personal experience—does not logically support such an opinion.  While being deposed, Mr. Niland admitted that he had only ever seen one instance of "blacklisting," and that was not attributed to the cancellation of the music festival, but due to the fact that the tickets were not refunded to the buyers.[7]  Accordingly, he does not have a factual basis that a cancellation *per se* causes blacklisting, but only that a refusal to refund tickets does, and accordingly, cannot opine that "blacklisting" occurs in reaction to a music festival cancellation.  Furthermore, he also cannot opine that a refusal to refund tickets causes blacklisting, because one is not qualified as an expert on some topic on the basis of one, experiential instance.  *See Smith v. Rasmussen*, 249 F.3d 755, 758 (8th Cir. 2001) (affirming the exclusion of expert witness—a psychiatrist of sexual disorders—on the topic of gender identity disorder because, *inter alia*, he

---

[7]    "Q:  If a partner was – had backed out of a show or concert or festival after tickets were on sale, how would band and artists and agencies deal with a scenario like that?

             …

"A:  All I have is my experience with that, and the only ones I've got with that is Pemberton.  I don't know how similar the cases may be because in Pemberton's case, the shit-storm that followed, which there was from agencies and managers, was related to the fact that the fans ticketing money wasn't being refunded.

And so in that case, it was deemed that festivals that make that move would destroy the confidence that fans have in the festival marketplace.  You know, the results of that was, essentially, a blacklist of the people that were involved in that event.  But that's specific to my situation with Pemberton."  (Scheibe Decl., Ex. 807 at 180:7-181:3.)

"had [in his career] examined only one patient with gender identity disorder").

Moreover, as with the prior opinions, this one is irrelevant.  Plaintiffs contend that they were financially unable to put on festivals because their business was destroyed by the alleged breach of contract and subsequent cancellation of Thunder.  (Scheibe Decl., Ex. 805 at 151:8-25; Ex. 806 at 266:3-13.)  As a result, whether they could have booked artists to appear at festivals they were financially unable to produce is irrelevant.

Lastly, this specific opinion too was never disclosed as a subject matter of expected expert testimony.  It was not mentioned in either plaintiffs' Second Supplemental Disclosures or their Disclosure of Expert Witnesses.  It should be excluded on this ground as well.  *Martinez*, 384 F. App'x at 847-48.  Accordingly, Mr. Niland's testimony about black-balling or blacklisting should be excluded.

### G.    MR. NILAND MAY NOT TESTIFY THAT "HANDSHAKE DEALS" ARE "FAIRLY COMMONPLACE IN THE INDUSTRY" BECAUSE THE OPINION'S FACTUAL BASIS BELIES IT AND IT WAS NEVER DISCLOSED

One of plaintiffs' cause of action is for breach of an oral contract, specifically, an alleged agreement by Madison to acquire a controlling interest in the 2015 Thunder on the Mountain music festival.  (Doc. 570 at ¶¶ 46, 152.)  They claim that defendants verbally accepted an email proposal setting forth four skeletal terms despite the fact that defendants in fact sent an email stating that HorsePower's approval of the proposed investment was "subject to docs, lease finalization, and final due dili."  (Ex. __.)  They seek to bolster their counterintuitive and counterfactual claim by having Mr. Niland opine that "handshake deals" are "fairly commonplace in the [music festival] industry."  (Scheibe Decl., Ex. 807 at 172:23-25.)  However, Mr. Niland makes three admissions that undermine this opinion:  (1) he has, in his personal experience, only encountered one music festival where an investor invested a

significant sum of money on a handshake deal;[8] (2) all other music festivals Mr. Niland was

involved in had written, investor agreements;[9] and, lastly, (3) even the aforementioned single

instance of a supposed "handshake deal" in fact involved extensive documentation of "all the

major points."[10]

---

[8]      "Q:  Can you think of any specific instance in which an investor invested a significant
sum of money, for example $750,000, in a music festival based on a handshake deal?
         "A:  I mean, again, my – my own personal experience yes.  That was the case, essentially,
with the Hangout.
         "Q:  That's the one where you had the detailed e-mails with –
         "A:  There was an e-mail, yes.  There was e-mail in place.  I'm stretching to think to
another, but I also don't know the inner workings of every festival."  (Scheibe Decl., Ex. 807 at
213:19-214:17.)

[9]      "Q:  Is that the only agreement that you had an investor that was not placed in writing?
         "A:  Yes.
         "Q:  Every other one that you had was placed in writing?
         "A:  I would say that the results of that relationship put me in a mindset that I couldn't
trust people the way that I thought I could, and I had to put anything and everything in an
agreement I could ever do ever again."  (*Id*. at 106:9-107:1.)

[10]     "Q: Was it important to you even though you did not have on omnibus written agreement
that in all the points that were significant to the business that you had at least an e-mail or a
handwritten note or something else that memorialized what you believed you had agreed upon
with Mr. Zislin?
                 . . .
         "A:  In terms of – yes – yes and no . . . .  I could say that there were things that weren't
covered, you know, based on that level of detail or even that we could foresee at that point.
         "But in terms of the four or five major tenets equity, the amount, things of that nature,
there was, you know, some written agreement, you know, that again, was in that initial state of
sort of laying out the deal.
         "Q:  In terms of those things that were in writing between you and Zislin, there was
something, again, whether it was a handwritten notation on a napkin or an e-mail or something
else, you had something in written[sic] that dealt with the equity split between you and Mr.
Zislin?
         "A:  Yes.
         "Q:  And you had something in written [sic] that dealt with the amount of the investment
between you and Mr. Zislin?
         "A:  Yes.
         "Q:  And what other key components were placed in writing such as a written napkin, an
e-mail, something that involved writing that you felt was important?
         "A:  Basic outlines of goals and responsibilities."  (*Id*. at 112:23-114:15.)

First, Mr. Niland has no factual basis for his opinion on the *commonality* of "handshake deals," because he admits that, in his experience, all agreements in which people invested in music festivals involved written agreements except for one.  He is also unable to identify any individual in the music festival industry that had a legal claim against a potential investor on the basis of an oral contract.[11]  Even if the one instance was truly a "handshake" deal, something that happened one time cannot be a "common" occurrence.  Second, and more importantly, Mr. Niland has no factual basis for the existence of handshake deals *at all* because, while he claims that he had one handshake agreement, he admitted that even in that one instance he and his investor documented in writing all of the important deal points.  In other words, Mr. Niland never once had an investor agreement that was not memorialized by a writing, and therefore, has no factual basis to opine on the existence, let alone the alleged "commonality" of "handshake deals" in the music festival industry.

Lastly, this specific opinion too was never disclosed as a subject matter of expected expert testimony.  It was not mentioned in either plaintiffs' Second Supplemental Disclosures or their Disclosure of Expert Witnesses.  It should be excluded on this ground as well.  *Martinez*, 384 F. App'x at 847-48.  Accordingly, Mr. Niland's testimony about the purported commonality of "handshake" deals in the music festival business should be excluded.

//

//

---

[11]      "Q: Can you identify for me the name of any parties where a legal claim was made by somebody who owned a music festival business claiming that a potential investor had breached a supposed oral agreement?
"A:  Other than myself with Shaul, which it didn't get any further than legal demand letters, no, I can't.  I can't think of a specific, no."  (Scheibe Decl., Ex. B at 154:12-20.)

## V.      <u>CONCLUSION</u>

For the forgoing reasons, any testimony by Mr. Niland as to the opinions disclosed in the expert witness designations and those that are not in the designations but may be offered should be excluded from evidence.

Respectfully submitted this
23rd day of December 2019

_/s/ Whitney L. Casement_
Whitney L. Casement #25466
Timothy A. Shultz #16060
Goodell, Stratton, Edmonds & Palmer, LLP
515 S. Kansas Ave.
Topeka, KS 66603-3999
Tel.: 785.233.0593
Fax: 785.233.8870
wcasement@gseplaw.com
tshultz@gseplaw.com

_/s/ Eric M. George_
Eric M. George (Cal. Bar No. 166403)
(admitted pro hac vice)
Benjamin D. Scheibe (Cal. Bar No. 101327)
Browne George Ross LLP
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Tel.: 310.274.7100
Fax: 310.275.5697
bscheibe@bgrfirm.com
ibibbero@bgrfirm.com
mchun@bgrfirm.com

**ATTORNEYS FOR DEFENDANTS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 23rd day of December 2019, a true and correct copy of the foregoing was filed with the Clerk of Court via CM/ECF and served on counsel for Plaintiffs through the Notice of Electronic Filing.

17

Jack D. McInnes, #21898
McInnes Law LLC
4300 Shawnee Mission Parkway, Suite 100
Fairway, KS 66205
Phone: 816.508.7588
Email: jack@mcinnes-law.com
Attorney for Plaintiffs

Anthony W. Bonuchi (KSD #78567)
Bonuchi Law, LLC
601 Walnut, Suite 300
Kansas City, MO 64106
Tel.: 816-944-3232
Fax: 816-944-3233
Email: anthony@bonuchilaw.com
Co-Counsel for Plaintiffs

Sean Cooper (KSD #26517)
PAUL LLP
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Tel: (816) 984-8100
FAX (816) 984-8101
Email:  Sean@PaulLLP.com
Counsel for Interested Non-Parties Grant Williams
and Settlement Class:

*/s/ Whitney L. Casement*