# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

PIPELINE PRODUCTIONS, INC., et al.,      )
     )
         **Plaintiffs,**      )      **CIVIL ACTION**
     )
**v.**      )      **No. 15-4890-KHV**
     )
THE MADISON COMPANIES, LLC, et al.,      )
     )
         **Defendants.**      )
     )

## MEMORANDUM AND ORDER

On May 21, 2015, Pipeline Productions, Inc. and Backwood Enterprises, LLC sued Horsepower Entertainment and The Madison Companies, LLC. Complaint (Doc. #1). On June 19, 2017, OK Productions, Inc. and Brett Mosiman joined as plaintiffs. Amended Complaint (Doc. #56). On August 30, 2019, plaintiffs added as defendants Kaaboo LLC, KaabooWorks Services LLC ("KWS"), KaabooWorks LLC, Kaaboo Del Mar LLC ("KDM") and WarDawgz, LLC. Second Amended Complaint (Doc. #570). As of November 15, 2019, plaintiffs alleged that defendants had reneged on their promise to partner in the production of a music festival, and brought claims for breach of contract (Count I), breach of fiduciary duty (Count II), fraud (Count III), tortious interference (Count IV) and successor and alter ego liability (Count V). See Amended Pretrial Order (Doc. #660). Defendants assert counterclaims against Pipeline, Backwood, OK Productions and Mosiman for breach of contract, promissory estoppel and unjust enrichment.

On December 19, 2019, the Court dismissed the tort claims by OK Productions and Mosiman (Counts II, III and IV), thereby eliminating their affirmative claims for relief in this

litigation.[1]  See Memorandum And Order (Doc. #712).  The Court also dismissed plaintiffs' tortious interference claims (Count IV) against Kaaboo, KWS, KaabooWorks, KDM and WarDawgz.  Id.  Because Mosiman and OK Productions have no remaining claims for affirmative relief, the Court dismisses them as plaintiffs.[2]  As a result, the following claims remain:

1.  Breach of Contract (Count I): Pipeline and Backwood against Madison and Horsepower;

2.  Breach of Fiduciary Duty (Count II): Pipeline and Backwood against Madison and Horsepower;

3.  Fraud (Count III): Pipeline and Backwood against Madison and Horsepower;

---

[1]  The parties seem to have different ideas about whether OK Productions and Mosiman are plaintiffs in Count I's claim for breach of contract.  They are not.  Count I of the Complaint (Doc. #1) filed May 5, 2015 at ¶ 25, the Amended Complaint (Doc. #56) filed June 19, 2017 at ¶ 64 and the Second Amended Complaint (Doc. #570) filed August 30, 2019 at ¶ 150, 151, 152, unambiguously allege that the putative contract was between Backwood/Pipeline (on the one hand) and Madison or Madison/Horsepower (on the other).  Plaintiffs do not mention OK Productions and Mosiman anywhere in any Count I.

The pretrial order and the amended pretrial order generally state that "plaintiffs" sue for breach of contract.  See Pretrial Order (Doc. #477) filed April 30, 2019; Amended Pretrial Order (Doc. #660).  Both pretrial orders are replete with sloppy, lazy and at best imprecise language about which of the many parties in this case allegedly did what.  Given the explicit pleading of Count I in three complaints filed over the course of four years, the Court cannot read either pretrial order as effectively asserting that OK Productions and Mosiman assert viable breach of contract claims.  When OK Productions and Mosiman sought leave to amend to join as plaintiffs, they did not avow any intent to sue for breach of contract.  See Plaintiffs' Motion For Leave To File Amended Complaint (Doc. #52) filed May 8, 2017.  Moreover, they never sought to amend to assert contract claims.  In the pretrial order and the amended pretrial order, plaintiffs' generic and imprecise reference to "plaintiffs" claiming breach of contract was far from sufficient to put defendants or the Court on notice that OK Productions and Mosiman asserted a claim for breach of contract.  With trial in less than 30 days, defendants would be highly prejudiced if OK Productions and Mosiman were allowed to assert a previously undeveloped theory of liability on the ground that their imprecise language in the pretrial orders could be read to expand repeated, specific allegations of three complaints filed in 2015, 2017 and 2019.

[2]  Technically, OK Productions and Mosiman assert claims for successor and alter ego liability (Count V), which are still in the case.  Because they have no substantive causes of action against Horsepower or Madison, however, they cannot recover against any successors or alter egos to Horsepower or Madison.

4.    Tortious Interference (Count IV): Pipeline and Backwood against Madison and Horsepower;

5.    Successor and Alter Ego Liability (Count V): Pipeline and Backwood against Kaaboo, KDM, KaabooWorks, KWS and WarDawgz;

6.    Breach of Contract Counterclaim: Madison and Horsepower[3] against Pipeline, Backwood, OK Productions and Brett Mosiman;

7.    Promissory Estoppel Counterclaim: Madison and Horsepower against Pipeline, Backwood, OK Productions and Brett Mosiman;

8.    Unjust Enrichment Counterclaim: Madison and Horsepower against Pipeline, Backwood, OK Productions and Brett Mosiman.

This matter is before the Court on Defendants' Motion For Summary Judgment (Doc. #663) filed November 18, 2019. For reasons stated below, the Court sustains defendants' motion in part.

---

[3]    Defendants have taken the same linguistic shortcuts as plaintiffs by making generic and imprecise references to "defendants" instead of listing which particular defendants assert particular counterclaims. Amended Pretrial Order (Doc. #660). From Defendants' Answer To Amended Complaint And Counterclaims (Doc. #66) filed October 25, 2017, it is clear that the counterclaimants are Madison and Horsepower. Defendants' pleadings were far from sufficient to put plaintiffs on notice that the Kaaboo entities and WarDawgz also assert counterclaims. The Court is not aware that anyone is confused on this point, but with trial in less than 30 days, plaintiffs would be highly prejudiced if the Kaaboo entities and WarDawgz were allowed to do so.

# Factual Background[4]

## I.     Parties

Brett Mosiman produces live music festivals, and is the principal and owner of music festival entities OK Productions, Backwood Enterprises and Pipeline Productions (except where otherwise noted, collectively referred to as "plaintiffs").  Nate Prenger, Brian Pilsl, Brian Wingerd and Taylor Gustafson worked for plaintiffs.

Bryan Gordon, Seth Wolkov and Rob Walker own Madison, a venture capital firm. Madison owns Horsepower, a music festival business.  In November of 2014, Madison and

---

[4]     On December 5, 2019, the Court struck plaintiffs' untimely response to defendants' motion for summary judgment.  See Memorandum And Order (Doc. #708).  On December 8, 2019, plaintiffs asked the Court to reconsider.  See Plaintiffs' Motion To Reconsider Orders 700 and 708 (Doc. #710).  In almost all respects, given the Court's rulings on defendants' summary judgment motion, plaintiffs' motion for reconsideration is moot.  The Court, however, overrules the motion to reconsider.  A motion to reconsider must be based on (1) an intervening change in controlling law, (2) the availability of new evidence or (3) the need to correct clear error or prevent manifest injustice.  See Coffeyville Res. Ref. & Mktg. LLC v. Liberty Surplus Ins. Corp., 748 F. Supp. 2d 1261, 1264 & n.2 (D. Kan. 2010); see also D. Kan. R. 7.3(b); Comeau v. Rupp, 810 F. Supp. 1172, 1174-75 (D. Kan. 1992).  A motion to reconsider is not a second opportunity for the losing party to make its strongest case, to rehash arguments or to dress up arguments that previously failed. Brown v. Presbyterian Healthcare Servs., 101 F.3d 1324, 1332 (10th Cir. 1996); RTC v. Greif, 906 F. Supp. 1446, 1456 (D. Kan. 1995); Voelkel v. Gen. Motors Corp., 846 F. Supp. 1482, 1483 (D. Kan. 1994).  A party's failure to present its strongest case in the first instance does not entitle it to a second chance in the form of a motion to reconsider.  Cline v. S. Star Cent. Gas Pipeline, Inc., 370 F. Supp. 2d 1130, 1132 (D. Kan. 2005).  Whether to grant a motion to reconsider is left to the Court's sound discretion.  Brumark Corp. v. Samson Res. Corp., 57 F.3d 941, 944 (10th Cir. 1995).  Here, for substantially the reasons set forth in its original order, the Court finds that plaintiffs have not satisfied this standard.  See Memorandum And Order (Doc. #708).

As the Court has explained, even when a motion for summary judgment is unopposed, the Court must determine whether the evidence shows that the moving party is entitled to judgment as a matter of law.  See Memorandum And Order (Doc. #708); see also Colony Nat. Ins. Co. v. Omer, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008).  Accordingly, the Court has considered the entire record and all available evidence, including stipulated evidence that the parties identified in the Amended Pretrial Order (Doc. #660) filed November 15, 2019. Specifically, for summary judgment purposes, the parties stipulated to 32 facts and the authenticity of more than 400 exhibits.  Id. at 2-15.  Consequently, where the listed exhibits could be located, the Court reviewed and considered them.

Horsepower formed Kaaboo and KDM. Seven months later, in June of 2015, they formed KaabooWorks and KWS. In December of 2016, Gordon, Wolkov and Walker, along with Barbara O'Hare, formed WarDawgz. Except where otherwise noted, the Court refers to Madison, Horsepower, the Kaaboo entities and WarDawgz as "defendants."

## II.     Negotiations

Backwood owned a music festival called "Thunder on the Mountain" ("Thunder"). On July 28, 2014, Pipeline, OK Productions, Mosiman and Prenger executed a Letter of Intent ("LOI") under which Horsepower would invest in a new company, Pipeline Festivals, LLC. Pursuant to the LOI, Horsepower would own 51 per cent of several festivals that plaintiffs had previously produced, including Thunder. The LOI provided that unless the parties agreed otherwise, the LOI would automatically terminate on November 1, 2014. That date arrived, and because the parties had not finalized any agreement, the LOI terminated.

After November 1, 2014, the parties began discussing a transaction that would only involve Thunder. On November 4, 2014, Mosiman emailed Gordon to propose two alternative investment scenarios. "Option A" called for an investment of $1.4 million for 50 per cent of a new company that would own Thunder. Under "Option B," Madison would invest $700,000, plus $500,000 in operating capital, in exchange for a 51 per cent interest in a new company that would own Thunder. Moreover, Madison would pay Pipeline $80,000 to book, market and produce Thunder, and Madison would receive $40,000 to run books.

In a phone call on November 6, 2014, Gordon accepted a slightly modified version of Option B (increasing $700,000 to $750,000). Gordon stated that Option B was "the only one that would work for him," and "made it very clear that he was very excited about the opportunity" to be Mosiman's partner. Mosiman's Dep. (Doc. #672-16) filed November 18, 2019 at 11:25-12:15,

16:22-17:13, 29:17-31:6.  The verbal agreement did not contain all relevant provisions, such as when payments were due and which of defendants' entities would pay them, but Mosiman understood that the parties would flesh out those details later.  Later that day, Mosiman emailed Gordon to discuss booking Chris Young for the festival, to which Gordon responded, "Do it, please!"  Gordon Email (Doc. #684-9) filed November 29, 2019.  Plaintiffs subsequently made commitments to many artists, sold tickets and solicited vendors for Thunder.  Defendants created four entities with variations of the name "Thunder on the Mountain," made $272,000 in artist deposits and instructed plaintiffs which artists to book for the festival.

On November 24, 2014, Gordon emailed Mosiman advising him that Horsepower's investment committee had met to discuss the proposal and the meeting had gone well, with the proposal garnering unanimous approval.  Gordon stated that they were "green to go, subject to docs, lease finalization and final due dili."  Gordon Email (Doc. #665-9) filed November 18, 2019. In response, Mosiman did not contend that an agreement was already in place.

On December 12, 2014, Gary Burghart, defendants' Chief Legal Officer, sent to Mosiman and Prenger drafts of proposed operating agreements for the Thunder entities and a draft contribution agreement calling for plaintiffs and an affiliated entity to contribute certain assets. The drafts reflected defendants' agreement to pay $750,000 to purchase the 51 per cent interest in Thunder.  The accompanying email stated, "These documents are drafts and subject to continuing review and comment by Bryan Gordon."  Burghart Email (Doc. #665-15) filed November 18, 2019 at 2.  Through March of 2015, defendants spent more than $10,000 conducting substantial due diligence on a wide variety of issues.

On December 16, 2014, Burghart had a telephone conference with Matt Gough (counsel for plaintiffs) and John Murdock (outside counsel for Horsepower), in which they identified and

discussed several points on which the parties disagreed, including how the parties would make certain decisions for Thunder. On January 7, 2015, Gough emailed Murdock and Burghart that the parties had not addressed "one or two of the open issues," and that with respect to some of the open items, he believed that Mosiman and Gordon would continue to negotiate. Gough Email (Doc. #665-20). Similarly, in an internal email between Mosiman and Prenger, Mosiman acknowledged the existence of "two outstanding issues" and proposed sending an email to Gordon about those issues. Mosiman continued, "We gotta get this closed or I'll be at the homeless shelter. The risk is he says fuck it – 'm out but we have nearly $300K of his money now with NO signed agreement to get it back or charge for it."[5] Mosiman Emails (Doc. #665-12).

Between January and March of 2015, the parties continued to negotiate several terms of the agreement, including provisions relating to loans, equipment leases and liquor licenses. On March 29, 2015, Murdock sent Gough copies of an operating agreement and ten other agreements, along with marked-up versions showing changes from previous drafts. On April 7, 2015, Gough responded that plaintiffs did not agree to the new terms. Gough also warned defendants that reneging on the deal would substantially harm plaintiffs. The parties later ceased negotiations, and plaintiffs cancelled Thunder. Plaintiffs have not produced another music festival.

## III. Subsequent Events

As early as March of 2015, before the parties ceased their negotiations, defendants were communicating with Prenger about coming to work for them. On July 1, 2015, plaintiffs fired Prenger. The next day, KWS officially hired him. Defendants later hired or retained several of plaintiffs' other employees, including Pilsl, Wingerd and Gustafson.

---

[5]     Mosiman was apparently referencing the $272,000 that defendants had already paid for artist deposits.

Defendants have filed two lawsuits against plaintiffs. In Delaware, defendants sought a declaration that the parties did not enter into a joint venture and recoupment of the $272,000 that they had paid for Thunder artist deposits. In Colorado, defendants sued plaintiffs for defamation. The courts dismissed both cases for lack of personal jurisdiction.

## Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving parties are entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Hill v. Allstate Ins. Co., 479 F.3d 735, 740 (10th Cir. 2007). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position. Id. at 252.

The moving parties bear the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Nahno-Lopez v. Houser, 625 F.3d 1279, 1283 (10th Cir. 2010). Once the moving parties meet their burden, the burden shifts to the nonmoving parties to demonstrate that genuine issues remain for trial as to those dispositive matters for which they carry the burden of proof. Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). To carry their burden, the nonmoving parties may not rest on their pleadings but must instead set forth specific facts supported by competent evidence. Nahno-Lopez, 625 F.3d at 1283.

The Court views the record in the light most favorable to the nonmoving parties. Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). It may

grant summary judgment if the nonmoving parties' evidence is merely colorable or is not significantly probative. <u>Liberty Lobby</u>, 477 U.S. at 250-51. In response to a motion for summary judgment, parties cannot rely on ignorance of facts, speculation or suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial. <u>Conaway v. Smith</u>, 853 F.2d 789, 794 (10th Cir. 1988); <u>Olympic Club v. Those Interested Underwriters at Lloyd's London</u>, 991 F.2d 497, 503 (9th Cir. 1993). The heart of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Liberty Lobby</u>, 477 U.S. at 251-52.

## <u>Analysis</u>

Except for part of Count V, defendants seek summary judgment on all claims.[6] Specifically, defendants argue that the evidence does not create genuine issues of material fact on plaintiffs' claims regarding (1) breach of contract by Madison and Horsepower (Count I), (2) breach of fiduciary duty by Madison and Horsepower (Count II), (3) fraud by Madison and Horsepower (Count III), (4) tortious interference by Madison and Horsepower (Count IV) and (5) successor liability of Kaaboo, KDM, KaabooWorks, KWS and WarDawgz (Count V). Defendants also seek summary judgment on the issue of damages.

## I.     Breach Of Contract (Count I)

Defendants assert that they are entitled to summary judgment on the claims of Backwood and Pipeline for breach of contract against Madison and Horsepower. To succeed on a breach of

---

[6]     Defendants do not seek summary judgment on plaintiffs' alter ego claims under Count V.

contract claim under Kansas law,[7] plaintiffs must show (1) the existence of a contract between the parties, (2) consideration, (3) plaintiffs' performance or willingness to perform in compliance with the contract, (4) defendants' breach and (5) injury to plaintiffs as a result of defendants' breach. Britvic Soft Drinks Ltd. v. ACSIS Techs., Inc., 265 F. Supp. 2d 1179, 1187 (D. Kan. 2003).

Here, defendants assert that the evidence is legally insufficient to show the existence of a contract. Specifically, defendants argue that the parties intended to enter a future contract and that any alleged agreements, as part of the ongoing negotiation process, were nonbinding.

Under Kansas law, parties form a binding contract – which can be written or oral – when they reach a meeting of the minds on all essential elements of the agreement. See Ludwikoski & Assocs., Inc. v. Yeti Coolers, LLC, No. 13-2649-EFM, 2014 WL 3767684, at *5 (D. Kan. July 31, 2014); see also RLI Ins. Co. v. Russell, No. 14-2479-EFM, 2015 WL 9455569, at *5 (D. Kan. Dec. 23, 2015). For the parties to reach a meeting of the minds, "there must be a fair understanding between [them] which normally accompanies mutual consent and the evidence must show with reasonable definiteness that the minds of the parties met upon the same manner and agreed upon the terms of the contract." Felling v. Hobby Lobby, Inc., No. 04-2374-GTV, 2005 WL 928641, at *3 (D. Kan. Apr. 19, 2005) (quoting Steele v. Harrison, 220 Kan. 422, 552 P.2d 957, 962 (1976)). To determine whether the parties did so, the Court applies an objective test that asks whether they manifested their intent to be bound by the agreement. Sw. & Assocs., Inc. v. Steven Enterprises, LLC, 32 Kan. App. 2d 778, 781, 88 P.3d 1246, 1249 (2004). In other words, the relevant inquiry is the "manifestation of a party's intention, rather than the actual or real

_____

[7] Kansas courts apply the rule of *lex loci contractus* to contract claims. Mirville v. Allstate Indem. Co., 71 F. Supp. 2d 1103, 1107 (D. Kan. 1999). Under this rule, the law where the parties made the contract controls. Id. Here, the parties agree that Kansas law governs plaintiffs' breach of contract claims.

intention." Id. Accordingly, the Court looks to the parties' "outward expression[s] of assent." Pierce v. PrimeRevenue, Inc., No. 17-2233-JWB, 2018 WL 4749331, at *2 (D. Kan. Oct. 2, 2018). Parties can manifest an intent sufficient to form a binding contract even if they "contemplate the subsequent execution of a formal instrument as evidence of their agreement," and even if they "know[ ] that there are other matters on which the have not agreed and on which they expect further negotiation." Phillips & Easton Supply Co. v. Eleanor Int'l, Inc., 212 Kan. 730, 735, 512 P.2d 379, 384 (1973); Storts v. Martin K. Eby Const. Co., 217 Kan. 34, 40, 535 P.2d 908, 913 (1975).

Here, defendants first assert that as a matter of law, the parties never had a meeting of the minds. According to defendants, the fact that they continued to negotiate and disagree on various contract terms shows that they intended to contract in the future. Alternatively, defendants argue that their purported agreement was too uncertain to be binding. Specifically, defendants provide an extensive list of possible terms that the parties could have included in the agreement, such as which of defendants' entities would make the particular payments, when they would make the payments and who would make decisions for the new venture. Defendants argue that without these terms, the agreement is unenforceable.

Kansas law does not support the overly-demanding standard for contract formation that defendants propose. The record contains evidence that Mosiman and Gordon entered into a binding agreement under which Backwood, Pipeline, Madison and Horsepower would partner to produce Thunder.[8] On November 4, 2014, Mosiman emailed Gordon to propose an agreement for the limited purpose of producing Thunder. Mosiman's proposal gave Gordon two options. Under

---

[8] Defendants assert that any alleged contract involved only Backwood, Pipeline and Horsepower – not Madison – because the parties understood that the transaction would include only Horsepower. The email in which Mosiman proposed Option B, however, explicitly references Madison as a party to the transaction. Accordingly, the evidence establishes a genuine issue of material fact whether Madison was a party to the agreement.

Option B, Madison and Horsepower would receive a 51 per cent interest in Thunder. In exchange, Madison would pay Pipeline $700,000 and advance $500,000 in operating capital for the festival. Moreover, Pipeline would get $80,000 to book, market and produce Thunder, and Madison would get $40,000 to run the books. In a conversation around November 6, 2014, Gordon told Mosiman that Option B was "the only one that would work for him." Mosiman's Dep. (Doc. #672-16) at 11:25-12:15, 16:22-17:13, 29:17-31:6. After further discussion, Mosiman and Gordon ultimately agreed to a slightly modified version of Option B (the $700,000 increased to $750,000), and Gordon expressed his excitement to be Mosiman's partner.

Defendants' subsequent actions further suggest an objective manifestation of assent. On November 6 – soon after they allegedly entered the agreement – Mosiman emailed Gordon to discuss booking Chris Young for Thunder, and Gordon responded, "Do it, please!" Moreover, Madison and Horsepower later funded $272,000 for artist payments and created four entities with variations of the name "Thunder on the Mountain." Finally, the record contains evidence that Madison and Horsepower continued to exercise significant control over various aspects of the operation, including deciding which bands to book and how much to pay them. This evidence creates a genuine issue of material fact whether the parties entered into a binding contract.

Defendants alternatively argue that as a matter of law, their agreement was too uncertain to be binding. This argument is without merit. The alleged agreement explains the per cent interest that Madison and Horsepower would have in Thunder (51 per cent), how much Madison would pay ($750,000),[9] who would receive this payment (Pipeline), how much Madison would pay in

---

[9] Originally, Option B called for Madison to invest $700,000. Mosiman Email (Doc. #665-6). Mosiman testified that he and Gordon agreed to a modified version of Option B, under which Madison would pay $750,000. The documents that the parties exchanged on December 12, 2014 reflect this price modification. See Operating Agreement (Doc. #665-15) at 72.

operating expenses ($500,000), who would book, market and produce Thunder (Pipeline), how much Pipeline would receive for doing so ($80,000), who would make that payment (Madison), who would run the books (Madison) and how much Madison would receive in return ($40,000). Defendants do not cite any authority that would invalidate this purported agreement simply because it does not contain the extensive list of detailed provisions that defendants cite.[10] The fact that the parties continued to negotiate additional details does not make their existing agreement unenforceable. Kansas law is clear that an agreement remains enforceable even though the parties anticipate that they will later execute a formal written document, or that they will continue to negotiate additional provisions. See Phillips, 212 Kan. at 735; see also Storts, 217 Kan. at 40. Because the evidence creates a genuine issue of material fact whether plaintiffs entered into binding contract with Madison and Horsepower, defendants are not entitled summary judgment on the breach of contract claims.

## II.     Breach Of Fiduciary Duty (Count II)

Defendants assert that they are entitled to summary judgment on plaintiffs' breach of fiduciary duty claims because (1) they did not owe plaintiffs a fiduciary duty and (2) if they did, they did not breach it.[11]

---

[10]     Defendants complain that, among other items, the putative agreement omits provisions regarding venue and choice of law, how new partners will join and rules for future competition among the parties.

[11]     Without citing any legal authority, defendants assert that they are also entitled to summary judgment because the record does not contain evidence of separate, cognizable damages for these claims. Defendants apparently argue that at the summary judgment stage, the loss of plaintiffs' music festival business cannot qualify as damages for both the breach of contract and breach of fiduciary duty claims. This is incorrect. While the Court will not allow plaintiffs to make a double recovery for the same injuries, at this stage they may submit claims as alternative theories of recovery for particular injuries. See BHC Dev., L.C. v. Bally Gaming, Inc., No. 12-2393-JPO, 2014 WL 781871, at *2 (D. Kan. Feb. 25, 2014).

## A.     Duty

Defendants assert that they did not owe plaintiffs a fiduciary duty because the parties did not enter a joint venture – the basis for the alleged fiduciary duty.  Under Kansas law, members of a joint venture owe each other a fiduciary duty.  See Underground Vaults & Storage, Inc. v. Cintas Corp., 632 F. App'x 917, 922 (10th Cir. 2015).  A joint venture is "an association of two or more persons or corporations to carry out a single business enterprise for profit."  Id. at 921.  Although a joint venture can only arise through agreement between the parties, "this agreement may be found in their mutual acts or conduct."  Id.  Kansas courts consult five factors to determine whether such an agreement exists: (1) the joint ownership and control of property, (2) the sharing of expenses, profits and losses, and having and exercising some voice in determining the division of the net earnings, (3) a community of control over and active participation in the management and direction of the business enterprise, (4) the intention of the parties (express or implied) and (5) the fixing of salaries by joint agreement.  Id.  Importantly, no single factor controls this analysis.  Id.

Here, defendants assert that as a matter of law, their relationship with plaintiffs did not constitute a joint venture because under the purported agreement, (1) the parties did not expressly allocate profits and losses and (2) defendants maintained a controlling interest (51 per cent) in Thunder.  In other words, because the agreement did not provide for precisely *equal* control over the enterprise, defendants argue that they were not part of a joint venture with plaintiffs.

Defendants' rigid analysis mischaracterizes Kanas law.  As the Tenth Circuit has explained, Kansas law does not contemplate a strict, all-or-nothing test for identifying joint ventures.  Id.  (strict three-part test is no longer accurate view of Kansas law).[12]  Accordingly,

---

[12]          Under prior Kansas law, a joint venture required three elements: (1) joint
(continued . . .)

contrary to defendants' assertion, the fact that their interest in Thunder was to be slightly greater than plaintiffs' (by two per cent) is not dispositive.  Id.  The Court must assess the five relevant factors as a whole.  Id.  Applying these factors, the Court finds that the evidence creates a genuine issue of material fact whether plaintiffs and defendants entered into a joint venture.[13]  Specifically, the record contains evidence that plaintiffs and defendants agreed to enter a joint venture to produce Thunder.  In doing so, plaintiffs, Madison and Horsepower maintained considerable control and authority over the direction of the festival, and each had important roles in its production.  Indeed, the purported agreement expressly provides that while Madison would run books, Pipeline would book, market and produce the festival – which it began to do by booking a significant number of artists.  Moreover, the agreement shows that both plaintiffs and defendants would contribute various amounts of capital to the enterprise – which defendants began to do by funding $272,000 for artist fees.  Accordingly, the evidence creates a genuine issue of material fact whether plaintiffs and defendants entered a joint venture and whether defendants therefore owed plaintiffs a fiduciary duty.

### B.     Breach

Defendants assert that even if they owed plaintiffs a fiduciary duty, they did not breach it. Plaintiffs claim that defendants violated their fiduciary by trying to force plaintiffs to accept a new deal after they had entered an agreement, bringing lawsuits against them, sending defamatory

---

[12](. . . continued)
ownership, (2) joint operation and (3) express or implied agreement to share in the profits and losses.  Underground Vaults & Storage, 632 F. App'x at 921.  The Tenth Circuit has held that Kansas law no longer supports this strict formula.  Id.

[13]     Defendants again assert that because the parties contemplated that the transaction would only include Horsepower, Madison cannot be a party to the purported joint venture.  As the Court explained above, however, the agreement explicitly references Madison as a party to the transaction.  Accordingly, like with the agreement itself, the evidence establishes a genuine issue of material fact whether Madison was a party to the joint venture.

letters to artist agencies and stealing their employees.  See Amended Pretrial Order (Doc. #660) at

24.  According to defendants, these actions were in their independent business interest, and

therefore do not constitute breaches of fiduciary duty.

Under Kansas law, all joint venture members owe their co-venturers the "same fiduciary

duty to each other as do partners," which include the duties of loyalty and care.  Pipeline Prods.,

Inc. v. Horsepower Entm't, No. 15-4890-KHV, 2017 WL 4536420, at *3 (D. Kan. Oct. 11, 2017).

This does not mean that Kansas statutes governing partnerships, such as the Kansas Partnership

Act ("KPA"), also govern relationships between parties to a joint venture.  See Kan. Stat. Ann. §

56a-404.  The Court has previously explained that while it "may utilize the same 'rules' that govern

partners to determine rights and liabilities of joint ventures, there is no authority to support a

finding that the *statutes* enacted under the Kansas Partnership Act apply to joint ventures."

Underground Vaults & Storage, Inc. v. Cintas Corp., No. 11-1067-MLB, 2014 WL 4408929, at

*5 (D. Kan. Sept. 8, 2014), aff'd, 632 F. App'x 917 (10th Cir. 2015) (emphasis in original).

Here, defendants rely exclusively on the KPA to argue that they did not breach their

fiduciary duty.  Specifically, defendants point to Section 56a-404(e), which provides that a partner

"does not violate a duty or obligation under this act or under the partnership agreement merely

because the partner's conduct furthers the partner's own interest."  Applying this provision,

defendants argue that because their actions furthered their own interests, they could not constitute

breaches of fiduciary duty.

Defendants' argument not only lacks merit; it would stand on its head any reasonable

construction of the law with respect to fiduciary duty.  As explained above, the KPA does not

govern relationships between parties to a joint venture, and defendants have not offered any

authority to the contrary.  The KPA does not immunize the actions of a joint venturer merely

because that party is acting to benefit its own business. The evidence creates a genuine issue of material fact whether defendants breached fiduciary duties that they owed to plaintiffs. Accordingly, the Court denies summary judgment on the breach of fiduciary claims.

## III.    Fraud (Count III)

Plaintiffs claim that defendants are liable for fraud because when defendants agreed to partner in the production of Thunder, they did not intend to perform. According to plaintiffs, defendants intended to string plaintiffs along until defendants became positioned to achieve a better deal.[14] Defendants assert that they are entitled to summary judgment on plaintiffs' fraud claims because the evidence shows that when the parties entered the alleged agreement, they intended to perform.

Under Kansas law,[15] defendants have a duty to refrain from misrepresenting present facts or intentions, and can be liable for fraud if, at the time of their promise, they had no intention of performing. See Pipeline Prods., 2017 WL 4536420, at *4. To succeed on a claim for fraudulent promises, plaintiffs "must prove more than mere nonperformance" of a contract. Zhu v. Countrywide Realty, Co., 165 F. Supp. 2d 1181, 1204 (D. Kan. 2001)    Plaintiffs must show by clear and convincing evidence that (1) when defendants made their promise to perform, they did not intend to do so (2) defendants did not perform, (3) defendants made the promise with the intent to deceive and for the purpose of inducing plaintiffs to act upon the promise, (4) plaintiffs

---

[14]    Plaintiffs do not specify what kind of deal defendants were trying to achieve. See Amended Pretrial Order (Doc. #660) at 24 (defendants attempting to force plaintiffs to accept a "terrible deal").

[15]    Kansas courts apply the doctrine of *lex loci delicti*, or the law of the place where the tort occurred, in tort actions. Swimwear Sol., Inc. v. Orlando Bathing Suit, LLC, 309 F. Supp. 3d 1022, 1031 (D. Kan. 2018). Here, the parties agree that Kansas law applies to plaintiffs' fraud claims.

reasonably relied and acted upon the promise and (5) plaintiffs sustained damages as a result of their reliance. Sithon Mar. Co. v. Holiday Mansion, No. 96-2262-KHV, 1999 WL 156167, at *7 (D. Kan. Feb. 16, 1999).

Here, plaintiffs allege that when defendants promised to purchase a 51 per cent interest in Thunder, they had no intention of honoring that promise. The record, however, lacks evidence to support plaintiffs' theory. To the contrary, the evidence shows that when defendants made the promise to invest in Thunder, they did intend to perform and in respects, they did perform. For months after the agreement in November of 2014, defendants continued to exert substantial control over the decision-making for Thunder, and contributed significant resources to the enterprise. Between December of 2014 and January of 2015, defendants contributed $272,000 for artist fees, and spent more than $10,000 on continued due diligence. The record contains no evidence that in November of 2014, when defendants made their promise, they did not intend to perform or intended to deceive plaintiffs. Without supporting evidence, plaintiffs' theory is just a theory. Theories do not create genuine issues of material fact for purposes of summary judgment. The Court therefore grants defendants summary judgment on plaintiffs' fraud claims.

## IV.    Tortious Interference (Count IV)

Plaintiffs claim that defendants engaged in tortious interference when they hired away their employees. Defendants assert that they are entitled to summary judgment on the tortious interference claims because plaintiffs no longer had a music festival business for which the employees could work, and defendants did not engage in intentional misconduct when hiring them.

To succeed on a claim for tortious interference with a prospective business advantage under Kansas law,[16] plaintiffs must show (1) a business relationship or expectancy with probable future

---

[16]    In Kansas, the law of the state where plaintiffs felt the wrong governs tortious

-18-

economic benefit to plaintiffs, (2) defendants' knowledge of the relationship or expectancy, (3) that but for defendants' conduct, plaintiffs were reasonably certain to have continued the relationship or realized the expectancy, (4) that defendants engaged in intentional misconduct and (5) plaintiffs sustained direct and proximate damages. Pipeline Prods., 2017 WL 4536420, at *5 (citing Byers v. Snyder, 237 P.3d 1258, 1269 (Kan. App. 2010)). Moreover, plaintiffs must demonstrate that defendants acted with malice, or "with actual evil-mindedness or specific intent to injure." Triple-I Corp. v. Hudson Assocs. Consulting, Inc., 713 F. Supp. 2d 1267, 1286 (D. Kan. 2010).

Here, defendants assert that plaintiffs' tortious interference claim must fail as a matter of law because plaintiffs cannot satisfy several of these elements.[17] Specifically, defendants assert that the evidence shows that (1) but for defendants' conduct, plaintiffs were not reasonably certain to have continued their relationship with the relevant employees, (2) defendants did not engage in intentional misconduct, (3) defendants did not act with malice and (4) plaintiffs did not suffer damages.

---

interference claims. Snyder v. Am. Kennel Club, 661 F. Supp. 2d 1219, 1230 (D. Kan. 2009), aff'd, 402 F. App'x 397 (10th Cir. 2010). Here, the parties agree that Kansas law applies.

[17] In addition, defendants apparently assert that only KWS can be liable for tortious interference because only KWS hired the employees in question. The record, however, contains evidence that defendants used Madison and Horsepower to solicit plaintiffs' employees. See Drafting Consulting Agreement (Doc. #689-20). This evidence creates a genuine issue of material fact whether Madison and Horsepower participated in stealing plaintiffs' employees.

Defendants also assert that Kansas' statute of limitations bars the tortious interference claims against Kaaboo, KDM, KaabooWorks, KWS and WarDawgz. In its prior order on defendants' motion to dismiss, the Court dismissed these claims. See Memorandum And Order (Doc. #712) at 24.

### A.     Continued Relationship

Defendants assert that as a matter of law, plaintiffs were not reasonably certain to continue their relationship with Prenger, Pilsl, Wingerd and Gustafson absent interference by defendants. According to defendants, these employees could not have continued their relationships with plaintiffs because Thunder had collapsed, and plaintiffs could not maintain their musical festival business. In other words, defendants assert that Prenger, Pilsl, Wingerd and Gustafson could not have continued to work for plaintiffs because their music festival business fell apart for reasons unrelated to defendants.[18]

Defendants' argument is unpersuasive. The record contains evidence that one reason plaintiffs had to quit the music festival business was that defendants took their employees. Accordingly, it is circular to argue that because plaintiffs went out of the music festival business, plaintiffs lacked a reasonable expectation of continuing their relationships with their employees. The record contains sufficient evidence to create a genuine issue of material fact whether but for defendants' actions, plaintiffs were reasonably certain to have continued their relationship with their employees.

### B.     Intentional Misconduct

Defendants assert that as a matter of law, they did not engage in intentional misconduct. Specifically, defendants argue that their actions constitute lawful competition, which does not satisfy the misconduct element under Kansas law.

---

[18]     Defendants also assert that plaintiffs could not have continued their relationship with Prenger because they fired him before he officially started working for defendants. The record contains evidence, however, that defendants began to engage Prenger before this termination. See Draft Consulting Agreement (Doc. #689-20). This evidence creates a genuine issue of material fact whether Prenger would have continued working for plaintiffs but for defendants' conduct.

Generally, allegations of "intent to do a harmful act without reasonable justification" satisfy the intentional misconduct element. Pipeline Prods., 2017 WL 4536420, at *5 (citing Linden Place, LLC, v. Stanley Bank, 167 P.3d 374, 380 (Kan. App. 2007)). When plaintiffs and defendants are business competitors, however, defendants can avoid liability by satisfying a series of requirements.[19] U.S. Transp., Inc. v. Torley, No. 08-1403-MLB, 2011 WL 3704723, at *5 (D. Kan. Aug. 23, 2011). One such requirement is that defendants did not employ "wrongful means." Id. at 6. The Tenth Circuit has defined "wrongful means" as independently actionable conduct, or conduct which itself could form the basis for liability. Id.

Nothing in the record suggests that for purposes of this particular tortious interference claim, plaintiffs and defendants were "competitors." Even if they were, the record contains evidence that defendants engaged in independently actionable conduct by breaching their fiduciary duty to plaintiffs. See Ayres v. AG Processing Inc., 345 F. Supp. 2d 1200, 1214 (D. Kan. 2004) (independently actionable conduct includes breach of fiduciary duty). As explained above, the evidence creates a genuine issue of material fact whether defendants breached a fiduciary duty by hiring away plaintiffs' employees. Accordingly, the evidence also creates a genuine issue of material fact whether defendants engaged in intentional misconduct for purposes of the tortious interference claim.

## C. Malice

Defendants assert that as a matter of law, they did not act with malice when hiring plaintiffs' employees. According to defendants, they did not intend to injure plaintiffs, but simply

---

[19] These requirements come from Restatement (Second) of Torts § 768. Although the Kansas Supreme Court has not yet addressed the issue, the Tenth Circuit has determined that the Kansas Supreme Court would apply these requirements in competitor cases. See DP-Tek, Inc. v. AT & T Global Info. Solutions Co., 100 F.3d 828, 832 (10th Cir. 1996).

desired the skill and expertise of Prenger, Pilsl, Wingerd and Gustafson for their own music festival business.

Contrary to their assertion, the record contains evidence that defendants intended to injure plaintiffs' music festival business when they hired away plaintiffs' employees. Defendants were soliciting Prenger as early as March of 2015. Although defendants dispute that the Thunder agreement was enforceable at that time, negotiations were still in progress, and defendants had already begun partial performance by, among other things, supplying $272,000 for artist fees and exerting substantial control over decision-making for the festival. Shortly after engaging Prenger, defendants sent plaintiffs a materially different agreement, refused to further perform and hired more of plaintiffs' employees. This evidence creates a genuine issue of material fact whether defendants acted with malice toward plaintiffs. Defendants' belief that Prenger, Pilsl, Wingerd and Gustafson could help their business does not establish good faith as a matter of law. Defendants are not entitled to summary judgment on this issue.

### D. Damages

Defendants assert that as a matter of law, any tortious intereference did not cause damages to plaintiffs. As to Prenger, Pilsl and Wingerd, defendants invoke the same argument that the Court has already rejected – that because Prenger, Pilsl and Wingerd could not help plaintiffs produce music festivals, plaintiffs did not suffer damages when they lost these employees. As the Court explained above, defendants have not cited any authority for the proposition that they can escape liability for tortious interference through the tortious interference itself. The evidence establishes a genuine issue of material fact whether plaintiffs' suffered damages when defendants' hired away Prenger, Pilsl and Wingerd. The same is true for Gustafson. Mosiman testified that it

cost approximately $4,500 to train Gustafson's replacement. Accordingly, the Court denies defendants' motion for summary judgment on the tortious interference claims.

## V.    Successor Liability (Count V)

Plaintiffs claim that as successors to Madison and Horsepower, Kaaboo, KDM, KaabooWorks, KWS and WarDawgz are liable for Madison and Horsepower's actions. Defendants assert that they are entitled to summary judgment on plaintiffs' successor liability claim because as a matter of law, Kaaboo, KDM, KaabooWorks, KWS and WarDawgz are not successors to Madison and Horsepower. Defendants do not cite a single piece of evidence on the issue of successor liability, but simply refer the Court to arguments in support of their prior motion to dismiss – which the Court already denied. See Memorandum And Order (Doc. #712) filed December 19, 2019.

For purposes of summary judgment, defendants have the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp., 477 U.S. at 323; Nahno-Lopez, 625 F.3d at 1283. It is not the Court's responsibility to comb through the evidence to determine whether such an issue exists. Accordingly, defendants have not shown that they are entitled to summary judgment on issue whether Kaaboo, KDM, KaabooWorks, KWS and WarDawgz are liable as successors to Madison and Horsepower.

## VI.    Damages

Plaintiffs seek to recover damages for attorneys' fees, Mosiman's personal debt and punitive damages. Defendants assert that under Kansas law, plaintiffs cannot recover such damages.[20]

---

[20]    Defendants also assert that plaintiffs cannot recover for damages suffered by non-parties, which are part of plaintiffs' expert valuations of their music festival business. This issue

(continued . . .)

### A.     Attorneys' Fees

Plaintiffs seek to recover the attorneys' fees that they incurred in this case and others. Defendants assert that as a matter of law, Kansas law bars such damages.

Defendants first argue that plaintiffs cannot recover attorneys' fees for this case.  Under Kansas law, the Court may not award attorney fees unless a statute authorizes the award or an agreement between the parties allows it.  See Snider v. Am. Family Mut. Ins. Co., 297 Kan. 157, 162 (2013).  Here, neither exception applies.  Accordingly, plaintiffs cannot recover for such attorneys' fees. The Court grants defendants summary judgment on this issue.

Plaintiffs also seek to recover for the attorneys' fees that they expended to defend lawsuits in Delaware and Colorado.  Plaintiffs claim that the lawsuits were frivolous, and they seek to recover attorneys' fees which they incurred before the courts in those jurisdictions dismissed the cases for lack of personal jurisdiction.  Plaintiffs have not asserted a claim for malicious prosecution or otherwise alleged how such fees would be recoverable in this case.  Accordingly, the Court grants summary judgment on this issue.

### B.     Punitive Damages

 Defendants assert that they are entitled to summary judgment on all punitive damage claims.  To recover punitive damages in a breach of contract action under Kansas law, plaintiffs must prove an independent tort which results in additional injury.  Underground Vaults & Storage, 2014 WL 4408929, at *5.  Punitive damages "punish the wrongdoer for his malicious, vindictive

---

[20](. . . continued)
is the subject of pending motions: Defendants' Motion To Exclude Testimony Of Plaintiffs' Expert Steven L. York (Doc. #716) filed December 23, 2019 and Defendants' Motion To Exclude Testimony Of Plaintiffs' Expert A.J. Wasson (Doc. #715) filed December 23, 2019.  The Court will address those issues at the hearing on January 15, 2020, and therefore defers any further analysis in the summary judgment context.

or willful and wanton invasion of another's rights, with the ultimate purpose being to restrain and deter others from the commission of similar wrongs." Brand v. Mazda Motor Corp., 978 F. Supp. 1382, 1393 (D. Kan. 1997). Defendants display wantonness when they realize that their acts place others in imminent danger or risk of injury, but fail to prevent such injury because of indifference to whether the injury occurs. Id. By statute, Kansas law requires plaintiffs to prove by clear and convincing evidence that defendants acted with willful or wanton conduct. Id. (citing K.S.A. § 60-3701(c)).

Here, the evidence creates a genuine issue of material fact whether plaintiffs can recover punitive damages. Contrary to defendants' characterization, this is more than just an action for breach of contract. Plaintiffs have brought multiple tort claims, including one for tortious interference. As explained above, the record reveals a genuine issue of material fact whether defendants engaged in tortious interference by maliciously hiring away plaintiffs' employees. The Court therefore denies defendants' summary judgment on this issue.

### C.    Mosiman's Personal Debts

Plaintiffs seek to recover Mosiman's personal debts, which allegedly total more than $4,000,000. Mosiman is no longer a plaintiff, so he cannot recover for his debts. The two remaining plaintiffs – Backwood and Pipeline – have not advanced any legal theory which would allow them to recover for Mosiman's personal debts. See Cochrane v. Schneider Nat. Carriers, Inc., 980 F. Supp. 374, 378 (D. Kan. 1997) (loss to non-parties irrelevant to plaintiffs' damages). Accordingly, the Court grants defendants summary judgment on this issue.

**IT IS THEREFORE ORDERED** that Defendants' Motion For Summary Judgment (Doc. #663) filed November 18, 2019 is **SUSTAINED in part**. The Court grants defendants summary judgment on plaintiffs' fraud claims (Count III), along with plaintiffs' damage claims

for attorneys' fees and Mosiman's personal debts.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion To Reconsider Orders 700 and 708 (Doc. #710) filed December 8, 2019 is **OVERRULED.**

The following claims remain for trial on February 3, 2020: claims of Backwood and Pipeline against Madison and Horsepower for breach of contract (Count I), breach of fiduciary duty (Count II), and tortious interference (Count IV), claims of Backwood and Pipeline against Kaaboo, KDM, KaabooWorks, KWS and WarDawgz for alter ego and successor liability (Count V), and counterclaims of Madison and Horsepower against Pipeline, Backwood, Mosiman and OK Productions for breach of contract, promissory estoppel and unjust enrichment.

Dated this 9th day of January, 2019 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge